David A. Foraker, OSB #812280
Greene & Markley, P.C.
1515 SW Fifth Avenue, Suite 600
Portland, OR 97201
Telephone:  (503) 295-2668
Facsimile:   (503) 224-8434
E-mail: david.foraker@greenemarkley.com

Attorneys for Debtor

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF OREGON

| | |
|---|---|
| In re | ) |
| | ) Case No. 14-30037-rld11 |
| Altrec, Inc., a Delaware corporation, | ) |
| | ) Chapter 11 |
| Debtor. | ) |
| | ) DEBTOR'S MOTION FOR ORDERS (1) |
| | ) AUTHORIZING AND SCHEDULING |
| | ) AN AUCTION FOR THE SALE OF |
| | ) SUBSTANTIALLY ALL ASSETS OF |
| | ) THE DEBTOR FREE AND CLEAR OF |
| | ) LIENS AND OTHER INTERESTS, (2) |
| | ) APPROVING SALE PROCEDURES, (3) |
| | ) APPROVING PROCEDURES FOR |
| | ) ASSUMPTION AND ASSIGNMENT OF |
| | ) EXECUTORY CONTRACTS AND |
| | ) UNEXPIRED LEASES, (4) DIRECTING |
| | ) APPOINTMENT OF CONSUMER |
| | ) PRIVACY OMBUDSMAN, (5) |
| | ) APPROVING PURCHASE |
| | ) AGREEMENT OR SUBSEQUENT |
| | ) OVERBID, (6) SCHEDULING A |
| | ) HEARING TO CONSIDER APPROVAL |
| | ) OF THE SALE, AND (7) |
| | ) ESTABLISHING THE FORM AND |
| | ) MANNER OF NOTICES RELATED |
| | ) THERETO |
| | ) |
| | ) EXPEDITED HEARING REQUESTED |

Altrec, Inc. (the "Debtor"), as debtor in possession, hereby moves this Court for the entry of orders: (a) authorizing and scheduling an auction (the "Auction") to sell substantially all assets of the Debtor (the "Assets") free and clear of liens and other interests (the "Sale"); (b) establishing reasonable and necessary bidding procedures in connection with the Sale and the Auction (the "Sale Procedures"); (c) approving procedures for the assumption and assignment of executory contracts and unexpired leases (the "Assumption and Assignment Procedures"); (d) directing the United States trustee to appoint a consumer privacy ombudsman; (e) approving the Sale pursuant to (i) that certain Asset Purchase Agreement dated January 13, 2014, by and between the Debtor and Great Outdoors Holdco, LLC (the "Purchaser"), a copy of which, exclusive of the disclosure schedules, is attached hereto as <u>Exhibit A</u> (the "Purchase Agreement") or (ii) a higher and better offer received at the Auction; (f) scheduling a final hearing to consider approval of the Sale (the "Sale Hearing"); and (g) establishing the form and manner of notices related thereto. In support of this motion, the Debtor represents:

<u>Background</u>

1.      On January 6, 2014 (the "Petition Date"), the Debtor filed herein a voluntary petition under Chapter 11 of the Bankruptcy Code. As of the date hereof, no trustee or examiner has been requested or appointed and no official committee of creditors has been appointed.

2.      The Debtor is a Delaware corporation headquartered in Redmond, Oregon that is engaged in the business of retailing premium outdoor adventure apparel and recreational gear through Altrec.com and providing relevant outdoor content, adventure articles and outdoor news through GreatOutdoors.com. The Debtor generates most of its revenues through the Altrec.com website, which was launched in March 1999. In addition to the Altrec.com and GreatOutdoors.com websites, the Debtor sells certain merchandise on Amazon.com's marketplace and operates a store on eBay. The Debtor's database includes information on approximately 2.8 million customers and it regularly sends targeted emails announcing product

offerings, promotions and inspirational content to more than 900,000 of these customers. Its product offerings include leading outdoor brands such as The North Face, Patagonia, Oakley, Burton, Keen, Arc'teryx, Mountain Hardware, Merrill, ASICS, Black Diamond, and others. The Debtor is taxed as a C corporation for federal income tax purposes.

3.      On December 12, 2013, Clyde A. Hamstreet & Associates, LLC ("Hamstreet") was appointed as general receiver (the "Receiver") for the Debtor in a civil action pending in the Circuit Court of the State of Oregon for the County of Deschutes entitled <u>Dale Stockamp, et al.</u> <u>v. Altrec, Inc., et al.,</u> Case No. 13CV1467FC. On or about December 23, 2013, while serving as Receiver, Hamstreet accepted a proposal from the Purchaser's parent company, Remington Outdoor Company ("Remington"), under which Remington or an affiliate of Remington would act as the "stalking horse" bidder in a section 363 sale process and would provide a secured DIP loan facility for up to $1 million to support the Debtor's operations during the sale process and to partially fund the expenses of the Chapter 11 case. Prior to the Receiver's appointment, the Debtor's management had approached a large number of potential investors and/or prospective purchasers of the Debtor's business. Effective as of January 8, 2014, under this Court's order of January 13, 2014 [ECF Doc #66], the Receiver turned over the Debtor's assets to the Debtor and the Debtor engaged Hamstreet as its Chief Restructuring Officer on an interim basis.

Jurisdiction

4.      This Court has jurisdiction over this matter pursuant to 28 USC §§ 157 and 1334 and LR 2100.1. Consideration of this motion constitutes a core proceeding within the meaning of 28 USC § 157(b)(2). The statutory predicates for the relief sought by this motion are sections 105, 363 and 365 of the Bankruptcy Code. This motion is also governed by Bankruptcy Rules 2002, 6004, 6006 and 9007 and LBR 2002-1. Venue is proper under 28 USC § 1408.

<u>Relief Requested</u>

5.     By this motion, the Debtor seeks entry of: (i) an order in the form attached hereto as <u>Exhibit B</u> (the "Sale Procedures Order") that will, among other things, establish rules by which prospective bidders can qualify to participate at the Auction, schedule the date and time of the Auction, establish rules to govern the Auction, schedule the Sale Hearing, approve the Purchaser's right to be reimbursed for certain expenses (subject to a cap of $250,000) in the event there is an overbid and it is not the successful bidder at the Auction, and approve notice procedures relating to the Sale; (b) an order directing the United States trustee to appoint a consumer privacy ombudsman under section 332 of the Bankruptcy Code; and (iii) an order substantially in the form attached hereto as <u>Exhibit C</u> (the "Sale Order") approving the Sale to the Purchaser or, if an Auction is conducted, to the successful bidder at the Auction.  The Debtor requests that the Court hold an expedited hearing on this motion for the purposes of considering and acting on this motion to the extent it seeks entry of the Sale Procedures Order and of an order directing the appointment of a consumer privacy ombudsman.

<u>Summary of Material Terms of Purchase Agreement</u>

6.     The following is a summary of the basic terms of the sale transaction contemplated by the Purchase Agreement:

(a)     Purchaser will purchase substantially all of the Debtor's assets, for (i) $3,250,000, subject to adjustment, and (ii) the assumption of the Assumed Liabilities[1] (as defined below), if any (the "Purchase Price").

(b)     The Purchase Price will be payable as follows:  (i) $2,750,000, subject to adjustment, in cash at Closing ("Closing Cash Consideration"), and (ii) $500,000, subject to

---

[1] The description of the Purchase Agreement contained in this motion is a summary only and should not be construed as modifying or limiting the terms of the Purchase Agreement.  In the event of a conflict between the description in this motion and the Purchase Agreement, the provisions of the Purchase Agreement shall govern. Capitalized terms used but not defined herein have the meaning ascribed to them in the Purchase Agreement.

adjustment, in cash one hundred eighty (180) days after the Closing ("Post-Closing Cash

Consideration"). As a condition of the Sale, $250,000 of the Purchase Price will be set aside for

the benefit of the Debtor's estate.

(c)     The amount of the Closing Cash Consideration will be reduced on a dollar

for dollar basis by the amount of all advances under the DIP Facility, and, pursuant to the terms

of the DIP Facility, the Debtor's obligation to repay such amounts shall be forgiven.

(d)     The amount of the Post-Closing Cash Consideration to be paid to the

Debtor will be reduced on a dollar for dollar basis by (i) the amount of all returns and warranty

claims honored by Purchaser and relating to the pre-Closing operations of the Debtor's business,

(ii) all costs of cure paid or payable by Purchaser relating to executory contracts and unexpired

leases that are assigned to Purchaser, (iii) the amount by which the Closing Working Capital is

less than the agreed Target Working Capital, and (iv) the amount of any damages for which any

Indemnified Party is entitled to be indemnified by the Debtor.

(e)     The Purchased Assets are defined to include all tangible and intangible

assets of the Debtor used in the operation of the Debtor's business (other than such assets as

Purchaser determines in the course of its due diligence review, to be identified and scheduled as

of the Closing, including all contracts and leases not specifically identified for assumption and

assignment), including (without limitation) inventory, equipment, intellectual property, software,

customer lists, and contracts and leases. The Excluded Assets are defined to include, among

other property, (i) all claims of the Debtor and its bankruptcy estate under Chapter 5 of the

Bankruptcy Code, and (ii) all amounts that may be due to the Debtor as a result of the Payment

Card Interchange Fee and Merchant Discount Antitrust Litigation.

(f)     The Purchased Assets will be transferred to Purchaser free and clear of all

liens pursuant to section 363(f) of the Bankruptcy Code, and to the extent that the Purchased

Assets include executory contracts or unexpired leases, those contracts and leases will be

assumed and assigned pursuant to section 365 of the Bankruptcy Code. The Purchase Agreement also includes a mechanism by which Purchaser may designate additional executory contracts and/or unexpired leases for assumption for a period of 60 days after the Closing Date.

(g)     Purchaser will assume the Debtor's liabilities for (i) obligations (other than cure costs) under assumed executory contracts and unexpired leases to the extent they are required to be performed after the Closing Date, and (ii) certain returns and warranty claims against the Debtor relating to pre-Closing operations of the Debtor's business (such obligations and claims, collectively, the "Assumed Liabilities"). Purchaser will not assume any liabilities or obligations of the Debtor, whether currently known or unknown, other than the Assumed Liabilities. Purchaser will not be deemed, as a result of any action taken in connection with the Agreement, to (i) be the successor of Debtor, (ii) have, de facto or otherwise, merged with or into Debtor, (iii) be a mere continuation or substantial continuation of Debtor or the enterprise of Debtor, or (iv) be responsible for any liability of Debtor or for payment of any benefit accruing to Debtor.

(h)     The obligations of Debtor and Purchaser under the Purchase Agreement are conditioned on approval of this Court and various other conditions.

<u>Proposed Sale Procedures</u>

7.     The following is a summary of the proposed Sale Procedures:

(a)     The Debtor will consider timely alternative bids (each an "Alternative Bid") submitted by interested parties other than Purchaser. All Alternative Bids must be received not later than 11:00 a.m. (Pacific Time) on February 6, 2014 (the "Alternative Bid Deadline") by the Debtor's counsel.

(b)     The Debtor will consider an Alternative Bid only if the Alternative Bid is a "Qualified Alternative Bid." To be a Qualified Alternative Bid, the Alternative Bid must:

(i)  identify the proponent of the Alternative Bid and an officer or employee who is authorized to appear, act on behalf of and bind the bidder;

(ii)  contain a signed definitive agreement of purchase and sale (together with a copy of the signed agreement that is marked to show changes from the Purchase Agreement) with, at minimum, the following requirements:  (A) substantially identical terms and conditions as the Purchase Agreement except with higher or better consideration; and (B) terms and conditions no less favorable to the bankruptcy estate than the terms and conditions in the Purchase Agreement (provided that no Qualified Alternative Bid shall provide for the payment to such bidder of any breakup fee, topping fee, expense reimbursement, or other similar arrangement);

(iii)  agree that the purchase price shall be at least $3,625,000 (i.e., $375,000 more than the Purchase Price contained in section 1.05 of the Purchase Agreement executed by Purchaser), and that the purchase price will be paid in cash;

(iv)  be accompanied by a deposit in the form of cash, cashier's check or letter of credit issued by a federal or state chartered domestic bank in the amount of $500,000, refundable in the event the bidder is not the Successful Bidder at the Auction (as defined below);

(v)  be accompanied by financial information for the bidder sufficient to enable the Debtor to determine the bidder's creditworthiness and ability to close a sale of the Assets, including information sufficient to demonstrate the bidder's ability to provide adequate assurance of future performance of obligations under any executory contracts or unexpired leases to be assumed and assigned to the bidder;

(vi)  not be conditional on the outcome of any unperformed due diligence by the bidder, the receipt of equity or debt financing, or the approval of the bidder's board of directors, shareholder, or other corporate approval; and

(viii)  by its terms, remain open and irrevocable through the conclusion of the Sale Hearing, unless extended by agreement of the parties.

(c)    If the Debtor receives a Qualified Alternative Bid, the Debtor will conduct an auction (the "Auction") at the offices of Greene & Markley, P.C., on the business day immediately prior to the Sale Hearing, beginning at 9:00 am (Pacific time) or such later time and/or other place as the Debtor shall notify all bidders who have submitted Qualified Alternative Bids (such persons together with the Purchaser are referred to as "Qualified Bidders").  The following procedures will apply:

(i)  Only representatives and professional advisors of the Debtor, Qualified Bidders, secured creditors, any official committee of unsecured creditors and other persons authorized by the Court will be entitled to attend the Auction, and only Qualified Bidders will be entitled to participate and make any additional bids ("Subsequent Bids") at the Auction.

(ii)  All Qualified Bidders will be entitled to be present for all bidding with the understanding that the identity of each bidder will be fully disclosed to all other bidders and that all material terms of each bid will be fully disclosed to all other bidders throughout the entire Auction.

(iii)  At least two days prior to the Auction, the Debtor will give all Qualified Bidders a copy of the highest and best Qualified Alternative Bid received and copies of all other Qualified Alternative Bids.  In addition, the Debtor will inform each Qualified Bidder that has expressed its intent to participate in the Auction of the identity of all Qualified Bidders that may participate in the Auction.

(iv)  Prior to the start of the Auction, the Debtor may announce at the Auction additional procedural rules for conducting the Auction that the Debtor determines to be reasonable under the circumstances (e.g., the amount of time allotted to make subsequent alternative bids), so long as such rules are not inconsistent with the Bidding Procedures.

(v)  At the Auction, bidding will begin with the highest Qualified Alternative Bid and continue in minimum increments of at least $100,000 higher than the previous highest bid.

(vi)  The Auction will continue in one or more rounds of bidding and will conclude after each participating bidder has had the opportunity to submit an additional Subsequent Bid with full knowledge and written confirmation of the then-existing highest bid, signed by the Debtor's counsel and identifying the party making the then-highest bid.

(vii)  For the purpose of evaluating the value of the consideration provided by each Subsequent Bid (including any Subsequent Bid by Purchaser), the value will be the net consideration payable to the Debtor after giving effect to the Expense Reimbursement that may be payable to Purchaser under the Purchase Agreement.

(viii)  At the conclusion of the bidding, the Debtor will announce the winning bidder (the "Successful Bidder").

(ix)  The Debtor, in consultation with its professionals, will determine in its sole discretion whether an Alternative Bid meets the qualifications for a Qualified Alternative Bid described herein and in the order approving these procedures and whether a Qualified Alternative Bid or Subsequent Bid constitutes the highest and/or best offer for the Assets.

(x)  The highest and/or best offer as determined by the Debtor will be submitted to the Bankruptcy Court for approval at the Sale Hearing.  Purchaser will be deemed a party-in-interest with standing to appear and be heard in connection with any motions, hearings, or other proceedings relating to the Sale, including the Purchase Agreement and any Qualified Alternative Bid or Subsequent Bid.

(xi)  If the Debtor does not receive any Qualified Alternative Bids, no Auction will be held, Purchaser will be declared the Successful Bidder, and the Debtor will report to the Bankruptcy Court and present the Sale Order for entry by the Court at the Sale

Hearing approving the sale of the Assets to Purchaser in accordance with the terms of the Purchase Agreement. No potential purchaser of any of the Debtor's assets will be entitled to object to entry of the Sale Order at the Sale Hearing unless the potential purchaser timely submitted a Qualified Alternative Bid.

<u>Proposed Assumption and Assignment Procedures</u>

8.    The following is a summary of the proposed Assumption and Assignment Procedures:

(a)    Pursuant to the Purchase Agreement, Purchaser will, on or before the Alternative Bid Deadline, submit to the Debtor the list of the executory contracts and unexpired leases that Purchaser proposes the Debtor assume and assign to it; and each bidder submitting an Alternative Bid must submit with its Alternative Bid on or before the Alternative Bid Deadline the list of the executory contracts and unexpired leases that it proposes that the Debtor assume and assign to it. The Debtor will maintain a schedule (the "Schedule") of executory contracts (the "Assumed Contracts") and unexpired leases (the "Assumed Leases") that Purchaser or a Successful Bidder (if applicable) designates for assumption and assignment.

(b)    For each Assumed Contract and Assumed Lease, the date on which Purchaser (or a Successful Bidder, if applicable) seeks to have the assumption and assignment become effective will be the closing date pursuant to the terms of the Purchase Agreement (the "Proposed Assumption Effective Date").

(c)    By the date to be fixed by the Court in the Sale Procedures Order, the Debtor will provide notice (the "Assumption and Assignment Notice") to each non-debtor counterparty to an Assumed Lease or Assumed Contract that Purchaser designates for assumption and assignment, substantially in the form attached to the Sale Procedures Order as Exhibit E, that (i) identifies the proposed amount to be paid to such counterparty to cure all defaults under such agreement that are required to be cured pursuant to section 365 of the

Bankruptcy Code as a prerequisite to assumption (together with the timing of such payments, if any), and (ii) describes the procedures for objecting to the proposed assumption and assignment of the agreement.

(d)     Purchaser's promise to perform from and after the Closing Date with respect to Assumed Contracts and Assumed Leases shall be the only adequate assurance of future performance provided to satisfy the requirements of section 365 of the Bankruptcy Code.

(e)     Objections, if any, to the proposed assumption and assignment of any Assumed Contract or Assumed Lease to Purchaser must be made in writing and filed with the Court no later than a date to be fixed by the Court in the Sale Procedures Order (the "Purchaser Contract Objection Deadline").

(f)     Any counterparty to an executory contract or unexpired lease that does not file and serve an objection to assignment (a "Contract Objection") before the Purchaser Contract Objection Deadline will be deemed to have consented to the assumption and assignment of its Assumed Contract or Assumed Lease to Purchaser and the cure of existing defaults and shall be forever barred from objecting to the cure and from asserting any additional cure or other amounts against the Debtor or Purchaser.  In that event, the Debtor and Purchaser may provide in the Sale Order for the assumption and assignment of the applicable Assumed Contract or Assumed Lease to Purchaser and for payment of the cure amount, if any, specified in the Assumption and Assignment Notice, all without further notice to that counterparty.

(g)     If Qualified Alternative Bids are received by the Debtor, and Purchaser is not the Successful Bidder at the Auction, the Debtor will provide an amended Assumption and Assignment Notice to each non-Debtor counterparty to an Assumed Contract or Assumed Lease designated by the Successful Bidder for assumption and assignment, identifying the Successful Bidder, and providing information to the non-debtor counterparties regarding the ability of the Successful Bidder to provide adequate assurance of future performance as required by section

365 of the Bankruptcy Code. Objections, if any, to the proposed assumption and assignment of any Assumed Contract or Assumed Lease to a Successful Bidder (other than Purchaser) must be made in writing and filed with the Court on a date to be fixed by the Court at the Sale Hearing.

(h)    If a timely Contract Objection is filed solely as to the proposed cure (a "Cure Objection"), and Purchaser is the purchaser, the cure amount will be determined by the Court at the Sale Hearing, unless otherwise agreed by the Debtor and Purchaser. If a timely Cure Objection is filed and Purchaser is not the purchaser, then the agreement may nevertheless be assumed and assigned to the Successful Bidder on the Proposed Assumption Effective Date, and the Successful Bidder will pay the undisputed portion of the cure on or as soon as reasonably practicable after the Proposed Assumption Effective Date, and the disputed portion of the cure will be determined and paid as soon as reasonably practicable following resolution of such disputed cure. To resolve the Cure Objection, the Debtor, the Successful Bidder, and the objecting party may confer in good faith to attempt to resolve any such objection without Court intervention. If the Debtor determines that the Cure Objection cannot be resolved without judicial intervention, then the cure will be determined as follows: (i) with respect to Assumed Contracts and Assumed Leases pursuant to which the counterparty has agreed to an alternative dispute resolution procedure, then, according to such procedure; and (ii) with respect to all other executory contracts and unexpired leases, by the Court at the discretion of the Debtor either at the Sale Hearing or such other date as determined by the Court.

(i)    If a timely Contract Objection is filed that objects to the assumption and assignment on a basis other than the proposed cure, the Debtor, the Successful Bidder, and the objecting counterparty shall confer in good faith to attempt to resolve any such objection without Court intervention. If the Debtor determines that the objection cannot be resolved without judicial intervention, then, if Purchaser is the purchaser, the objection will be resolved by the Court at the Sale Hearing unless otherwise agreed by the Debtor and Purchaser. If the

Successful Bidder is not Purchaser, at the discretion of the Debtor and the Successful Bidder, the objection will be determined by the Court at the Sale Hearing or such other date as determined by the Court. If the Court determines at such hearing that the executory contract or unexpired lease should not be assumed and assigned, then such agreement will no longer be considered an Assumed Contract or Assumed Lease.

(j)    Each Assumed Contract and Assumed Lease will be assumed and assigned to Purchaser or the Successful Bidder (as applicable) on the date (the "Assumption Effective Date") that is the later of (i) the Proposed Assumption Effective Date, and (ii) the Assumption Resolution Date (as defined below). The "Assumption Resolution Date" shall be, (i) if no Contract Objection has been filed on or prior to the Contract Objection Deadline, the business day after the Contract Objection Deadline, or (ii) if a Contract Objection has been filed on or prior to the Contract Objection Deadline, the date of the Assumption Resolution Stipulation or the date of a Court order authorizing the assumption and assignment to Purchaser or the Successful Bidder (as applicable) of the Assumed Contract or Assumed Lease.

Points and Authorities

A.  Sale of Substantially All Assets Under Section 363

9.    Section 363 of the Bankruptcy Code provides authority for a debtor in possession "after notice and a hearing, [to] use, sell or lease, other than in the ordinary course of business, property of the estate." 11 USC § 363(b)(1). This provision generally allows a debtor in possession (subject to court approval) to sell property of the estate outside the ordinary course of business where the proposed sale is a sound exercise of the debtor's business judgment and when the sale is proposed in good faith and for fair value. *See Committee of Equity Security Holders v. Lionel Corporation (In re Lionel Corp.)*, 722 F2d 1063, 1070 (2d Cir 1983); *In re Ernst Home Ctr., Inc.*, 209 BR 974, 980 (Bankr WD Wash 1997). When a trustee or debtor articulates a reasonable basis for its business decisions, the "court will generally not entertain objections to

the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 BR 612, 616 (Bankr SDNY 1986).

10.    The authority to sell assets conferred upon a debtor in possession by section 363(b) "include[s] a sale of substantially all the assets of an estate." *Otto Preminger Films, Ltd. v. Qintex Entm't, Inc. (In re Qintex Entm't, Inc.)*, 950 F2d 1492, 1495 (9th Cir 1991). Further, section 105(a) allows the court to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title."

11.    A bankruptcy court's power to authorize a sale under section 363(b) is to be exercised at the court's discretion. *In re WPRV-TV*, 983 F2d 336, 340 (1st Cir 1993); *New Haven Radio, Inc. v. Meister (In re Martin-Trigona)*, 760 F2d 1334, 1346 (2d Cir 1985); *Lionel*, 722 F2d at 1069; *Stephens Indus., Inc. v McClung*, 789 F2d 386, 390-91 (6th Cir 1986).

12.    Courts within the Ninth Circuit have authorized a sale of all or substantially all of a debtor's assets pursuant to section 363 when there is a good business reason for so doing. *See, e.g., In re Am. Dev. Corp.*, 95 BR 735, 739 (Bankr CD Cal 1989) (among the factors that determines whether a good business reason exists is whether the sale is in the best interests of the estate's creditors); *In re Photocopy & Supply, Inc.*, 1994 WL 553065 at 1 (Bankr. D. Idaho 1994) (a sale of substantially all of the debtor's assets was authorized, in the absence of a reorganization plan, when justified by a good business reason); *see also In re Martin*, 91 F3d 395 (3d Cir 1996); *Lionel*, 722 F2d at 1071; *In re Titusville Country Club*, 128 BR 396 (Bankr WD Pa 1991).

13.    Courts have also required that the debtor provide reasonable and adequate notice of the sale, that the sale price be fair and reasonable, and that the sale be the result of good faith negotiations with the buyer. *See, e.g., In re Ewell*, 958 F2d 276 (9th Cir 1992) (declining to set aside or modify a sale pursuant to 11 USC § 363 because the price was fair and reasonable and the buyer was a good faith purchaser pursuant to 11 USC § 363(m)); *In re King-Wilson*, 1998 US

Dist LEXIS 16595 at *11-12 (ND Cal Oct. 13, 1998); *In re Canyon P'ship*, 55 BR 520 (Bankr

SD Cal 1985); *see also In re Abbotts Dairies of Pa.*, 788 F2d 143, 147-50 (3d Cir 1986): *In re*

*Tempo Tech. Corp.*, 202 BR 363, 367 (D Del 1996), *aff'd sub nom. Diamond Abrasives Corp. v.*

*Temtechco, Inc. (In re Temtechco, Inc.)*, 141 F3d 1155 (3d Cir 1998).

14.     In *Lionel*, the Second Circuit Court of Appeals held that the standard for the

proper exercise of the debtor's discretion is a good business reason. *Id.* at 1071. The court

adopted, in part, the following criteria for evaluating whether a good business reason exists for

authorizing a sale of substantially all of the assets of a debtor:

    (1)    The proportionate value of the asset to the estate as a whole;

    (2)    The amount of elapsed time since the filing of the petition;

    (3)    The likelihood that a plan will be proposed and confirmed in the near

    future;

    (4)    The effect of the proposed disposition on future plans of reorganization;

    and

    (5)    Most importantly, whether the assets to be sold are decreasing or

    increasing in value.

15.     The Debtor respectfully submits that the proposed sale of substantially all of the

Debtor's assets as set forth herein is entirely consistent with the guidelines set forth in *Lionel* and

applicable law.  A prompt sale will maximize the amount that the Debtor, its estate and its

creditors may realize for the value of the assets.  The terms and conditions of the Auction and the

Sale Procedures are fair and reasonable and in the best interest of the Debtor, its creditors, and

the estate.  The proposed sale should, therefore, be approved.

16.     Moreover, the Purchase Agreement is the product of substantial good faith, arms'-

length negotiations between the Debtor and Purchaser.  The price and the form and structure of

the proposed sale will be tested in the marketplace.  The Sale Procedures provide certain

protections to Purchaser while maximizing the opportunity for competing bids. Thus, the Debtor is confident that the winning bid that emerges from this process will be the highest and best bid obtainable for the Assets in the circumstances.

17.    One of the more important factors to be considered in a sale of substantially all of the assets of a debtor under section 363(b) is whether the value of the debtor's assets will decline. *In re Lionel Corp.*, 722 F2d 1063, 1071. Such consideration is often dispositive. *In re Boogaart of Florida, Inc.*, 17 BR 480, 483-84 (Bankr SD Fla 1981) ("Where . . . the value of the assets is rapidly decreasing and the estates are suffering continuing losses, liquidation of assets prior to the proposal and confirmation of plans of reorganization may be desirable because it will ultimately increase the amounts distributed to creditors after plans are confirmed.").

18.    In this case, the Debtor's assets are a "melting ice cube." Unless its DIP Facility can be increased in amount and its maturity date extended, the Debtor will not have the working capital to continue its business operations after March 7, 2014. In order to preserve the value of its business assets, the Debtor must continue to operate its business in an orderly manner. Delaying a sale could seriously jeopardize the value of the Debtor's business assets.

B. Sale Free and Clear of Liens and Other Interests

19.    The Debtor requests authorization to sell the Assets free and clear of all liens and other interests. Section 363(f) of the Bankruptcy Code authorizes a debtor in possession to sell property "free and clear of any interest in such property of an entity other than the estate" if one or more of the following conditions is satisfied:

  (1)    applicable nonbankruptcy law permits the sale of such property free and clear of such interest;

  (2)    such entity consents;

  (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)     such interest is bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to

accept a money satisfaction of such interest.

11 USC § 363(f). Consistent with the use of the term elsewhere in the Bankruptcy Code, courts

construe the term "interest" broadly to include all legal and equitable interests in the property

and arising from the property. *See In re Trans World Airlines, Inc.*, 322 F.3d 283, 289 (3d Cir.

2003) ("interests" is read expansively to include obligations that may flow from ownership of the

property).

20.     Applicable case law provides that a sale of a debtor's assets free and clear of

liens, interests and encumbrances, with such liens, interests and encumbrances attaching to the

net proceeds of the sale, is permissible under section 363(f). *See, e.g., In re Goffena*, 175 BR

386, 387 (Bankr D Mont 1994); *In re Granite Lumber Co.*, 63 BR 466, 471 (Bankr D Mont

1986); *see also Folger Adam Sec., Inc. v. DeMatteis/MacGregor, JV*, 209 F3d 252, 259 (3d Cir

2000) ("[T]he holdings of the courts suggest that any interest in property that can be reduced to a

money satisfaction constitutes a claim for purposes of § 363(f) and, therefore, attaches to the

proceeds of the sale."); *In re Elliot*, 94 BR 343, 345 (ED Pa 1988).

21.     One or more of the conditions set forth in section 363(f) are satisfied here with

regard to each of the security interests of the Debtor's prepetition creditors. *See In re Jolan, Inc.*,

403 B.R. 866, 869–70 (Bankr. W.D. Wash. 2009); *see also* Memorandum Regarding Sale, *In re*

*Wrangell Seafoods, Inc.*, No. 09-00012 (Bankr. D. Alaska Mar. 9, 2009). In addition, the

absence of an objection by holders of interests in the assets to be sold can constitute consent to

the sale free and clear of such claims and interests. *See Futuresource LLC v. Reuters Ltd.*, 312

F.3d 281, 285–86 (7th Cir. 2002) (in a sale conducted pursuant to section 363 of the Bankruptcy

Code, "lack of objection (provided of course there is notice) counts as consent."); *In re Tabone,*

*Inc.*, 175 BR 855, 858 (Bankr D.N.J. 1994); *Veltman v. Whetzal*, 93 F3d 517 (8th Cir 1996).

C. Sale in Good Faith

22.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) and (c) of this section of a sale or lease of property does not
> affect the validity of a sale or lease under such authorization to an entity
> that purchased or leased such property in good faith, whether or not such
> entity knew of the pendency of the appeal, unless such authorization and
> such sale or lease were stayed pending appeal.

11 USC § 363(m).

23.    While the Bankruptcy Code does not define "good faith," the Ninth Circuit has

held that:

> For purposes of § 363(m), a "good faith purchaser" is one who buys "in
> good faith" and "for value." This court has said that lack of good faith is
> shown by "fraud, collusion between the purchaser and the trustee, or an
> attempt to take grossly unfair advantage of other bidders."

*In re Serzow*, 1994 US App LEXIS 16392, at *4-6 (9th Cir June 28, 1994) (citations omitted); *In*

*re Ewell*, 958 F2d 276, 281 (9th Cir 1992).

24.    The Debtor submits, and if necessary will present additional evidence at the Sale

Hearing showing, that the negotiation of the Purchase Agreement was conducted in a fair

manner, and that due to the open and competitive nature of the Auction, the Purchase Agreement

or any purchase agreement finalized by another Successful Bidder will, by definition, be the

result of arms'-length negotiations in good faith.

D. The Expense Reimbursement

25.    The Purchase Agreement provides that, in the event Purchaser is not the

Successful Bidder, Purchaser's expenses, including all expenses incurred by Purchaser from

December 1, 2013 and continuing through Purchaser's participation, if any, in the Sale Hearing,

will be reimbursed; provided, however, that in no event will the total amount of the Expense

Reimbursement exceed $250,000. "Stalking horse" purchasers in asset sales often seek break-up

fees or other forms of protection in the event they are not the successful purchasers, and courts

have often approved such incentives, deferring to debtors' business judgment that such incentives are necessary in order to induce the initial bidder to step forward. *See, e.g., In re 995 Fifth Ave. Assocs., L.P.*, 96 BR 24, 28 (Bankr SDNY 1989) (holding that bidding incentives may be necessary to "convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted). Even courts that have rejected the "business judgment" test for evaluating break-up fees as a bidding incentive have indicated that bidding incentives would be appropriate where they provide a benefit to the debtor's estate. *See, e.g., In re O'Brien Envtl. Energy, Inc.*, 181 F3d 527, 533 (3d Cir 1999) (stating that bidding incentives benefit the estate where they (i) promote "more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited," or (ii) induce a bidder to submit a bid that serves as a "floor bid" on which other bidders can rely).

26.    The Debtor submits that the Expense Reimbursement is reasonable and appropriate in the circumstances of this case. The Expense Reimbursement includes only actual out-of-pocket expenses and it is capped at $250,000. Given the material benefits which will inure to the estate and creditors as the result of a going concern sale (as opposed to a liquidation) – including the establishment of a floor price for the assets to be sold – the Debtor submits that the expense reimbursement should be approved.

E. Assumption and Assignment of Executory Contracts and Unexpired Leases

27.    As set forth above, the Purchase Agreement provides for Purchaser or other Successful Bidder to request that the Debtor assume and assign certain contracts and leases. The Bankruptcy Code authorizes a debtor in possession to assume or reject an executory contract or unexpired lease, subject to bankruptcy court approval, providing that:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default …;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

11 USC § 365(a), (b)(1).

28.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical pragmatic construction." *See, e.g., In re Great Nw. Recreation Ctr., Inc.*, 74 BR 846 (Bankr D Mont 1987); *see also Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 BR 524, 538 (Bankr D NJ 1988); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 BR 789, 803 (Bankr ND Ill 1985) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").  Purchaser's promise to perform from and after the Closing Date with respect to Assumed Contracts and Assumed Leases constitutes adequate assurance of future performance in satisfaction of the requirements of section 365 of the Bankruptcy Code.

29.     The standard that is applied in the Ninth Circuit for determining whether an executory contract or unexpired lease should be assumed is the debtor's "business judgment" that the assumption is in its economic best interests.  *See In re GI Indus., Inc.*, 204 F3d 1276, 1282 (9th Cir 2000) ("a bankruptcy court applies the business judgment rule to evaluate a trustee's rejection decision"); *see also Sharon Steel Corp. v. National Fuel Gas Distrib. Corp. (In re Sharon Steel Corp.)*, 872 F2d 36, 40 (3d Cir 1989); *In re III Enters., Inc. V*, 163 BR 453, 469 (Bankr ED Pa 1994) ("Generally, a court will give great deference to a debtor's decision to assume or reject a contract.  A debtor need only show that its decision to assume or reject the contract is an exercise of sound business judgment- a standard which we have concluded many times is not difficult to meet.") (citations omitted).  *Cf. Agarwal v. Pomona Valley Med. Group,*

*Inc. (In re Pomona Valley Med. Group, Inc.)*, 476 F3d 665 (9th Cir 2007) (DIP's rejection of contract was permitted unless based on bad faith, whim or caprice, or on unreasonable strategy).

30.     Under the Purchase Agreement, the Debtor will be responsible for any and all cure costs that are required to be paid under section 365 as a condition of the assumption and assignment of the contacts and leases designated by Purchaser.  To the extent Purchaser pays any such cure amounts, they will be deducted from the Post-Closing Cash Consideration.

F.  Appointment of a Consumer Privacy Ombudsman

31.     It may be the case that the Debtor has disclosed to its customers a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the Debtor and that such a policy was in effect on the Petition Date. Accordingly, in accordance with Bankruptcy Rule 6004(g)(1), the Debtor is requesting herein that the Court enter an order directing the United States trustee to appoint a consumer privacy ombudsman under section 322  so that the Court will be able to make the findings required by section 363(b)(1)(A) or (B) at the Sale Hearing.

G.  Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate

32.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Bankruptcy Rule 6006(d) similarly provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  The Debtor requests that any order authorizing it to sell the Assets and to assign the Assumed Contracts and the Assumed Leases be effective immediately by providing that the 14-day stay of Bankruptcy Rules 6004(h) and 6006(d) will not apply.

33.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory

Committee Notes to Bankruptcy Rules 6004(h). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay, a leading bankruptcy treatise suggests that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 COLLIER ON BANKRUPTCY. ¶ 6004.10 (15th ed. rev. 2006). That treatise further suggests that if an objection is overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to seek a stay, unless the court determines that the need to proceed sooner outweighs the interests of the objecting party. *Id.*

34. The Debtor requests that the Court rule that the 14-day stay period under Bankruptcy Rules 6004(h) and 6006(d) be waived or, in the alternative, if an objection to the sale is filed, that the stay period be shortened to the minimum amount of time needed by the objecting party to seek a stay pending appeal.

<u>Notice</u>

35. Notice of this motion has been given to, among other parties, (i) the Debtor's secured creditors whose interests will be affected by the relief requested herein, (ii) the United States trustee, (iii) all entities that have requested special notice under Bankruptcy Rule 2002(i), (iv) all ECF participants, and (v) the creditors holding the 20 largest unsecured claims. In addition to any other requirements set forth in the Sale Procedures Order, notice of the proposed Sale and of the Sale Hearing will be given by mail to all creditors, shareholders and other parties entitled to receive notice under Bankruptcy Rule 2002 and to all parties known to the Debtor who previously expressed an interest in purchasing the Debtor's assets. The Debtor submits that the foregoing constitutes good and sufficient notice and that no other or further notice need be given in the circumstances.

WHEREFORE, the Debtor requests entry of an order granting the relief requested herein and such other and further relief as is appropriate.

Dated:  January 13, 2014.

Greene & Markley, P.C.

By ___/s/ David A. Foraker_____
David A. Foraker, OSB #812280
Attorneys for Debtor

\7576\P Sale Motion (Clean-u)

Exhibit A – Proposed Form of Purchase Agreement

**ASSET PURCHASE AGREEMENT**

between

**ALTREC, INC.**

and

**GREAT OUTDOORS HOLDCO, LLC**

dated as of

JANUARY 13, 2014

# TABLE OF CONTENTS

**ARTICLE I** PURCHASE AND SALE ....................................................................................1

Section 1.01 Purchase and Sale of Assets. ...........................................................................1

Section 1.02 Excluded Assets..............................................................................................3

Section 1.03 Assumed Liabilities. ........................................................................................3

Section 1.04 Excluded Liabilities. ........................................................................................4

Section 1.05 Purchase Price..................................................................................................4

Section 1.06 Purchase Price Adjustment. .............................................................................4

Section 1.07 Allocation of Purchase Price............................................................................6

Section 1.08 Third Party Consents. ......................................................................................6

**ARTICLE II** CLOSING ......................................................................................................7

Section 2.01 Closing.............................................................................................................7

Section 2.02 Closing Deliverables........................................................................................7

**ARTICLE III** REPRESENTATIONS AND WARRANTIES OF SELLER....................7

Section 3.01 Organization and Qualification of Seller. ........................................................8

Section 3.02 Subsidiaries......................................................................................................8

Section 3.03 Authority of Seller. ..........................................................................................8

Section 3.04 No Conflicts; Consents. ...................................................................................8

Section 3.05 Financial Statements........................................................................................9

Section 3.06 Absence of Certain Changes, Events and Conditions......................................9

Section 3.07 Business Contracts..........................................................................................10

Section 3.08 Title to Purchased Assets................................................................................10

Section 3.09 Condition and Sufficiency of Assets. ............................................................11

Section 3.10 Real Property ..................................................................................................11

Section 3.11 Intellectual Property........................................................................................12

Section 3.12 Inventory.........................................................................................................13

Section 3.13 Accounts Receivable. .....................................................................................13

Section 3.14 Insurance.........................................................................................................14

i

Section 3.15 Legal Proceedings; Governmental Orders. ...........................................................14

Section 3.16 Compliance With Laws; Permits. ........................................................................14

Section 3.17 Environmental Matters. .......................................................................................15

Section 3.18 Employee Benefit Matters. ..................................................................................15

Section 3.19 Employment Matters. ..........................................................................................16

Section 3.20 Taxes....................................................................................................................17

Section 3.21 Brokers. ...............................................................................................................18

Section 3.23 Privacy and Security. ..........................................................................................18

**ARTICLE IV** REPRESENTATIONS AND WARRANTIES OF BUYER ...................18

Section 4.01 Organization of Buyer. ........................................................................................18

Section 4.02 Authority of Buyer...............................................................................................18

Section 4.03 No Conflicts; Consents. .......................................................................................19

Section 4.04 Brokers. ...............................................................................................................19

Section 4.05 Sufficiency of Funds............................................................................................19

Section 4.06 Legal Proceedings................................................................................................19

**ARTICLE V** COVENANTS ...................................................................................................19

Section 5.01 Conduct of Business Prior to the Closing. ...........................................................19

Section 5.02 Access to Information...........................................................................................20

Section 5.03 [Reserved.]...........................................................................................................20

Section 5.04 Notice of Certain Events......................................................................................20

Section 5.05 Employees. ..........................................................................................................21

Section 5.06 Confidentiality. ....................................................................................................21

Section 5.07 Governmental Approvals and Consents................................................................22

Section 5.08 Closing Conditions ..............................................................................................22

Section 5.09 Transfer Taxes. ....................................................................................................23

Section 5.10 Bankruptcy Actions. ............................................................................................23

Section 5.11 Assumption and Rejection of Executory Contracts and Leases............................24

Section 5.12 Maintenance of Business. ....................................................................................25

Section 5.13 Further Assurances. .............................................................................................26

**ARTICLE VI** CONDITIONS TO CLOSING..........................................................................26

Section 6.01 Conditions to Obligations of All Parties. ................................................26

Section 6.02 Conditions to Obligations of Buyer. ......................................................26

Section 6.03 Conditions to Obligations of Seller. ......................................................28

**ARTICLE VII** INDEMNIFICATION ...........................................................................29

Section 7.01 Survival. ................................................................................................29

Section 7.02 Indemnification By Seller. .....................................................................29

Section 7.04 Right to Participate. ...............................................................................30

Section 7.05 Tax Treatment of Indemnification Payments. ........................................30

Section 7.06 Effect of Investigation. ..........................................................................30

Section 7.07 Right of Setoff. ......................................................................................30

Section 7.08 Exclusion of Certain Losses. .................................................................30

**ARTICLE VIII** TERMINATION ..................................................................................31

Section 8.01 Termination. ..........................................................................................31

Section 8.02 Effect of Termination. ...........................................................................31

**ARTICLE IX** MISCELLANEOUS ...............................................................................32

Section 9.01 Expenses. ..............................................................................................32

Section 9.02 Notices. .................................................................................................32

Section 9.03 Interpretation. ........................................................................................33

Section 9.04 Headings. ..............................................................................................33

Section 9.05 Severability. ..........................................................................................34

Section 9.06 Entire Agreement. ..................................................................................34

Section 9.07 Successors and Assigns. ........................................................................34

Section 9.08 No Third-party Beneficiaries. ................................................................34

Section 9.09 Amendment and Modification; Waiver. .................................................34

Section 9.10 Governing Law; Submission to Jurisdiction; Waiver of Jury Trial. ........35

Section 9.11 Specific Performance. ............................................................................35

Section 9.12 Counterparts. .........................................................................................35

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**"), dated as of January 13, 2014 is entered into between Altrec, Inc., a Delaware corporation ("**Seller**") and Great Outdoors Holdco, LLC, a Delaware limited liability company ("**Buyer**"). Capitalized terms used but not otherwise defined herein have the meanings specified or referred to in **Exhibit A** attached hereto.

## RECITALS

WHEREAS, Seller is engaged in the ownership and operation of an online retail business selling outdoor clothing, foot wear and gear, which includes several websites (the "**Business**");

WHEREAS, On January 6, 2014, the Seller filed a voluntary petition ("**Petition**") for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Oregon (the "**Bankruptcy Court**") and continues to manage its property as debtor and debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code (the "**Bankruptcy Case**"); and

WHEREAS, Seller wishes to sell and assign to Buyer, and Buyer wishes to purchase and assume from Seller, substantially all the assets, and certain specified liabilities, of the Business, subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
### PURCHASE AND SALE

**Section 1.01  Purchase and Sale of Assets.** {TC "Section 1.01 Purchase and Sale of Assets. " \L2}Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, free and clear of any Encumbrances, all of Seller's right, title and interest in, to and under all of the assets, properties and rights of every kind and nature, whether real, personal or mixed, tangible or intangible (including goodwill), wherever located and whether now existing or hereafter acquired (other than the Excluded Assets), which relate to, or are used or held for use in connection with, the Business (collectively, the "**Purchased Assets**"), including the following (other than the Excluded Assets):

(a)     all inventory, finished goods, raw materials, work in progress, packaging, supplies, parts and other inventories ("**Inventory**");

(b)     all furniture, fixtures, equipment, machinery, tools, vehicles, office equipment, supplies, computers, telephones and other tangible personal property (the "**Tangible Personal Property**");

(c)     all Intellectual Property Assets, including all Marks, Works, Websites, Software, Trade Secrets and Patents included therein;

(d)     originals, or where not available, copies, of all books and records, including customer lists, books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices), strategic plans, internal financial statements, marketing and promotional surveys, material and research and files relating to the Intellectual Property Assets and the Intellectual Property Agreements ("**Books and Records**");

(e)     all interests of Seller under all Business Contracts that are not Excluded Executory Contracts;

(f)     all interests of Seller under executory Business Contracts that are designated by the Buyer to be assumed by the Seller and assigned to the Buyer in accordance with **Section 5.11** ("**Assumed Executory Contracts**"), which Assumed Executory Contracts shall be identified on **Section 1.01(f)** of the Disclosure Schedule, as it may be amended from time to time as provided in **Section 5.11**;

(g)     all Permits which are held by Seller and required for the conduct of the Business as currently conducted or for the ownership and use of the Purchased Assets, including those listed on **Section 3.16(b)** of the Disclosure Schedules;

(h)     cash (but not including cash held in escrow for the payment of professional fees in the Bankruptcy Case) and cash equivalents;

(i)     all accounts or notes receivable held by Seller, and any security, claim, remedy or other right related to any of the foregoing ("**Accounts Receivable**");

(j)     all rights to any Actions of any nature available to or being pursued by Seller to the extent related to the Business, the Purchased Assets or the Assumed Liabilities, whether arising by way of counterclaim or otherwise;

(k)     all prepaid expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, security deposits, charges, sums and fees (including any such item relating to the payment of Taxes);

(l)     all of Seller's rights under warranties, indemnities and all similar rights against third parties arising from or relating to the Business, the Purchased Assets or the Assumed Liabilities;

(m)     all insurance benefits, including rights and proceeds, arising from or relating to the Business, the Purchased Assets or the Assumed Liabilities; and

(n)    all goodwill and the going concern value of the Business.

Section 1.02  Excluded Assets. {TC "Section 1.02 Excluded Assets. " \L2}Notwithstanding the foregoing, the Purchased Assets shall not include the following assets (collectively, the "**Excluded Assets**"):

(a)    all executory Business Contracts that are designated by the Buyer to be rejected by the Seller in accordance with **Section 5.11** ("**Excluded Executory Contracts**");

(b)    the corporate seals, organizational documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization of Seller;

(c)    all Benefit Plans and assets attributable thereto;

(d)    all equity interests in any Person, including Black Butte Holdings, LLC;

(e)    the assets, properties and rights specifically set forth on **Section 1.02(e)** of the Disclosure Schedules as such section may be amended by Buyer up until the Closing Date;

(f)    all claims of the Seller and its bankruptcy estate under Chapter 5 of the Bankruptcy Code;

(g)    amounts that may be due to Seller as a result of the Payment Card Interchange Fee and Merchant Discount Antitrust Litigation, MDL No. 1720 (JG)(JO); and

(h)    the rights which accrue or will accrue to Seller under the Transaction Documents.

Section 1.03  Assumed Liabilities. {TC "Section 1.03 Assumed Liabilities. " \L2}Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge only the following Liabilities of Seller (collectively, the "**Assumed Liabilities**"), and no other Liabilities:

(a)    all Liabilities in respect of the Assumed Executory Contracts (other than cure obligations pursuant to Section 365 of the Bankruptcy Code) but only to the extent that such Liabilities thereunder are required to be performed after the Closing Date, were incurred in the ordinary course of business and do not relate to any failure to perform, improper performance, warranty or other breach, default or violation by Seller on or prior to the Closing;

(b)    customer credits, returns, refunds, and exchanges incurred in the ordinary course of business relating to the pre-Closing operation of the Business except to the extent such Liabilities relate to (i) any product Liability or similar claim for injury to a Person or property which arises out of or is based upon any express or implied representation, warranty, agreement or guaranty made by Seller, or by reason of the improper performance or malfunctioning of a product, improper design or manufacture, failure to adequately package, label or warn of hazards or other related product defects of any products at any time manufactured or sold or any service performed by Seller; or (ii) any recall, design defect or similar claims of any products manufactured or sold or any service performed by Seller (collectively, "**Assumed Return Claims**"); and

(c)    those Liabilities of Seller set forth on **Section 1.03(c)** of the Disclosure Schedules, as such section may be amended by Buyer up until entry of the Sale Order.

3

**Section 1.04    Excluded Liabilities.** {TC "Section 1.04 Excluded Liabilities. " \L2}Notwithstanding any other provision in this Agreement to the contrary, Buyer shall not assume and shall not be responsible to pay, perform or discharge any Liabilities of Seller or any of its Affiliates of any kind or nature whatsoever other than the Assumed Liabilities (the "**Excluded Liabilities**"), including any and all Liabilities under Excluded Executory Contracts and any executory Contract (including any executory Business Contract) which is not an Assumed Executory Contract. Seller shall, and shall cause each of its Affiliates to, pay and satisfy all Excluded Liabilities as required by and in connection with the Bankruptcy Case.

**Section 1.05    Purchase Price.** {TC "Section 1.05 Purchase Price. " \L2}The aggregate purchase price for the Purchased Assets shall be $3,250,000, subject to adjustment pursuant to **Section 1.06** hereof (the "**Purchase Price**"), plus the assumption of the Assumed Liabilities. The Purchase Price shall be paid as follows:

(a)    $2,750,000 of the Purchase Price (the "**Closing Cash Consideration**"), subject to adjustment pursuant to **Section 1.06(a)**, shall be paid at Closing by wire transfer of immediately available funds to an account designated in writing by Seller to Buyer; and

(b)    $500,000 of the Purchase Price (the "**Post-Closing Cash Consideration**"), subject to adjustment pursuant to **Section 1.06(b)**, shall be paid in accordance with the timeline set forth in **Section 1.06(b)** by wire transfer of immediately available funds to an account designated in writing by Seller to Buyer. The amount of the Post-Closing Cash Consideration shall be increased by the amount of the Post-Closing Adjustment (if a positive number) or decreased by the amount of the Post-Closing Adjustment (if a negative number) on a dollar-for-dollar basis. The "**Post-Closing Adjustment**" means by an amount equal to (i) the amount of the Working Capital Adjustment Amount (which may be a positive or negative number), minus (ii) Assumed Return Claims, minus (iii) Cure Claims, minus (iv) any and all claims made by any Buyer Indemnitee against Seller pursuant to **Article VII**.

**Section 1.06    Purchase Price Adjustment.**{TC "Section 1.06 Purchase Price Adjustment." \L2}

(a)    **Closing Adjustment.** The amount of the Closing Cash Consideration will be reduced on a dollar-for-dollar basis by the amount of all advances under the DIP Facility and, pursuant to the terms of the DIP Facility, Seller's obligation to repay such amounts shall be forgiven.

(b)    **Post-Closing Adjustment.**

(i)    Within 180 days after the Closing Date, Buyer shall prepare and deliver to Seller a statement (the "**Post-Closing Adjustment Statement**") containing the calculation of the Post-Closing Adjustment and setting forth:

(A)    its calculation of Closing Working Capital and the Working Capital Adjustment Amount, which statement shall be substantially in the form of **Section 1.06(b)** of the Disclosure Schedules (the "**Closing Working Capital Statement**"),

4

(B)     the amount of all Assumed Return Claims; *provided, however*, that Assumed Return Claims which involve a return of resalable goods to Buyer shall be valued, for purposes of determining the Post-Closing Adjustment, at 75% of the amount due to the customer,

(C)     all costs of cure paid or payable by Buyer relating to any Assumed Executory Contracts assigned to Buyer ("**Cure Claims**"), and

(D)     a statement of any claims made by any Buyer Indemnitee against Seller pursuant to **Article VII**.

(ii)     If within fifteen (15) days following delivery of the Post-Closing Adjustment Statement Seller has not given Buyer written notice of its objection as to the Post-Closing Adjustment Statement and Post-Closing Adjustment calculation (which notice shall state the basis of Seller's objection), then the Post-Closing Adjustment Statement and the Post-Closing Adjustment calculated by Buyer shall be final, binding and conclusive on the parties.

(iii)     If Seller duly gives Buyer such notice of objection, Seller and Buyer shall in good faith attempt to resolve the issues outstanding with respect to the Post-Closing Adjustment Statement and the calculation of the Post-Closing Adjustment during the fifteen (15) day period following Buyer's receipt of Seller's notice of objection.  Any such resolution shall be final, binding and conclusive on the parties.

(iv)     If the parties fail to resolve the issues outstanding with respect to the Post-Closing Adjustment Statement and the calculation of the Post-Closing Adjustment within such fifteen (15) day period, Seller and Buyer shall submit the issues remaining in dispute to the Independent Accountants for resolution in accordance with this **Section 1.06**; *provided, however*, that the Independent Accountants shall not be authorized to resolve any unresolved dispute relating to any claims made by any Buyer Indemnitee against Seller pursuant to **Article VII**. If issues are submitted to the Independent Accountants for resolution, (A) Seller and Buyer shall furnish or cause to be furnished to the Independent Accountants such work papers and other documents and information relating to the disputed issues submitted to the Independent Accountants as the Independent Accountants may reasonably request and are available to that party or its agents and shall be afforded the opportunity to present to the Independent Accountants any material relating to such disputed issues and to discuss the issues with the Independent Accountants; (B) the determination by the Independent Accountants, as set forth in a notice to be delivered to both Seller and Buyer within thirty (30) days of the submission to the Independent Accountants of the issues submitted to the Independent Accountants remaining in dispute, shall be final, binding and conclusive on the parties and shall be used in the calculation of the Post Closing Adjustment; and (C) Seller and Buyer will each bear fifty percent (50%) of the fees and costs of the Independent Accountants for such determination.

(v)     Any unresolved dispute relating to any claims made by any Buyer Indemnitee against Seller pursuant to **Article VII** shall be resolved by the Bankruptcy Court.  The decision of the Bankruptcy Court with respect to any such dispute shall be final, binding and conclusive on the parties.

(vi)     Within three (3) Business Days after the calculation of the Post-Closing Adjustment becomes final, binding and conclusive on the parties pursuant to the procedures set forth in

**Section 1.06(b)(ii) - (v)**, Buyer shall pay the Seller the difference between the amount of the Post-Closing Cash Consideration minus the Post-Closing Adjustment.

(c)     **Adjustments for Tax Purposes.** Any payments made pursuant to **Section 1.06** shall be treated as an adjustment to the Purchase Price by the parties for Tax purposes, unless otherwise required by Law.

**Section 1.07     Allocation of Purchase Price.** {TC "Section 1.07 Allocation of Purchase Price. " \L2}Seller and Buyer agree that the Purchase Price and the Assumed Liabilities (plus other relevant items) shall be allocated among the Purchased Assets for all purposes (including Tax and financial accounting) as shown on the allocation schedule (the "**Allocation Schedule**"). A draft of the Allocation Schedule shall be prepared by Buyer and delivered to Seller within 180 days following the Closing Date. If Seller notifies Buyer in writing that Seller objects to one or more items reflected in the Allocation Schedule, Seller and Buyer shall negotiate in good faith to resolve such dispute; *provided, however*, that if Seller and Buyer are unable to resolve any dispute with respect to the Allocation Schedule within 30 days following Buyer's delivery of the Allocation Schedule to Seller, such dispute shall be resolved by the Independent Accountants. The fees and expenses of the Independent Accountant shall be borne equally by Seller and Buyer. Buyer and Seller shall file all Tax Returns (including amended returns and claims for refund) and information reports in a manner consistent with the Allocation Schedule. Any adjustments to the Purchase Price pursuant to **Section 1.06** herein shall be allocated in a manner consistent with the Allocation Schedule.

**Section 1.08   Third Party Consents.** {TC "Section 1.08 Third Party Consents. " \L2}If any Purchased Asset or Seller's rights with respect to any Purchased Assets by its terms or applicable Law may not be assigned to Buyer without the consent of another Person which has not been obtained or which is not subject to Section 365(b)(2) of the Bankruptcy Code, to the extent such terms are not superseded by the terms of the Sale Order, the Seller shall use its reasonable best efforts to obtain, or cause to be obtained, on or prior to the Closing, any approvals or consents necessary to convey to the Buyer the benefit thereof. The Buyer shall cooperate with the Seller in such manner as may be reasonably requested in connection therewith. In the event any consent or approval to an assignment contemplated hereby is not obtained on or prior to the Closing Date, the Seller shall continue to use reasonable best efforts to obtain any such approval or consent after the Closing Date and the Seller agrees to enter into any appropriate and commercially reasonable arrangement to provide that the Buyer shall receive the Seller's interest in the benefits under any such Purchased Asset or right with respect thereto. Notwithstanding any provision in this **Section 1.08** to the contrary, Buyer shall not be deemed to have waived its rights under **Section 6.02(e)** hereof unless and until Buyer either provides written waivers thereof or elects to proceed to consummate the Contemplated Transactions at Closing.

## ARTICLE II
### CLOSING

Section 2.01    **Closing.** {TC "Section 2.01 Closing. " \L2}Subject to the terms and conditions of this Agreement, the consummation of the Contemplated Transactions (the "**Closing**") shall take place at the offices of Davis Wright Tremaine LLP in Seattle, Washington, at 10:00 am, Pacific time, within five Business Day after all of the conditions to Closing set forth in **Article VI** are either satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date), or at such other time, date or place as Seller and Buyer may mutually agree upon in writing. The date on which the Closing is to occur is herein referred to as the "**Closing Date**".

Section 2.02    **Closing Deliverables.**{TC "Section 2.02 Closing Deliverables." \L2}

(a)    At the Closing, Seller shall deliver to Buyer the following:

(i)    All documents and instruments necessary or desirable to convey the Purchased Assets to Buyer, in accordance with **Section 1.01** hereof, in form and substance acceptable to Buyer, all duly executed by Seller and duly acknowledged, where applicable, including (i) bills of sale, (ii) assignments of Intellectual Property Assets , (iii) domain name transfer forms, and (iv) login names and passwords for all Websites;

(ii)    employment and noncompetition agreements with each Key Employee (the "**Employment Agreements**"), duly executed by each Key Employee, in form and substance acceptable to Buyer;

(iii)    certification of the Business's compliance with Card Association Rules in form and substance satisfactory to Buyer, from a third party approved by Buyer in its discretion;

(iv)    the Seller Closing Certificate;

(v)    the FIRPTA Certificate; and

(vi)    such other instruments of transfer, assumption, filings or documents as Buyer may request to give effect to this Agreement.

(b)    At the Closing, Buyer shall deliver to Seller the following:

(i)    the Closing Cash Consideration, as adjusted;

(ii)    executed counterparts of the documents referenced in **Section 2.02(a)(i)**, as applicable; and

(iii)    the Buyer Closing Certificate.

## ARTICLE III
### REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer that the statements contained in this **Article III** are true and correct as of the date hereof.

**Section 3.01  Organization and Qualification of Seller.** {TC "Section 3.01 Organization and Qualification of Seller. " \L2}Seller is a corporation duly organized, validly existing and in good standing under the Laws of the state of Delaware and has full corporate power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on the Business as currently conducted. **Section 3.01** of the Disclosure Schedules sets forth each jurisdiction in which Seller is licensed or qualified to do business, and Seller is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the ownership of the Purchased Assets or the operation of the Business as currently conducted makes such licensing or qualification necessary and where the failure to be so licensed or qualified would reasonably be expected to result in a Material Adverse Effect.

**Section 3.02  Subsidiaries.** {TC "Section 3.02 Subsidiaries. " \L2} Except for Black Butte Holdings, LLC, a Washington limited liability company ("**BBH**"), Seller has no Subsidiaries, and has no direct or indirect equity, debt or other interest in any Person, or any right, warrant or option to acquire any such interest. BBH does not own or operate any portion of the Business and does not have any right, title or interest in, to or under any asset, property or right that is used in or useful for the operation of the Business.

**Section 3.03  Authority of Seller.** {TC "Section 3.03 Authority of Seller. " \L2}Subject to Bankruptcy Court approval, Seller has full corporate power and authority to enter into this Agreement and the other Transaction Documents to which Seller is a party, to carry out its obligations hereunder and thereunder and to consummate the Contemplated Transactions. The execution and delivery by Seller of this Agreement and any other Transaction Document to which Seller is a party, the performance by Seller of its obligations hereunder and thereunder and the consummation by Seller of the Contemplated Transactions have been duly authorized by all requisite corporate action on the part of Seller. Subject to Bankruptcy Court approval, (i) this Agreement has been duly executed and delivered by Seller, and (ii) (assuming due authorization, execution and delivery by Buyer) this Agreement constitutes a legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms. Subject to Bankruptcy Court approval, when each other Transaction Document to which Seller is or will be a party has been duly executed and delivered by Seller (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of Seller enforceable against it in accordance with its terms.

**Section 3.04  No Conflicts; Consents.** {TC "Section 3.04 No Conflicts; Consents. " \L2}The execution, delivery and performance by Seller of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the Contemplated Transactions, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of incorporation, by-laws or other organizational documents of Seller; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to Seller, the Business or the Purchased Assets; (c) except as set forth in **Section 3.04** of the Disclosure Schedules, and except for the approval of the Bankruptcy Court, require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Contract or Permit to which Seller is a party or by which

Seller or the Business is bound or to which any of the Purchased Assets are subject (including any Assumed Executory Contract); or (d) result in the creation or imposition of any Encumbrance on the Purchased Assets. Except for the approval of the Bankruptcy Court, no consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Seller in connection with the execution and delivery of this Agreement or any of the other Transaction Documents and the consummation of the Contemplated Transactions.

**Section 3.05   Financial Statements.** {TC "Section 3.05 Financial Statements. " \L2}Complete copies of the audited financial statements consisting of the balance sheet of the Business as at December 31 in each of the years 2010, 2011 and 2012 and the related statements of income and retained earnings, stockholders' equity and cash flow for the years then ended (the "**Audited Financial Statements**"), and unaudited financial statements consisting of the balance sheet of the Business as at September 30, 2013 and the related statements of operations and cash flow for the nine- month period then ended (the "**Interim Financial Statements**" and together with the Audited Financial Statements, the "**Financial Statements**") have been delivered to Buyer. Except as set forth in **Section 3.05** of the Disclosure Schedules, the Financial Statements have been prepared in accordance with GAAP, except for the departure from GAAP taken by Seller relating to the valuation of its deferred tax assets as described in the Audited Financial Statements, applied on a consistent basis throughout the period involved, subject, in the case of the Interim Financial Statements, to normal and recurring year-end adjustments (the effect of which will not be materially adverse) and the absence of notes (that, if presented, would not differ materially from those presented in the Audited Financial Statements). The Financial Statements are based on the books and records of the Business, and fairly present the financial condition of the Business as of the respective dates they were prepared and the results of the operations of the Business for the periods indicated. The balance sheet of the Business as of December 31, 2012 is referred to herein as the "**Balance Sheet**" and the date thereof as the "**Balance Sheet Date**" and the balance sheet of the Business as of September 30, 2013 is referred to herein as the "**Interim Balance Sheet**" and the date thereof as the "**Interim Balance Sheet Date**". Seller maintains a standard system of accounting for the Business established and administered in accordance with GAAP.

**Section 3.06   Absence of Certain Changes, Events and Conditions.** {TC "Section 3.06 Absence of Certain Changes, Events and Conditions. " \L2}Since the Interim Balance Sheet Date, and other than in the ordinary course of business consistent with past practice or as described on **Section 3.06** of the Disclosure Schedule, there has not been any:

(a)        event, occurrence or development that has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, other than the appointment of a receiver on December 12, 2013 and the filing of the Bankruptcy Case;

(b)        transfer, assignment, sale or other disposition of any of the Purchased Assets shown or reflected in the Balance Sheet, except for (i) the sale of Inventory in the ordinary course of business and (ii) until the date of this Agreement, the sale through a liquidation process by the receiver and the sale of assets during the closure of Seller's retail store in Bend, Oregon and office in Seattle, Washington ;

(c)     cancellation of any debts or claims or amendment, termination or waiver of any rights constituting Purchased Assets;

(d)     transfer, assignment or grant of any license or sublicense of any material rights under or with respect to any Intellectual Property Assets or Intellectual Property Agreements;

(e)     material damage, destruction or loss, or any material interruption in use, of any Purchased Assets, whether or not covered by insurance;

(f)     acceleration, termination, material modification to or cancellation of any Business Contract or Permit;

(g)     imposition of any Encumbrance upon any of the Purchased Assets, other than the default judgment issue in connection with the Amer Sports lawsuit;

(h)     (i) grant of any bonuses, whether monetary or otherwise, or increase in any wages, salary, severance, pension or other compensation or benefits in respect of any employees, officers, directors, independent contractors or consultants of the Business, other than as provided for in any written agreements or required by applicable Law, or (ii) action to accelerate the vesting or payment of any compensation or benefit for any employee, officer, director, consultant or independent contractor of the Business;

(i)     adoption of any plan of merger or consolidation;

(j)     any Contract to do any of the foregoing, or any action or omission that would result in any of the foregoing.

**Section 3.07   Business Contracts.**{TC "Section 3.07 Business Contracts." \L2}

(a)     Each Contract (x) by which any of the Purchased Assets are bound or affected or (y) to which Seller is a party or by which it is bound in connection with the Business or the Purchased Assets is a "**Business Contract**". **Section 3.07(a)** of the Disclosure Schedules contains a complete and accurate list of all Business Contracts.

(b)     Each Business Contract is valid and binding on Seller in accordance with its terms and is in full force and effect. Except (i) to the extent that the filing of the Bankruptcy Case constitutes a breach or default and (ii) with respect to breaches or defaults arising from nonpayment, Seller is not in material breach of or material default under (or is alleged to be in material breach of or material default under) under any Business Contract. Seller has not received any notice of any intention to terminate, any Business Contract. To Seller's Knowledge, no counterparty to any Business Contract is in breach of or default under (or is alleged to be in breach of or default under), or has provided any notice of any intention to terminate, any Business Contract. Complete and correct copies of each Business Contract (including all modifications, amendments and supplements thereto and waivers thereunder) have been made available to Buyer. There are no material disputes pending or, to Seller's Knowledge, threatened under any of the Business Contracts.

**Section 3.08   Title to Purchased Assets.** {TC "Section 3.08 Title to Purchased Assets. " \L2}Seller has good and valid title to, or a valid leasehold interest in, all of the Purchased Assets, free and clear of Encumbrances except those Encumbrances disclosed on **Section 3.08** of the Disclosure Schedule.

Subject to Bankruptcy Court approval, at Closing Seller will convey to Buyer good and valid title to, or in the case of leased assets, valid leasehold interests in, all Purchased Assets. On the Closing Date, Buyer will have sufficient title in and to the Purchased Assets to operate and conduct the Business in the same fashion it was conducted before the Closing Date.

**Section 3.09   Condition and Sufficiency of Assets.** {TC "Section 3.09 Condition and Sufficiency of Assets. " \L2}The Tangible Personal Property included in the Purchased Assets are adequate for the uses to which they are being put. The Tangible Personal Property included in the Purchased Assets are, in all material respects, structurally sound and in good operating condition and repair, and none of such Tangible Personal Property is in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost. The Purchased Assets, together with the Excluded Executory Contracts, are sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the Closing and constitute all of the rights, property and assets necessary to conduct the Business as currently conducted. None of the Excluded Assets other than the Excluded Executory Contracts are material to the Business.

**Section 3.10   Real Property**{TC "Section 3.10 Real Property" \L2}

(a)      Seller owns no real property. **Section 3.10(a)** of the Disclosure Schedules sets forth each parcel of real property leased by Seller and used in or necessary for the conduct of the Business as currently conducted (together with all rights, title and interest of Seller in and to leasehold improvements relating thereto, including, but not limited to, security deposits, reserves or prepaid rents paid in connection therewith, collectively, the **"Leased Real Property"**), and a true and complete list of all leases, subleases, licenses, concessions and other agreements (whether written or oral), including all amendments, extensions renewals, guaranties and other agreements with respect thereto, pursuant to which Seller holds any Leased Real Property (collectively, the **"Leases"**). Seller has delivered to Buyer a true and complete copy of each Lease. With respect to each Lease, except as set forth on **Section 3.10(a)** of the Disclosure Schedules:

(i)      such Lease is valid, binding, enforceable and in full force and effect, and Seller enjoys peaceful and undisturbed possession of the Leased Real Property;

(ii)      Seller is not in material breach or material default under such Lease (except to the extent that the filing of the Bankruptcy Case constitutes a material breach or material default and except with respect to breaches or defaults arising from nonpayment) and Seller has paid all rent due and payable under such Lease;

(iii)      Seller has not received nor given any notice of any default or event that with notice or lapse of time, or both, would constitute a default by Seller under any of the Leases and, to the Knowledge of Seller, no other party is in default thereof, and no party to any Lease has exercised any termination rights with respect thereto;

(iv)      Seller has not subleased, assigned or otherwise granted to any Person the right to use or occupy such Leased Real Property or any portion thereof; and

(v)      Seller has not pledged, mortgaged or otherwise granted an Encumbrance on its leasehold interest in any Leased Real Property.

(b)      Seller has not received any written notice of (i) violations of building codes and/or zoning ordinances or other governmental or regulatory Laws affecting the Leased Real Property, (ii) existing, pending or threatened condemnation proceedings affecting the Leased Real Property, or (iii) existing, pending or threatened zoning, building code or other moratorium proceedings, or similar matters which could reasonably be expected to adversely affect the ability to operate the Leased Real Property as currently operated. Neither the whole nor any material portion of any Leased Real Property has been damaged or destroyed by fire or other casualty.

(c)      The Leased Real Property is sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the Closing and constitutes all of the real property necessary to conduct the Business as currently conducted.

**Section 3.11  Intellectual Property.**{TC "Section 3.11 Intellectual Property." \L2}

(a)      **Section 3.11(a)** of the Disclosure Schedules lists all (i) Intellectual Property Registrations and (ii) Intellectual Property Assets, including Software, that are not registered but that are material to the operation of the Business. All required filings and fees related to the Intellectual Property Registrations have been timely filed with and paid to the relevant Governmental Authorities and authorized registrars, and all Intellectual Property Registrations are otherwise in good standing. Seller has provided Buyer with true and complete copies of file histories, documents, certificates, office actions, correspondence and other materials related to all Intellectual Property Registrations.

(b)      **Section 3.11(b)** of the Disclosure Schedules lists all Intellectual Property Agreements. Seller has provided Buyer with true and complete copies of all such Intellectual Property Agreements, including all modifications, amendments and supplements thereto and waivers thereunder. Each Intellectual Property Agreement is valid and binding on Seller in accordance with its terms and is in full force and effect. Except as set forth in **Section 3.11(b)** of the Disclosure Schedules, None of Seller or, to Seller's Knowledge, any other party thereto is in material breach of or material default under (or is alleged to be in breach of or default under), or has provided or received any notice of material breach or material default of or any intention to terminate, any Intellectual Property Agreement. Except for the filing of the Bankruptcy Case, no event or circumstance has occurred that, with notice or lapse of time or both, would constitute an event of default under any Intellectual Property Agreement or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit thereunder.

(c)      Seller is the sole and exclusive legal and beneficial, and with respect to the Intellectual Property Registrations, record, owner of all right, title and interest in and to the Intellectual Property Assets, and has the valid right to use all other Intellectual Property used in or necessary for the conduct of the Business as currently conducted, in each case, free and clear of Encumbrances. Without limiting the generality of the foregoing, Seller has entered into binding, written agreements with every current and former employee of Seller, and with every current and former independent contractor whereby such employees and independent contractors (i) assign to Seller any ownership interest and right they may have in the Intellectual Property Assets; and (ii) acknowledge Seller's exclusive ownership of all Intellectual Property Assets. Seller has provided Buyer with true and complete copies of all such agreements.

(d)    The Intellectual Property Assets and Intellectual Property licensed under the Intellectual Property Agreements are all of the Intellectual Property necessary to operate the Business as presently conducted. The consummation of the Contemplated Transactions will not result in the loss or impairment of or payment of any additional amounts with respect to, nor require the consent of any other Person in respect of, the Buyer's right to own, use or hold for use any Intellectual Property as owned, used or held for use in the conduct of the Business as currently conducted.

(e)    Seller's rights in the Intellectual Property Assets are valid, subsisting and enforceable. Seller has taken all commercially reasonable steps to maintain the Intellectual Property Assets and to protect and preserve the confidentiality of all trade secrets included in the Intellectual Property Assets, including requiring all Persons having access thereto to execute written non-disclosure agreements.

(f)    The conduct of the Business as currently and formerly conducted, and the Intellectual Property Assets and Intellectual Property licensed under the Intellectual Property Agreements as currently or formerly owned, licensed or used by Seller, have not infringed, misappropriated, diluted or otherwise violated, and have not, do not and will not infringe, dilute, misappropriate or otherwise violate, the Intellectual Property or other rights of any Person. To Seller's Knowledge, no Person has infringed, misappropriated, diluted or otherwise violated, or is currently infringing, misappropriating, diluting or otherwise violating, any Intellectual Property Assets.

(g)    Except as set forth in **Section 3.11(g)** of the Disclosure Schedule, there are no Actions (including any oppositions, interferences or re-examinations) settled, pending or threatened (including in the form of offers to obtain a license): (i) alleging any infringement, misappropriation, dilution or violation of the Intellectual Property of any Person by Seller in connection with the Business; (ii) challenging the validity, enforceability, registrability or ownership of any Intellectual Property Assets or Seller's rights with respect to any Intellectual Property Assets; or (iii) by Seller or any other Person alleging any infringement, misappropriation, dilution or violation by any Person of any Intellectual Property Assets. Seller is not subject to any outstanding or prospective Governmental Order (including any motion or petition therefor) that does or would materially restrict or impair the use of any Intellectual Property Assets.

**Section 3.12   Inventory.** {TC "Section 3.12 Inventory. " \L2}Except as set forth in **Section 3.12** of the Disclosure Schedules, all Inventory, whether or not reflected in the Balance Sheet, consists of a quality and quantity usable and salable in the ordinary course of business consistent with past practice, except for Inventory returned by customers that is not restockable into resale Inventory, obsolete, damaged, defective or slow-moving items, all of which have been written off or written down to fair market value or for which adequate reserves have been established. Except as set forth in **Section 3.12** of the Disclosure Schedules, all Inventory is owned by Seller free and clear of all Encumbrances, and no Inventory is held on a consignment basis.

**Section 3.13   Accounts Receivable.** {TC "Section 3.13 Accounts Receivable. " \L2}Except as set forth on **Section 3.13** of the Disclosure Schedules, the Accounts Receivable reflected on the Interim Balance Sheet and the Accounts Receivable arising after the date thereof (a) have arisen from bona fide transactions entered into by Seller involving the sale of goods or the rendering of services in the ordinary course of business consistent with past practice; (b) constitute only valid, undisputed claims of Seller not

13

subject to claims of set-off or other defenses or counterclaims other than normal cash discounts accrued in the ordinary course of business consistent with past practice and (c) subject to the reserve for bad debts reflected on the Interim Balance Sheet, are collectible in full within 90 days after billing. Accounts Receivable arising from unclaimed property and unasserted legal claims are not reflected on the Balance Sheet.

Section 3.14  **Insurance.** {TC "Section 3.14 Insurance. " \L2}Section 3.14 of the Disclosure Schedules sets forth (a) a true and complete list of all current policies or binders of fire, liability, product liability, umbrella liability, real and personal property, workers' compensation, vehicular, fiduciary liability and other casualty and property insurance maintained by Seller and relating to the Business, the Purchased Assets or the Assumed Liabilities (collectively, the "**Insurance Policies**"); and (b) with respect to the Business, the Purchased Assets or the Assumed Liabilities, a list of all pending claims and the claims history for Seller since January 1, 2012. Except as set forth on **Section 3.14** of the Disclosure Schedules, there are no claims related to the Business, the Purchased Assets or the Assumed Liabilities pending under any such Insurance Policies as to which coverage has been questioned, denied or disputed or in respect of which there is an outstanding reservation of rights. Neither Seller nor any of its Affiliates has received any written notice of cancellation of, premium increase with respect to, or alteration of coverage under, any of such Insurance Policies.

Section 3.15  **Legal Proceedings; Governmental Orders.**{TC "Section 3.15 Legal Proceedings; Governmental Orders." \L2}

(a)     Except for the Bankruptcy Case or as set forth on **Section 3.15** of the Disclosure Schedules, there are no Actions pending or, to Seller's Knowledge, threatened against or by Seller (a) relating to or affecting the Business, the Purchased Assets or the Assumed Liabilities; or (b) that challenge or seek to prevent, enjoin or otherwise delay the Contemplated Transactions.

(b)     There are no outstanding Governmental Orders and no unsatisfied judgments, penalties or awards against, relating to or affecting the Business.

Section 3.16  **Compliance With Laws; Permits.**{TC "Section 3.16 Compliance With Laws; Permits." \L2}

(a)     Seller has complied, and is now complying, in all material respects with all Laws applicable to the conduct of the Business as currently conducted or the ownership and use of the Purchased Assets.

(b)     All Permits required for Seller to conduct the Business as currently conducted or for the ownership and use of the Purchased Assets have been obtained by Seller and are valid and in full force and effect. All fees and charges with respect to such Permits as of the date hereof have been paid in full. **Section 3.16(b)** of the Disclosure Schedules lists all current Permits issued to Seller which are related to the conduct of the Business as currently conducted or the ownership and use of the Purchased Assets, including the names of the Permits and their respective dates of issuance and expiration.

**Section 3.17  Environmental Matters.**{TC "Section 3.17 Environmental Matters." \L2}

(a)      The operations of Seller with respect to the Business and the Purchased Assets are currently and have been in compliance in all material respects with all Environmental Laws. Seller has not received from any Person, with respect to the Business or the Purchased Assets, any: (i) Environmental Notice or Environmental Claim; or (ii) written request for information pursuant to Environmental Law, which, in each case, either remains pending or unresolved, or is the source of ongoing obligations or requirements as of the Closing Date.

(b)      Seller has not retained or assumed, by contract or operation of Law, any liabilities or obligations of third parties under Environmental Law.

**Section 3.18  Employee Benefit Matters.**{TC "Section 3.18 Employee Benefit Matters." \L2}

(a)      **Section 3.18(a)** of the Disclosure Schedules contains a true and complete list of each employee benefit plan, including, without limitation, any "employee benefit plan" within the meaning of Section 3(3) of ERISA (whether or not subject to ERISA), and any other compensation, deferred compensation, incentive, bonus, stock or stock-based, change in control, retention, severance, vacation, paid time off, fringe-benefit and other similar agreement, plan, policy, program or arrangement, in each case whether or not reduced to writing and whether funded or unfunded, which is or has been maintained, sponsored, contributed to, or required to be contributed to by Seller for the benefit of any current or former employee, officer, director, retiree, independent contractor or consultant of the Business or any spouse or dependent of such individual, or under which Seller or any ERISA Affiliate has or may have any Liability, or with respect to which Buyer or any of its Affiliates would reasonably be expected to have any Liability, contingent or otherwise (as listed on **Section 3.18(a)** of the Disclosure Schedules, each, a "**Benefit Plan**").

(b)      With respect to each Benefit Plan, Seller has made available to Buyer accurate, current and complete copies of each of the following: (i) the plan document together with all amendments (or, if no plan document is available, a description of the Benefit Plan; (ii) where applicable, any trust agreements or other funding arrangements, custodial agreements, insurance policies and contracts, and administration agreements and similar agreements; (iii) the most recent summary plan descriptions, including summaries of material modifications (if required), employee handbooks and any other written communications relating to any Benefit Plan; (iv) in the case of any Benefit Plan that is intended to be qualified under Section 401(a) of the Code, the most recent determination, opinion or advisory letter from the Internal Revenue Service; (v) in the case of any Benefit Plan for which a Form 5500 is required to be filed, the most recently filed Form 5500, with schedules attached; and (vi) copies of material notices, letters or other correspondence from any Governmental Authority relating to the Benefit Plan.

(c)      Except as set forth in **Section 3.18(c)** of the Disclosure Schedules, each Benefit Plan has been established, administered and maintained in accordance with its terms and in compliance with all applicable Laws (including ERISA and the Code), including any vesting required under Section 411(d)(3) of the Code. Each Benefit Plan that is intended to be qualified under Section 401(a) of the Code (a "**Qualified Benefit Plan**") is so qualified and has received a favorable and current determination or opinion letter from the Internal Revenue Service, and nothing has occurred that could reasonably be expected to cause the loss of the tax-qualified status of such Benefit Plan. Nothing has occurred with respect to any

Benefit Plan that has subjected or could reasonably be expected to subject Seller or, with respect to any period on or after the Closing Date, Buyer or any of its Affiliates, to a penalty under Section 502 of ERISA or to tax or penalty under Section 4975 of the Code. Except as set forth in **Section 3.18(c)** of the Disclosure Schedules, all benefits, contributions and premiums relating to each Benefit Plan have been timely paid in accordance with the terms of such Benefit Plan and all applicable Laws and accounting principles, and all benefits accrued under any unfunded Benefit Plan have been paid, accrued or otherwise adequately reserved to the extent required by, and in accordance with GAAP.

(d)     Neither Seller nor any of its ERISA Affiliates has incurred or reasonably would be expected to incur, either directly or indirectly, any material Liability under Title I or Title IV of ERISA with respect to any Benefit Plan;   .

(e)     With respect to each Benefit Plan (i) no such plan is a "multiemployer plan" within the meaning of Section 3(37) of ERISA ; (ii) no such plan is a "multiple employer plan" within the meaning of Section 413(c) of the Code or a "multiple employer welfare arrangement" (as defined in Section 3(40) of ERISA); (iii) no Action has been initiated by the Pension Benefit Guaranty Corporation to terminate any such plan or to appoint a trustee for any such plan; and (iv) no such plan is subject to the minimum funding standards of Section 302 of ERISA or Section 412 of the Code.

(f)     Except as set forth in **Section 3.18(f)** of the Disclosure Schedules and other than as required under Section 601 et. seq. of ERISA or other applicable Law, no Benefit Plan provides post-termination or retiree welfare benefits to any individual for any reason.

(g)     Except as set forth in **Section 3.18(g)** of the Disclosure Schedules, neither the execution of this Agreement nor any of the Contemplated Transactions will (either alone or upon the occurrence of any additional or subsequent events): (i) entitle any current or former director, officer, employee, independent contractor or consultant of the Business to severance pay or any other payment; (ii) accelerate the time of payment, funding or vesting, or increase the amount of compensation due to any such individual; (iii) increase the amount payable under or result in any other material obligation pursuant to any Benefit Plan; or (iv) result in "excess parachute payments" within the meaning of Section 280G(b) of the Code.

**Section 3.19  Employment Matters.**{TC "Section 3.19 Employment Matters." \L2}

(a)     **Section 3.19(a)** of the Disclosure Schedules contains a list of all persons who are employees, independent contractors or consultants of the Business as of the date hereof, and sets forth for each such individual the following: (i) name; (ii) title or position (including whether full or part time); (iii) hire date; (iv) current annual base compensation rate; (v) commission, bonus or other incentive-based compensation; and (vi) a description of the fringe benefits provided to each such individual as of the date hereof. As of the date hereof, all compensation, including wages, commissions and bonuses payable to employees, independent contractors or consultants of the Business for services performed on or prior to the date hereof have been paid in full or adequately accrued for in accordance with GAAP and there are no outstanding agreements, understandings or commitments of Seller with respect to any compensation, commissions or bonuses.

(b)    Seller is not, and has never been, a party to, bound by, or negotiating any collective bargaining agreement or other Contract with a union, works council or labor organization (collectively, "**Union**"), and there is not, and has never been, any Union representing or purporting to represent any employee of Seller, and, to Seller's Knowledge, no Union or group of employees is seeking or has sought to organize employees for the purpose of collective bargaining. There has never been, nor, to Seller's Knowledge, has there been any threat of, any strike, slowdown, work stoppage, lockout, concerted refusal to work overtime or other similar labor disruption or dispute affecting Seller or any employees of the Business.

Section 3.20  Taxes. {TC "Section 3.20 Taxes. " \L2}Except as set forth in **Section 3.20** of the Disclosure Schedules:

(a)    All Tax Returns required to be filed by Seller for any Pre-Closing Tax Period have been, or will be, timely filed. Such Tax Returns are, or will be, true, complete and correct in all material respects. All Taxes due and owing by Seller (whether or not shown on any Tax Return) have been, or will be, timely paid.

(b)    No claim has ever been made by an authority in a jurisdiction where Seller does not file Tax Returns that Seller is or may be subject to taxation by that jurisdiction.

(c)    Seller has withheld and paid each Tax required to have been withheld and paid in connection with amounts paid or owing to any Employee, independent contractor, creditor, customer, shareholder or other party, and has complied with all information reporting and backup withholding provisions of applicable Law.

(d)    No extensions or waivers of statutes of limitations have been given or requested with respect to any Taxes of Seller.

(e)    All deficiencies asserted, or assessments made, against Seller as a result of any examinations by any taxing authority have been fully paid.

(f)    Seller is not a party to any Action by any taxing authority. There are no pending or, to Seller's Knowledge, threatened Actions by any taxing authority.

(g)    There are no Encumbrances for Taxes upon any of the Purchased Assets nor is any taxing authority in the process of any Tax audit with respect to any of the Purchased Assets (other than for current Taxes not yet due and payable).

(h)    Seller is not a "foreign person" as that term is used in Treasury Regulations Section 1.1445-2.

(i)    Seller is not, and has not been, a party to, or a promoter of, a "reportable transaction" within the meaning of Section 6707A(c)(1) of the Code and Treasury Regulations Section 1.6011 4(b).

(j)    None of the Purchased Assets is tax-exempt use property within the meaning of Section 168(h) of the Code.

**Section 3.21   Brokers.** {TC "Section 3.21 Brokers. " \L2} Except as set forth in **Section 3.21** of the Disclosure Schedule, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the Contemplated Transactions based upon arrangements made by or on behalf of Seller.

**Section 3.22   Privacy and Security.** {TC "Section 3.23 Privacy and Security. " \L2}Seller (i) maintains adequate policies with respect to data security and data privacy (including the collection of personally identifiable information and the privacy of all customers and any of their personally identifiable information) and (ii) complies with all (and is not aware of any violation of any) (A) such policies, (B) applicable Laws relating to any such collection, data security, data privacy, deceptive trade practices, and consumer marketing and research, and (C) rules, regulations, standards, policies, manuals, and procedures of any applicable credit or debit card networks or associations (including, with respect to the processing of credit card information, the Payment Card Industry Data Security Standards (PCI-DSS)) governing the collection or use of personal information and payment card information (*"Card Association Rules"*). No claim has been made or is pending, or, to the Knowledge of Seller, is threatened, with respect to any failure to so maintain or comply. Except as set forth in **Section 3.22** of the Disclosure Schedules, there are not, and have not been, any facts or circumstances that would require a Seller to give notice to any customer, supplier or other Person of any actual or perceived data security breaches pursuant to any Law or Card Association Rules. Except as set forth in **Section 3.22** of the Disclosure Schedules, there have been no actual or alleged unauthorized use, access, intrusions, or breaches of security, of the (x) computer systems (including the computer software, firmware and hardware), telecommunications, networks, peripherals, platforms, computer systems and other similar or related items of automated, computerized and/or software systems that are used by Seller or (y) any personal information, payment card information, confidential or proprietary data or any other such information collected, maintained or stored by or on behalf of a Seller (or any loss, destruction, compromise or unauthorized disclosure thereof). To the Knowledge of Seller, none of any of their employees' or customers' personally identifiable information has been stolen or fraudulently acquired.

## ARTICLE IV
### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that the statements contained in this **Article IV** are true and correct as of the date hereof.

**Section 4.01   Organization of Buyer.** {TC "Section 4.01 Organization of Buyer. " \L2}Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the state of Delaware.

**Section 4.02   Authority of Buyer.** {TC "Section 4.02 Authority of Buyer. " \L2}Buyer has full corporate power and authority to enter into this Agreement and the other Transaction Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the

Contemplated Transactions. The execution and delivery by Buyer of this Agreement and any other Transaction Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder and the consummation by Buyer of the Contemplated Transactions have been duly authorized by all requisite corporate action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms. When each other Transaction Document to which Buyer is or will be a party has been duly executed and delivered by Buyer (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of Buyer enforceable against it in accordance with its terms.

Section 4.03   No Conflicts; Consents. {TC "Section 4.03 No Conflicts; Consents. " \L2}The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the Contemplated Transactions, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of incorporation, by-laws or other organizational documents of Buyer; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to Buyer; or (c) require the consent, notice or other action by any Person under any Contract to which Buyer is a party. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the Contemplated Transactions.

Section 4.04   Brokers. {TC "Section 4.04 Brokers. " \L2} No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the Contemplated Transactions based upon arrangements made by or on behalf of Buyer.

Section 4.05   Sufficiency of Funds. {TC "Section 4.05 Sufficiency of Funds. " \L2}Buyer has sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Purchase Price and consummate the Contemplated Transactions.

Section 4.06   Legal Proceedings. {TC "Section 4.06 Legal Proceedings. " \L2}There are no Actions pending or, to Buyer's knowledge, threatened against or by Buyer or any Affiliate of Buyer that challenge or seek to prevent, enjoin or otherwise delay the Contemplated Transactions. No event has occurred or circumstances exist that may give rise or serve as a basis for any such Action.

ARTICLE V
COVENANTS

Section 5.01   Conduct of Business Prior to the Closing. {TC "Section 5.01 Conduct of Business Prior to the Closing. " \L2}From the date hereof until the Closing, except as otherwise provided in

this Agreement or consented to in writing by Buyer, Seller shall (x) conduct the Business in the ordinary course of business consistent with past practice; and (y) use best efforts to maintain and preserve intact its current Business organization, operations and franchise and to preserve the rights, franchises, goodwill and relationships of its employees, customers, suppliers, regulators and others having relationships with the Business. Without limiting the foregoing, from the date hereof until the Closing Date, unless Buyer otherwise consents, Seller shall:

(a)     preserve and maintain all Permits required for the conduct of the Business as currently conducted or the ownership and use of the Purchased Assets;

(b)     maintain the properties and assets included in the Purchased Assets in the same condition as they were on the date of this Agreement, subject to reasonable wear and tear;

(c)     continue in full force and effect without modification all Insurance Policies;

(d)     defend and protect the properties and assets included in the Purchased Assets from infringement or usurpation;

(e)     perform all of its post-petition obligations under all Assumed Executory Contracts;

(f)     maintain the Books and Records in accordance with past practice;

(g)     comply in all material respects with all Laws applicable to the conduct of the Business or the ownership and use of the Purchased Assets;

(h)     not sell current season Inventory beneath minimum advertised pricing standards set by vendors;

(i)     comply with the budget set forth in connection with the DIP Facility; and

(j)     not take or permit any action that would cause any of the changes, events or conditions described in **Section 3.06** to occur.

**Section 5.02    Access to Information.** {TC "Section 5.02 Access to Information. " \L2}From the date hereof until the Closing, Seller shall (a) afford Buyer and its Representatives full and free access to and the right to inspect all of the Leased Real Property, properties, assets, premises, Books and Records, Contracts and other documents and data related to the Business; (b) furnish Buyer and its Representatives with such financial, operating and other data and information related to the Business as Buyer or any of its Representatives may reasonably request; and (c) instruct the Representatives of Seller to cooperate with Buyer in its investigation of the Business. Any investigation pursuant to this **Section 5.02** shall be conducted in such manner as not to interfere unreasonably with the conduct of the Business. No investigation by Buyer or other information received by Buyer shall operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Seller in this Agreement.

**Section 5.03    [Reserved].**{TC "Section 5.03 [Reserved.]" \L2}

**Section 5.04    Notice of Certain Events.**{TC "Section 5.04 Notice of Certain Events." \L2}

(a)      From the date hereof until the Closing, Seller shall promptly notify Buyer in writing of:

(i)      any fact, circumstance, event or action the existence, occurrence or taking of which (A) has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (B) has resulted in, or could reasonably be expected to result in, any representation or warranty made by Seller hereunder not being true and correct or (C) has resulted in, or could reasonably be expected to result in, the failure of any of the conditions set forth in **Section 6.02** to be satisfied;

(ii)      any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the Contemplated Transactions;

(iii)      any notice or other communication from any Governmental Authority in connection with the Contemplated Transactions; and

(iv)      any Action commenced or, to Seller's Knowledge, threatened against, relating to or involving or otherwise affecting the Business, the Purchased Assets or the Assumed Liabilities or relating to the consummation of the Contemplated Transactions.

(b)      Buyer's receipt of information pursuant to this **Section 5.04** shall not operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Seller in this Agreement (including **Section 7.02** and **Section 8.01(b)**) and shall not be deemed to amend or supplement the Disclosure Schedules.

**Section 5.05   Employees.**{TC "Section 5.05 Employees." \L2}

(a)      Commencing on the Closing Date, Seller shall terminate all employees of the Business who are actively at work on the Closing Date, and, subject to Buyer's ordinary course hiring practices, Buyer will offer employment, on an "at will" basis, to substantially all of Seller's employees.

(b)      Seller shall be solely responsible, and Buyer shall have no obligations whatsoever for, any compensation or other amounts payable to any current or former employee, officer, director, independent contractor or consultant of the Business, including, without limitation, hourly pay, commission, bonus, salary, accrued vacation, fringe, pension or profit sharing benefits or severance pay for any period relating to the service with Seller at any time on or prior to the Closing Date and Seller shall pay all such amounts to all entitled persons on or prior to the Closing Date.

(c)      Seller shall remain solely responsible for the satisfaction of all claims for medical, dental, life insurance, health accident or disability benefits brought by or in respect of current or former employees, officers, directors, independent contractors or consultants of the Business or the spouses, dependents or beneficiaries thereof, which claims relate to events occurring on or prior to the Closing Date. Seller also shall remain solely responsible for all worker's compensation claims of any current or former employees, officers, directors, independent contractors or consultants of the Business which relate to events occurring on or prior to the Closing Date. Seller shall pay, or cause to be paid, all such amounts to the appropriate persons as and when due.

**Section 5.06   Confidentiality.** {TC "Section 5.06 Confidentiality. " \L2}From and after the Closing, Seller shall, and shall cause its Affiliates to, hold, and shall use its reasonable best efforts to

cause its or their respective Representatives to hold, in confidence any and all information, whether written or oral, concerning the Business or the Purchased Assets, except to the extent that Seller can show that such information (a) is generally available to and known by the public through no fault of Seller, any of its Affiliates or their respective Representatives; or (b) is lawfully acquired by Seller, any of its Affiliates or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation. If Seller or any of its Affiliates or their respective Representatives are compelled to disclose any information by judicial or administrative process or by other requirements of Law, Seller shall promptly notify Buyer in writing and shall disclose only that portion of such information which Seller is advised by its counsel in writing is legally required to be disclosed, *provided that* Seller shall use reasonable best efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

**Section 5.07   Governmental Approvals and Consents**{TC "Section 5.07 Governmental Approvals and Consents" \L2}

(a)    Seller shall, as promptly as possible, (i) make, or cause or be made, all filings and submissions required under any Law applicable to Seller or any of its Affiliates; and (ii) use best efforts to obtain, or cause to be obtained, all consents, authorizations, orders and approvals from all Governmental Authorities that may be or become necessary for its execution and delivery of this Agreement and the performance of its obligations pursuant to this Agreement and the other Transaction Documents. Seller shall not willfully take any action that will have the effect of delaying, impairing or impeding the receipt of any required consents, authorizations, orders and approvals.

(b)    Seller shall use best efforts to give all notices to, and obtain all consents from, all third parties that are described in **Section 3.04** of the Disclosure Schedules.

(c)    Without limiting the generality of Seller's undertakings pursuant to subsections (a) and (b) above, Seller shall use best efforts to:

(i)    respond to any inquiries by any Governmental Authority with respect to the Contemplated Transactions;

(ii)    avoid the imposition of any order or the taking of any action that would restrain, alter or enjoin the Contemplated Transactions; and

(iii)    in the event any Governmental Order adversely affecting the ability of the parties to consummate the Contemplated Transactions has been issued, to have such Governmental Order vacated or lifted.

**Section 5.08   Closing Conditions** {TC "Section 5.08 Closing Conditions " \L2}From the date hereof until the Closing, Seller shall use best efforts to take such actions as are necessary to expeditiously satisfy the closing conditions set forth in **Article VI** hereof.

**Section 5.09  Transfer Taxes.** {TC "Section 5.09 Transfer Taxes. " \L2}All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the other Transaction Documents (including any real property leasehold transfer Tax and any other similar Tax), if any, shall be borne and paid by Seller when due. Seller shall, at its own expense, timely file any Tax Return or other document with respect to such Taxes or fees (and Buyer shall cooperate with respect thereto as necessary).

**Section 5.10  Bankruptcy Matters.** {TC "Section 5.10 Bankruptcy Actions. " \L2}

Seller acknowledges that a material inducement to Buyer's agreement to provide the DIP Facility and to act as a stalking horse bidder in the Bankruptcy Case is Seller's agreement to conduct the sale of the Purchased Assets in the manner set forth in the Sale Procedures Order, to seek approval of the Sale Procedures Order (including the approval of the form of this Agreement), and to seek approval of the Sale Motion in an expeditious manner consistent with the requirements of the Bankruptcy Code.  Accordingly, Seller agrees as follows:

(a)      Not later than January 13, 2014, Seller shall file with the Bankruptcy Court a motion to approve the Contemplated Transactions ("**Sale Motion**"), which motion shall seek the Bankruptcy Court's approval of this Agreement and Seller's performance under this Agreement.

(b)      Not later than January 13, 2014, Seller shall file with the Bankruptcy Court a motion for entry of the Sale Procedures Order, and shall seek an order shortening time on such motion. The Sale Procedures Order shall provide for approval of the Expense Reimbursement.

(c)      [reserved].

(d)      Prior to the earlier of (i) termination of this Agreement pursuant to **Section 8.01**, and (ii) entry of the Sale Procedures Order by the Bankruptcy Court, Seller shall not solicit or participate in negotiations or discussions regarding any Acquisition Proposal other than an Acquisition Proposal contemplated in the Sale Procedures Order (i.e., a Qualifying Alternative Bid) (which may include providing access to due diligence materials).  Following entry of the Sale Procedures Order by the Bankruptcy Court, Seller agrees that Seller shall not solicit or participate in negotiations or discussions regarding any Acquisition Proposal other than in compliance with the Sale Procedures Order, and shall conduct the sale of the Purchased Assets in accordance with the Sale Procedures Order, as approved by the Bankruptcy Court (which may include providing access to due diligence materials).  From the date of the entry of the Sale Order until the Closing Date, and provided that Buyer is proceeding in good faith to consummate the Contemplated Transactions in a timely manner, Seller shall not discuss, negotiate or consummate any transaction involving (i) the issuance, redemption, sale or exchange or other disposition of any equity interest in Seller or (ii) the sale, exchange, liquidation, reorganization, or other disposition of all or any part of the Purchased Assets.

(e)      If Buyer is not the deemed to be the Successful Bidder (as defined in the Sale Procedures Order) or the Bankruptcy Court approves the sale of substantially all of the Purchased Assets to a purchaser other than Buyer, Seller shall immediately pay or reimburse the Buyer for all its out-of-pocket costs and expenses incurred in connection with (i) the development, preparation and execution of, and any amendment, supplement or modification to, this Agreement and any other documents prepared in

connection herewith or therewith, (ii) conducting due diligence on Buyer's assets and business, (iii) participating in the Bankruptcy Case, and enforcing or preserving any rights under this and any such other documents, including the fees and disbursements of counsel to the Buyer (the "**Expense Reimbursement**"). The foregoing shall include, but not be limited to (i) all such costs and expenses incurred from and after December 1, 2013 through and including the participation by Buyer in the Sale Hearing (as defined in the Sale Procedures Order), (ii) preparation for and attendance at hearings in the Bankruptcy Case, (iii) preparation for and participation in the Auction (as defined in the Sale Procedures Order), and (iv) preparation for and participation in the Sale Hearing (as defined in the Sale Procedures Order). Seller's obligation to pay the Expense Reimbursement shall constitute an administrative expense of Seller under Section 503 of the Bankruptcy Code.  Notwithstanding any other provision hereof, Seller's obligation to the Expense Reimbursement shall not exceed $250,000.

(f)    Seller will provide Buyer with a reasonable opportunity to review and comment upon all motions, applications and supporting papers prepared by Seller (including forms of orders and notices to interested parties) prior to the filing thereof in the Bankruptcy Case; provided, however, if (i) a motion, application or supporting paper to be filed in the Bankruptcy Case is not related (directly or indirectly) to this Agreement, the Contemplated Transactions, the Transaction Documents, Buyer or the Purchased Assets, and (ii) Seller does not have sufficient time to provide Buyer with a reasonable opportunity to review and comment upon such motion, application or supporting paper due to the urgent nature of such motion or application, Seller shall not be required to provide Buyer with a reasonable opportunity to review and comment but shall provide a copy of the motion, application and supporting paper to Buyer simultaneously with the filing thereof. All motions, applications and supporting papers prepared by Seller and relating (directly or indirectly) to Buyer, this Agreement or any of the Contemplated Transactions (including forms of orders and notices to interested parties) to be filed on behalf of Seller after the date hereof must be acceptable in form and substance to Buyer.

(g)    If a Qualifying Alternative Bid is submitted prior to the Alternative Bid Deadline, the condition set forth in **Section 6.02(c)** shall be deemed to have been waived by Buyer as of the Alternative Bid Deadline.

(h)    Seller agrees that the rights and remedies for noncompliance with this **Section 5.10** shall include having such provision specifically enforced by any court having equity jurisdiction, it being acknowledged and agreed that any such breach or threatened breach shall cause irreparable injury to Buyer and that money damages would not provide an adequate remedy to Buyer.

**Section 5.11  Assumption and Rejection of Executory Contracts and Leases.** {TC "Section 5.11 Assumption and Rejection of Executory Contracts and Leases. " \L2}

(a)    Not later than January 13, 2014, Seller shall file with the Bankruptcy Court a motion (which may be included in the Sale Motion) for an order authorizing the assumption and assignment pursuant to Section 365 of the Bankruptcy Code of the Assumed Executory Contracts on terms acceptable to Buyer (the "**Assignment Motion**"). Within three (3) days of entry of the Sale Procedures Order, Seller shall send notice to counterparties to all executory Business Contracts that such contracts may become Assumed Executory Contracts. Each such executory Business Contract shall be identified (by the date, the other party to the contract or lease and the address of such party) on an exhibit to the  notice. Such exhibit

shall set forth the amount Seller believes is necessary to cure defaults under each of such executory Business Contract and lease. In cases in which Seller is unable to establish that a default exists, the relevant cure amount shall be set at $0.00. The Assignment Motion shall reflect that Buyer's promise to perform from and after the Closing under executory Contracts and leases that become Assumed Executory Contracts shall be the only adequate assurance of future performance necessary to satisfy the requirements of Section 365 of the Bankruptcy Code in respect of the assignment to Buyer of such Assumed Executory Contract.

(b)     The Buyer shall, on or before the Alternative Bid Deadline, identify those executory Business Contracts that it intends to have become Assumed Executory Contracts. Seller shall be responsible for paying any and all cure amounts with respect to those Assumed Executory Contracts from the Purchase Price proceeds.

(c)     The Buyer shall have the right, exercisable without limitation at any time and from time to time prior to the Designation Deadline, to notify the Seller in writing of the Buyer's election to treat any executory Business Contract as either an Assumed Executory Contract or an Excluded Executory Contract. With respect to any Business Contract first designated by Buyer to become an Assumed Executory Contract after the Alternative Bid Deadline, (i) if the executory Business Contract was identified in **Section 3.07(a)** of the Disclosure Schedules as of the date hereof, Buyer shall be responsible for paying any cure amounts associated with assumption and assignment of such contract, unless Buyer and Seller otherwise agree, and (ii) if the executory Business Contract was not identified in **Section 3.07(a)** of the Disclosure Schedules as of the date hereof, Seller shall be responsible for paying any cure amounts associated with assumption and assignment of such contract.

(d)     Promptly following delivery of each notice by the Buyer pursuant to **Section 5.11(b),** the Sellers shall or shall cause (i) the Business Contract that the Buyer has elected to treat as Assumed Executory Contract to be assumed and assigned to the Buyer in accordance with Section 365 of the Bankruptcy Code and the Sale Order, and such Business Contract shall be deemed to be added to **Section 1.01(f),** and (ii) each Business Contract that the Buyer has elected to treat as an Excluded Executory Contract to be rejected in accordance with Section 365 of the Bankruptcy Code and the Sale Order. The Sellers shall timely file appropriate motions and take such other actions as may be necessary to assume and assign to the Buyer the Assumed Executory Contracts, and the Sale Order shall authorize such assumption and assignment. On the date of the assignment thereof to the Buyer, the Seller shall be released from any further liability under the Assumed Executory Contracts.

**Section 5.12   Maintenance of Business.** {TC "Section 5.12 Maintenance of Business. " \L2} At all times before and after the Closing, Seller will cooperate with Buyer in its efforts to continue and maintain for the benefit of Buyer those business relationships of Seller existing prior to the Closing and relating to the Business to be operated by Buyer after the Closing, including relationships with lessors, employees, regulatory authorities, licensors, customers, suppliers and others having a business relationships with Seller. Seller will in good faith encourage such Persons to continue its relationship with Buyer for the benefit of the Business following the Closing Date. Seller will refer to Buyer all inquiries relating to the Business. Neither Seller nor any of its officers, employees, agents or shareholders shall take any action that would tend to diminish the value of the Purchased Assets before

or after the Closing or that would interfere with the business of Buyer to be engaged in after the Closing. Seller and its Affiliates will not disparage Buyer or any of Buyer's shareholders, directors, officers, employees or agents. For purposes of this **Section 5.12**, it is agreed and understood that after Closing Seller is expected to have few, if any, employees, agents or other persons acting on its behalf and its ability to fulfill the obligations described in this **Section 5.12** at such time will be limited accordingly.

Section 5.13    **Further Assurances.** {TC "Section 5.13 Further Assurances. " \L2}Following the Closing, Seller shall, and shall cause its Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof, give effect to the Contemplated Transactions, and address any Action that may arise following the Closing Date with respect to the Purchased Assets.

## ARTICLE VI
### CONDITIONS TO CLOSING

Section 6.01    **Conditions to Obligations of All Parties.** {TC "Section 6.01 Conditions to Obligations of All Parties. " \L2}The obligations of each party to consummate Contemplated Transactions shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)    No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Governmental Order which is in effect and has the effect of making the Contemplated Transactions illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the Contemplated Transactions to be rescinded following completion thereof.

Section 6.02    **Conditions to Obligations of Buyer.** {TC "Section 6.02 Conditions to Obligations of Buyer. " \L2}The obligations of Buyer to consummate the Contemplated Transactions shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)    Other than the representations and warranties of Seller contained in **Section 3.01, Section 3.02** and **Section 3.21,** the representations and warranties of Seller contained in this Agreement, the other Transaction Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects). The representations and warranties of Seller contained **Section 3.01, Section 3.02** and **Section 3.21** shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(b)     Seller shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date.

(c)     Subject to **Section 5.10(g)**, Buyer shall be satisfied with the results of its due diligence review in its absolute discretion.

(d)     No Action shall have been commenced against Buyer or Seller, which would prevent the Closing. No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any of the Contemplated Transactions.

(e)     All approvals, consents and waivers that are listed on **Section 3.04** of the Disclosure Schedules shall have been received, and executed counterparts thereof shall have been delivered to Buyer at or prior to the Closing.

(f)     There shall not have occurred any Material Adverse Effect, nor shall any event or events have occurred that, individually or in the aggregate, with or without the lapse of time, could reasonably be expected to result in a Material Adverse Effect, in each case, other than the filing of the Bankruptcy Case.

(g)     Buyer shall have received adequate assurance that certain key vendors of Seller's Business shall conduct business with Buyer on reasonable terms after Closing, as determined by Buyer in its absolute discretion, and a sufficient number (in Buyer's discretion) of Seller's vendors shall have reinstituted drop shipments for the Business prior to Closing.

(h)     Seller shall have delivered to Buyer duly executed counterparts to the Transaction Documents (other than this Agreement) and such other documents and deliveries set forth in **Section 2.02(a)(a)**.

(i)     Buyer shall have received all Permits that are necessary for it to conduct the Business as conducted by Seller as of the Closing Date.

(j)     The Sale Procedures Order shall have been entered on the docket by the Clerk of the Bankruptcy Court, without any material change, on or before January 21, 2014 (unless extended by the mutual agreement of Buyer and Seller).

(k)     The Sale Order shall have been entered on the docket by the Clerk of the Bankruptcy Court on or before February 14, 2014 (unless extended by the mutual agreement of Buyer and Seller) and shall have become a Final Order. The Sale Order shall approve and authorize the assumption and assignment of the Assumed Executory Contracts on terms acceptable to Buyer, such that they will be in full force and effect from and after the Closing with non-debtor parties being barred and enjoined from asserting against Buyer, among other things, defaults, breaches or claims of pecuniary losses existing as of the Closing or by reason of the Closing.

(l)     [reserved]

(m)     Buyer shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Seller, that each of the conditions set forth in **Section 6.02(a)** and **Section 6.02(b)** have been satisfied (the "**Seller Closing Certificate**").

(n)    Seller shall have delivered to Buyer certification of compliance with the Card Association Rules by the Business in form and substance satisfactory to Buyer, from a third party approved by Buyer in its discretion;

(o)    Buyer shall have received a certificate pursuant to Treasury Regulations Section 1.1445-2(b) (the "**FIRPTA Certificate**") that Seller is not a foreign person within the meaning of Section 1445 of the Code duly executed by Seller.

(p)    Seller shall have paid or otherwise provided for all cure obligations (pursuant to Section 365 of the Bankruptcy Code) with respect to the Assumed Executory Contracts.

(q)    Seller shall have executed all documents necessary to change its name to a name substantially dissimilar to "Altrec" (and satisfactory to Buyer in its discretion) and shall have delivered to Buyer for filing fully executed copies of all requisite documentation to effect such change with all applicable Governmental Authorities.

(r)    Seller shall have delivered to Buyer such other documents or instruments as Buyer may request in order to consummate the Contemplated Transactions.

**Section 6.03    Conditions to Obligations of Seller.** {TC "Section 6.03 Conditions to Obligations of Seller. " \L2}The obligations of Seller to consummate the Contemplated Transactions shall be subject to the fulfillment or Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a)    Other than the representations and warranties of Buyer contained in **Section 4.01, Section 4.02** and **Section 4.04,** the representations and warranties of Buyer contained in this Agreement, the other Transaction Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects). The representations and warranties of Buyer contained **Section 4.01, Section 4.02** and **Section 4.04** shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(b)    Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date.

(c)    No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any material transaction contemplated hereby.

(d)      Buyer shall have delivered to Seller duly executed counterparts to the Transaction Documents (other than this Agreement) and such other documents and deliveries set forth in **Section 2.02(b)**.

(e)      Seller shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Buyer, that each of the conditions set forth in **Error! Reference source not found.** and **Section 6.03(a)** have been satisfied (the "**Buyer Closing Certificate**").

(f)      Each of the Sale Order and the Sale Procedures Order shall be been entered on the Bankruptcy Court's docket by the Clerk of the Bankruptcy Court and shall not have been stayed or subject to any stay.

(g)      Buyer shall have delivered to Seller such other documents or instruments as Seller reasonably requests and are reasonably necessary to consummate the Contemplated Transactions.

## ARTICLE VII
### INDEMNIFICATION

**Section 7.01   Survival.** {TC "Section 7.01 Survival. " \L2}Subject to the limitations and other provisions of this Agreement, Seller's representations and warranties contained herein shall survive the Closing and shall remain in full force and effect until the date that is 180 days from the Closing Date. All covenants and agreements of the parties contained herein shall survive the Closing indefinitely or for the period explicitly specified therein. Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from the non-breaching party to the breaching party within 180 days from the Closing Date (including by including in the Post-Closing Adjustment Statement) shall not thereafter be barred by the expiration of the relevant representation or warranty and such claims shall survive until finally resolved. For the avoidance of doubt, the Buyer Indemnitees' right to bring claims under **Section 7.02** shall expire after the completion of the 180 day period following the Closing Date, provided that any claims for which notice was given within 180 days from the Closing Date shall survive until finally resolved.

**Section 7.02   Indemnification.** {TC "Section 7.02 Indemnification By Seller. " \L2}Subject to the other terms and conditions of this **Article VII**, Seller shall indemnify and defend each of Buyer and its Affiliates and their respective Representatives (collectively, the "**Buyer Indemnitees**") against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, the Buyer Indemnitees based upon, arising out of, with respect to or by reason of:

(a)      any inaccuracy in or breach of any of the representations or warranties of Seller contained in this Agreement, the other Transaction Documents or in any certificate or instrument delivered by or on behalf of Seller pursuant to this Agreement, as of the date such representation or warranty was made or as if such representation or warranty was made on and as of the Closing Date (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date);

(b)      any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Seller pursuant to this Agreement, the other Transaction Documents or any certificate or instrument delivered by or on behalf of Seller pursuant to this Agreement;

(c)      any Excluded Asset or any Excluded Liability; or

(d)      any Third Party Claim based upon, resulting from or arising out of the business, operations, properties, assets or obligations of Seller or any of its Affiliates conducted, existing or arising on or prior to the Closing Date.

In the absence of fraud or intentional misrepresentation, the aggregate amount of all Losses for which Seller shall be liable pursuant to this **Section 7.02** shall not exceed, and the sole and exclusive source of recovery for any Buyer Indemnitee shall be, the amount of the Post-Closing Cash Consideration, as adjusted.

**Section 7.03   No Right to Participate.** {TC "Section 7.04 Right to Participate. " \L2} Seller shall not have the right to participate in, or to assume the defense of, any Third Party Claim against a Buyer Indemnitee unless Buyer shall have first consented in writing, which consent it may withhold in its discretion.

**Section 7.04   Tax Treatment of Indemnification Payments.** {TC "Section 7.05 Tax Treatment of Indemnification Payments. " \L2}All indemnification payments made under this Agreement shall be treated by the parties as an adjustment to the Purchase Price for Tax purposes, unless otherwise required by Law.

**Section 7.05   Effect of Investigation.** {TC "Section 7.06 Effect of Investigation. " \L2}The representations, warranties and covenants of Seller, and Buyer's right to indemnification with respect thereto, shall not be affected or deemed waived by reason of any investigation made by or on behalf of Buyer (including by any of its Representatives) or by reason of the fact that the Buyer or any of its Representatives knew or should have known that any such representation or warranty is, was or might be inaccurate or by reason of the Buyer's waiver of any condition set forth in **Section 6.02** or **Section 6.03**, as the case may be.

**Section 7.06   Right of Setoff.** {TC "Section 7.07 Right of Setoff. " \L2}Notwithstanding any other provision hereof, Buyer or any other Buyer Indemnitee shall have the right to offset the amount of any claim such Person may have pursuant to this **Article VII** from any amount payable from Buyer to Seller, including the Post-Closing Cash Consideration.

**Section 7.07   Exclusion of Certain Losses.** {TC "Section 7.08 Exclusion of Certain Losses. " \L2} Notwithstanding any other provision hereof, Seller acknowledges and agrees that no Buyer Indemnitee shall have any liability (whether direct or indirect, in contract, tort, or otherwise) to Seller or any of its security holders or creditors for or in connection with the Contemplated Transactions, except for direct damages (as opposed to special, indirect, consequential or punitive damages (including,

without limitation, any loss of profits, business or anticipated savings)) determined by a court of competent jurisdiction to have resulted from such Person's gross negligence or willful misconduct.

## ARTICLE VIII
### TERMINATION

**Section 8.01  Termination.** {TC "Section 8.01 Termination. " \L2}This Agreement may be terminated at any time prior to the Closing:

(a)      by the mutual written consent of Seller and Buyer;

(b)      by Buyer by written notice to Seller if:

(i)      there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in **Article VI** and such breach, inaccuracy or failure has not been cured by Seller within five days of Seller's receipt of written notice of such breach from Buyer; or

(ii)      the Closing shall not have occurred by February 24, 2014;

(iii)      at any time prior to the Alternative Bid Deadline Buyer determines, in its sole and absolute discretion, that it is not satisfied with the results of its due diligence;

(iv)      it becomes apparent that any of the conditions set forth in **Section 6.01** or **Section 6.02** will not be fulfilled by the respective dates set forth therein or, with respect to those conditions for which no date is specified, by February 17, 2014;

(v)      the Bankruptcy Court shall not have entered the Sale Order by February 14, 2014; or

(vi)      the Bankruptcy Court shall have approved a transaction by Seller with another party that would prevent the consummation of Contemplated Transactions with Buyer.

(c)      by Seller by written notice to Buyer if:

(i)      there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in **Article VI** and such breach, inaccuracy or failure has not been cured by Buyer within five days of Buyer's receipt of written notice of such breach from Seller; or

(d)      by Buyer or Seller in the event that (i) there shall be any Law that makes consummation of the Contemplated Transactions illegal or otherwise prohibited or (ii) any Governmental Authority shall have issued a Governmental Order restraining or enjoining the Contemplated Transactions , and such Governmental Order shall have become final and non-appealable.

**Section 8.02  Effect of Termination.** {TC "Section 8.02 Effect of Termination. " \L2}In the event of the termination of this Agreement in accordance with this Article, this Agreement shall forthwith become void and there shall be no liability on the part of any party hereto except:

(a)      as set forth in this **Article VIII**, **Section 5.06**, **Section 5.10** and **Article IX** hereof; and

(b)      that nothing herein shall relieve any party hereto from liability for any willful breach of any provision hereof.

**ARTICLE IX**

**MISCELLANEOUS**

**Section 9.01   Expenses.** Except to the extent set forth in **Section 5.10**, the parties will each pay their own transaction expenses, including the fees and expenses of their advisors incurred in connection with the proposed transaction.{TC "Section 9.01 Expenses. " \L2}

**Section 9.02   Notices.** {TC "Section 9.02 Notices. " \L2}All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this **Section 9.02**):

If to Seller:

**Prior to Closing**
Altrec, Inc.
725 SW Umatilla Avenue,
Redmond, OR 97756
Phone: (541) 316-2403
Facsimile: (541) 610-1628
Attention:  Janet Mathews

**After Closing**
Hamstreet & Associates
One SW Columbia Street, Suite 1000
Portland OR 97258
Phone: (503) 223-6222
Facsimile: (503) 546-6579
Attention: Hannah Schmidt

with a copy to:

Greene & Markley, P.C.
1515 SW Fifth Ave., Suite 600

Portland, OR 97201
Phone: (503) 546-1450
Facsimile: (503) 224-8434
Attention: David A. Foraker

If to Buyer:                                      Great Outdoors Holdco, LLC
                                                 300 First Stamford Pl.,
                                                 5th Floor-ROC, Stamford, CT 06902
                                                 Phone: (203) 276-3638
                                                 Facsimile: (203) 276-3649
                                                 Attention: Jonathan K. Sprole

with a copy to:                                  Davis Wright Tremaine LLP
                                                 1201 Third Avenue
                                                 Suite 2200
                                                 Seattle, Washington 98101
                                                 Phone: (206) 757-8123
                                                 Facsimile: (206) 757-7123
                                                 Attention: Ragan Powers

 

 

**Section 9.03  Interpretation.** {TC "Section 9.03 Interpretation. " \L2}For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

**Section 9.04  Headings.** {TC "Section 9.04 Headings. " \L2}The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 9.05   Severability.** {TC "Section 9.05 Severability. " \L2}If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the Contemplated Transactions be consummated as originally contemplated to the greatest extent possible.

**Section 9.06   Entire Agreement.** {TC "Section 9.06 Entire Agreement. " \L2}This Agreement and the other Transaction Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the other Transaction Documents, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**Section 9.07   Successors and Assigns.** {TC "Section 9.07 Successors and Assigns. " \L2}This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed; *provided, however,* that prior to the Closing Date, Buyer may, without the prior written consent of Seller, assign all or any portion of its rights under this Agreement to one or more of its Affiliates or direct or indirect wholly-owned subsidiaries.

**Section 9.08   No Third-party Beneficiaries.** {TC "Section 9.08 No Third-party Beneficiaries. " \L2}Except as provided in **Article VII**, this Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 9.09   Amendment and Modification; Waiver.** {TC "Section 9.09 Amendment and Modification; Waiver. " \L2}This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor

shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 9.10   Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.**{TC "Section 9.10 Governing Law; Submission to Jurisdiction; Waiver of Jury Trial." \L2}

    (a)     This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction).

    (b)     Each party irrevocably consents to the service of any and all process in any action or proceeding arising out of or relating to this Agreement by the mailing of copies of such process to each party at its address specified in **Section 9.02**. The parties hereto irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court) over any dispute arising out of or relating to this Agreement or any of the Contemplated Transactions. Each party hereby irrevocably agrees that all claims in respect of such dispute or proceedings may be heard and determined in such courts. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum in connection therewith..

**Section 9.11   Specific Performance.** {TC "Section 9.11 Specific Performance. " \L2}The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

**Section 9.12   Counterparts.** {TC "Section 9.12 Counterparts. " \L2}This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

Altrec, Inc.

By _~signature~_

Name: CLYDE A HAMSTREET

Title: C R O

Great Outdoors Holdco, LLC

By _____

Name:

Title:

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

Altrec, Inc.

By_____
Name:
Title:

Great Outdoors Holdco, LLC

By_____
Name: *CHRISTOPHER WHIPPS*
Title: *VICE PRESIDENT*

[Signature Page to Asset Purchase Agreement]

**EXHIBIT A**
Definitions

The following terms have the meanings specified or referred to in this **Exhibit A**:

"**Accounts Receivable**" has the meaning set forth in **Section 1.01(i)**.

"**Acquisition Proposal**" means a proposal (other than by Buyer) relating to any merger, consolidation, business combination, sale or other disposition of any of the Purchased Assets pursuant to one or more transactions, the sale of any of the outstanding shares of capital stock or equity interests of Seller (including, without limitation, by way of a tender offer, foreclosure or plan of reorganization or liquidation) or a similar transaction or business combination involving one or more third parties and Seller

"**Action**" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the preamble.

"**Allocation Schedule**" has the meaning set forth in **Section 1.07**.

"**Alternative Bid Deadline**" has the meaning given in the Sale Procedures Order.

"**Assignment Motion**" has the meaning set forth in **Section 5.11**.

"**Assumed Executory Contracts**" has the meaning set forth in **Section 1.01**.

"**Assumed Liabilities**" has the meaning set forth in **Section 1.03**.

"**Assumed Return Claims**" has the meaning set forth in **Section 1.03(b)**.

"**Audited Financial Statements**" has the meaning set forth in **Section 3.05**.

"**Balance Sheet**" has the meaning set forth in **Section 3.05**.

"**Balance Sheet Date**" has the meaning set forth in **Section 3.05**.

"**Bankruptcy Case**" has the meaning set forth in the Recitals.

"**Bankruptcy Code**" has the meaning set forth in the Recitals.

"**Bankruptcy Court**" has the meaning set forth in the Recitals.

"**BBH**" has the meaning set forth in **Section 3.02**.

"**Benefit Plan**" has the meaning set forth in **Section 3.18(a)**.

"**Books and Records**" has the meaning set forth in **Section 1.01**.

"**Business**" has the meaning set forth in the recitals.

"**Business Contracts**" has the meaning set forth in **Section 3.07(a)**.

"**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in Seattle, Washington are authorized or required by Law to be closed for business.

"**Buyer**" has the meaning set forth in the preamble.

"**Buyer Closing Certificate**" has the meaning set forth in **Section 6.03(e)**.

"**Buyer Indemnitees**" has the meaning set forth in **Section 7.02**.

"**Card Association Rules**" has the meaning set forth in **Section 3.22**.

"**Closing**" has the meaning set forth in **Section 2.01**.

"**Closing Cash Consideration**" has the meaning set forth in **Section 1.05(a)**.

"**Closing Date**" has the meaning set forth in **Section 2.01**.

"**Closing Working Capital**" means: (a) Current Assets, less (b) Current Liabilities, determined as of the close of business on the Closing Date.

"**Closing Working Capital Statement**" has the meaning set forth in **Section 1.06(b)(i)**.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Contracts**" means all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures, purchase orders and all other agreements, commitments and legally binding arrangements, whether written or oral.

"**Contemplated Transactions**" means all the transactions contemplated by this Agreement.

"**Cure Claims**" has the meaning set forth in Section 1.06(b)(i).

"**Current Assets**" means the current assets of the Business determined in accordance with GAAP included in the line items set forth on **Section 1.06(b)(i)** of the Disclosure Schedules and only to the extent acquired pursuant to the terms of this Agreement.

"**Current Liabilities**" means the current liabilities of the Business determined in accordance with GAAP included in the line items set forth on **Section 1.06(b)(i)** of the Disclosure Schedules and only to the extent assumed pursuant to the terms of this Agreement.

"**Designation Deadline**" means the first business day that is sixty (60) days from the date the Sale Order becomes a Final Order.

"**DIP Facility**" means the loans made to Seller by Buyer or one of its Affiliates pursuant to that certain Superpriority Debtor-in-Possession Credit Agreement by and between Seller and Buyer and the related documents thereto.

"**Disclosure Schedules**" means the Disclosure Schedules delivered by Seller and Buyer concurrently with the execution and delivery of this Agreement, as amended by Buyer pursuant as provided for in this Agreement.

"**Dollars or $**" means the lawful currency of the United States.

"**Employment Agreement**" has the meaning given in **Section 2.02(a)(ii)**.

"**Encumbrance**" means any charge, claim, community property interest, pledge, condition, equitable interest, lien (statutory or other), option, security interest, mortgage, easement, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"**Environmental Claim**" means any Action, Governmental Order, lien, fine, penalty, or, as to each, any settlement or judgment arising therefrom, by or from any Person alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (a) the presence, Release of, or exposure to, any Hazardous Materials; or (b) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"**Environmental Law**" means any applicable Law, and any Governmental Order or binding agreement with any Governmental Authority: (a) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata); or (b) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Materials.

"**Environmental Notice**" means any written directive, notice of violation or infraction, or notice respecting any Environmental Claim relating to actual or alleged non-compliance with any Environmental Law or any term or condition of any Environmental Permit.

"**Environmental Permit**" means any Permit, letter, clearance, consent, waiver, closure, exemption, decision or other action required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"**ERISA Affiliate**" means, with respect to any Person, any other Person that, together with such first Person, would be treated as a single employer within the meaning of Section 414(b), (c), (m) or (o) of the Code.

"**Excluded Assets**" has the meaning set forth in **Section 1.02**.

"**Excluded Liabilities**" has the meaning set forth in **Section 1.04**.

"**Expense Reimbursement**" has the meaning set forth in **Section 5.10**.

"**Final Order**" means an Order as to which the time to file an appeal, a motion for rehearing or reconsideration (excluding any motion under F.R.C.P. 60(b)) or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending.

"**Financial Statements**" has the meaning set forth in **Section 3.05**.

"**FIRPTA Certificate**" has the meaning set forth in **Section 6.02(n)**.

"**GAAP**" means United States generally accepted accounting principles in effect from time to time.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction, including the Bankruptcy Court.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"**Hazardous Materials**" means: (a) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or manmade, that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental Laws; and (b) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation and polychlorinated biphenyls.

"**Independent Accountants**" means an impartial nationally recognized firm of independent certified public accountants mutually agreeable to Buyer and Seller.

"**Insurance Policies**" has the meaning set forth in **Section 3.14**.

"**Intellectual Property**" means all intellectual property and industrial property rights and assets, and all rights, interests and protections that are associated with, similar to, or required for the exercise of, any of the foregoing, however arising, pursuant to the Laws of any jurisdiction throughout the world, whether registered or unregistered, including any and all: (a) trademarks, service marks, trade names, brand names, logos, trade dress, design rights and other similar designations of source, sponsorship, association or origin, together with the goodwill connected with the use of and symbolized by, and all registrations, applications and renewals for, any of the foregoing (collectively, "**Marks**"); (b) internet domain names, whether or not trademarks, registered in any top-level domain by any authorized private registrar or Governmental Authority, web addresses, web pages, websites and related content, accounts with Twitter, Facebook and other social media companies and the content found thereon and related thereto, and URLs (collectively, "**Websites**"); (c) works of authorship, expressions, designs and design registrations, whether or not copyrightable, including copyrights, author, performer, moral and neighboring rights, and all registrations, applications for registration and renewals of such copyrights (collectively, "**Works**"); (d) inventions, discoveries, trade secrets, business and technical information and know-how, databases, data collections and other confidential and proprietary information and all rights therein (collectively, "**Trade Secrets**"); (e) patents (including all reissues, divisionals, provisionals, continuations and continuations-in-part, re-examinations, renewals, substitutions and extensions thereof), patent applications, and other patent rights, whether registered or unregistered and existing as of the Closing Date, and any other Governmental Authority-issued indicia of invention ownership (including inventor's certificates, petty patents and patent utility models) (collectively, "**Patents**"); (f) software and firmware, including data files, source code, object code, application programming interfaces, architecture, files, records, schematics, computerized databases and other related specifications and documentation (collectively, "**Software**"); (g) royalties, fees, income, payments and other proceeds now or hereafter due or payable with respect to any and all of the foregoing; and (h) all rights to any Actions of any nature available to or being pursued by Seller to the extent related to the foregoing, whether accruing before, on or after the date hereof, including all rights to and claims for damages, restitution and injunctive relief for infringement, dilution, misappropriation, violation, misuse, breach or default, with the right but no obligation to sue for such legal and equitable relief, and to collect, or otherwise recover, any such damages.

"**Intellectual Property Agreements**" means all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, permissions and other Contracts (including any right to receive or obligation to pay royalties or any other consideration), whether written or oral, relating to any Intellectual Property that is used in or necessary for the conduct of the Business as currently conducted to which Seller is a party, beneficiary or otherwise bound.

"**Intellectual Property Assets**" means all Intellectual Property that is owned by Seller, whether registered or unregistered, in connection with the Business as it has been conducted in the past, as it is currently conducted, or as it is currently contemplated to be conducted.

5

"**Intellectual Property Registrations**" means all Intellectual Property Assets that are subject to any issuance, registration, application or other filing by, to or with any Governmental Authority or authorized private registrar in any jurisdiction, including registered trademarks, domain names and copyrights, issued and reissued patents and pending applications for any of the foregoing.

"**Interim Balance Sheet**" has the meaning set forth in **Section 3.05**.

"**Interim Balance Sheet Date**" has the meaning set forth in **Section 3.05**.

"**Interim Financial Statements**" has the meaning set forth in **Section 3.05**.

"**Inventory**" has the meaning set forth in **Section 1.01**.

"**Key Employees**" means those employees of Seller identified by Buyer in writing to Seller as "Key Employees" not less than five (5) days prior to Closing.

"**Knowledge of Seller or Seller's Knowledge**" or any other similar knowledge qualification, means the actual or constructive knowledge of any director or officer of Seller, after due inquiry *provided, however*, that for purposes of this definition, the Seller's chief restructuring officer shall not be deemed to be an officer.

"**Law**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"**Leased Real Property**" has the meaning set forth in **Section 3.10(a)**.

"**Leases**" has the meaning set forth in **Section 3.10(a)**.

"**Liabilities**" means liabilities, obligations or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise.

"**Losses**" means losses, damages, Liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers.

"**Material Adverse Effect**" means any event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (a) the business, results of operations, condition (financial or other) or assets of the Business, (b) the value of the Purchased Assets, or (c) the ability of Seller to consummate the Contemplated Transactions on a timely basis; *provided, however,* that the following shall not constitute a Material Adverse Effect and shall not be taken into account in determining whether or not there has been or could reasonably be expected to occur a Material Adverse Effect: (i) changes in Law, (ii) any changes in accounting regulations or changes in accounting policies or practices that Seller is required to adopt, (iii) changes in general economic or political conditions, (iv) changes in the industries in which Seller operates, (v) any outbreak or escalation of

hostilities or war (whether declared or undeclared) or any act of terrorism, or (vi) the taking of any action contemplated or required by this Agreement; *provided further, however,* that any event, occurrence, fact, condition or change referred to in clauses (i) through (v) immediately above shall be taken into account in determining whether a Material Adverse Effect has occurred or could reasonably be expected to occur to the extent that such event, occurrence, fact, condition or change has a disproportionate effect on Seller or the Business compared to other participants in the industries in which the Business operates

"**Multiemployer Plan**" has the meaning set forth in **Section 3.18(b)**.

"**Permits**" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from Governmental Authorities, including Environmental Permits.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Petition**" has the meaning set forth in the Recitals.

"**Post-Closing Adjustment**" has the meaning set forth in **Section 1.05(b)**.

"**Post-Closing Cash Consideration**" has the meaning set forth in **Section 1.05(b).**

"**Post-Closing Adjustment Statement**" has the meaning set forth in **Section 1.06(b)(i).**

"**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date.

"**Purchase Price**" has the meaning set forth in **Section 1.05**.

"**Purchased Assets**" has the meaning set forth in **Section 1.01**.

"**Qualified Benefit Plan**" has the meaning set forth in **Section 3.18(b)**.

"**Qualifying Alternative Bid**" has the meaning given in the Sale Procedures Order.

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Sale Motion**" has the meaning set forth in **Section 5.10.**

"**Sale Procedures Order**" means the order of the Bankruptcy Court in form acceptable to Buyer.

"**Sale Order**" means an order (or orders) of the Bankruptcy Court, which has been entered on the Bankruptcy Court docket, in form and substance reasonably acceptable to the Buyer, approving this

7

Agreement, the Transaction Documents, and all terms and conditions thereof, and approving and authorizing Seller to consummate the Contemplated Transactions.

"**Seller**" has the meaning set forth in the preamble.

"**Seller Closing Certificate**" has the meaning set forth in **Section 6.02(m)**.

"**Subsidiaries**" shall mean any corporation, partnership, trust, limited liability company or other non-corporate business enterprise in which Seller (or another Subsidiary) holds stock or other ownership interests representing (a) more than 50% of the voting power of all outstanding stock or ownership interests of such entity or (b) the right to receive more than 50% of the net assets of such entity available for distribution to the holders of outstanding stock or ownership interests upon a liquidation or dissolution of such entity.

"**Tangible Personal Property**" has the meaning set forth in **Section 1.01**.

"**Target Working Capital**" means $1,247,763.

"**Taxes**" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, documentary, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"**Tax Return**" means any return, declaration, report, claim for refund, information return or statement or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Third Party Claim**" means any Action made or brought by any Person who is not a party to this Agreement or an Affiliate of a party to this Agreement or a Representative of the foregoing.

"**Transaction Documents**" means this Agreement, the documents described in **Section 3.02(a)(i)**, the Employment Agreements, and the other agreements, instruments and documents required to be delivered at the Closing.

"**Union**" has the meaning set forth in **Section 3.19(b)**.

"**Working Capital Adjustment Amount**" means the amount equal to (i) the Closing Working Capital minus (ii) the Target Working Capital. The Working Capital Adjustment Amount may be a positive or negative number.

Exhibit B – Proposed Form of Sale Procedures Order

UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

| | |
|---|---|
| In re | ) |
| | ) Case No. 14-30037-rld11 |
| Altrec, Inc., a Delaware corporation, | ) |
| | ) Chapter 11 |
| Debtor. | ) |
| | ) ORDER APPROVING (I) FORM OF |
| | ) PURCHASE AGREEMENT, |
| | ) INCLUDING EXPENSE |
| | ) REIMBURSEMENT, (II) SALE |
| | ) PROCEDURES, (III) ASSUMPTION |
| | ) AND ASSIGNMENT PROCEDURES, |
| | ) (IV) NOTICE PROCEDURES, AND (V) |
| | ) OTHER RELIEF |
| | ) |

This matter came before the Court on January __, 2014, upon the motion [ECF Doc #__]

(sometimes referred to herein as the "Sale Motion") filed by Altrec, Inc. (the "Debtor"), as

debtor in possession, requesting, among other things, entry of this order (the "Sale Procedures

Order" or this "Order").

This Court having considered the motion and the exhibits attached thereto; an interim

hearing on the motion having been held before the Court to consider entry of this Sale

Procedures Order, appearances being noted on the record; all objections to this Order being

resolved, overruled, or withdrawn; and after due deliberation and consideration and sufficient cause appear therefor,

IT IS HEREBY FOUND AND CONCLUDED that:

A.     This Court has jurisdiction over this matter pursuant to 28 USC §§ 157 and 1334 and LR 2100.1.  Consideration of the motion constitutes a core proceeding within the meaning of 28 USC § 157(b)(2).  Venue is proper under 28 USC § 1408.

B.     Due, sufficient, and adequate notice of the relief requested in the motion and granted herein has been given to parties in interest.

C.     In the motion and supporting papers, the Debtor has established good and sufficient reasons for (i) approving the form of the Purchase Agreement, (ii) approving and authorizing payment of an expense reimbursement (the "Expense Reimbursement") payable to Great Outdoors Holdco, LLC ("Purchaser") pursuant and subject to the terms of the Purchase Agreement, (iii) approving the Sale Procedures, (iv) approving the Assumption and Assignment Procedures, (v) fixing notice procedures and approving forms of notice, and (vi) granting the other relief provided for herein.  The Debtor has engaged in arms'-length negotiations with Purchaser concerning the terms of the Purchase Agreement.  The proposed Sale Procedures, Assumption and Assignment Procedures, notice procedures and other relief granted in this Order are reasonable under the circumstances and in the best interests of the Debtor, its creditors and other parties in interest.

D.     The Sale Procedures are reasonably calculated to produce an arms'-length bidding process for obtaining the highest and best bid available from a good faith purchaser.  Any Successful Bidder (as defined below) that complies in good faith with the Sale Procedures shall be deemed by the Court at the Sale Hearing (as defined below) to be a good faith purchaser

within the meaning of section 363(m) of the Bankruptcy Code and entitled to all of the

protections thereof.

      E.     If Purchaser becomes entitled to the Expense Reimbursement pursuant to the

Purchase Agreement, payment of the Expense Reimbursement (i) shall constitute an actual and

necessary cost and expense of preserving the Debtor's estate, within the meaning of section

503(b) of the Bankruptcy Code, (ii) shall be of substantial benefit to the Debtor's estate, (iii) is

reasonable and appropriate considering, among other things, the size and nature of the proposed

sale, the efforts that have been and will be expended by Purchaser notwithstanding that the

proposed sale is subject to higher or better offers for the assets to be sold pursuant to the

Purchase Agreement (the "Assets"), and the prevailing custom and practice applicable to non-

bankruptcy sale transactions of similar type and size, and (iv) is necessary to ensure that

Purchaser will continue to pursue its proposed acquisition of the Assets.  Absent further order of

this Court, no Qualified Bidder (as defined below) other than the Purchaser shall be entitled to

Expense Reimbursement or any similar payment.

      F.     The bid procedures and overbid protections afforded to Purchaser under the

Purchase Agreement and Sale Procedures are reasonable and appropriate and represent the best

method for maximizing the return for the Assets.

      G.     The Assumption and Assignment Procedures, including procedures for addressing

objections to assumption and assignment and proposed cure amounts, are reasonable and

appropriate.

      H.     This Order constitutes a final order within the meaning of 28 USC § 158(a).

      Based upon the foregoing findings and conclusions, and upon the record made before this

Court at the interim hearing on the motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.    The form of the Purchase Agreement attached as <u>Exhibit A</u> is approved and shall be provided to all Qualified Alternative Bidders (as defined in the Sale Procedures).

2.    The Sale Procedures attached hereto as <u>Exhibit B</u> are hereby approved and shall govern all bids and sale procedures relating to the sale contemplated by the motion (the "Sale").

3.    The Assumption and Assignment Procedures attached hereto as <u>Exhibit C</u> are hereby approved and shall govern the assumption and assignment of executory contracts and unexpired leases in connection with the Sale pursuant to section 365 of the Bankruptcy Code.

4.    Unless the Debtor notifies this Court before 5:00 p.m. (Pacific time) on [date], 2014, that it wishes to terminate the Sale, the Court shall conduct a final hearing on the motion (the "Sale Hearing") to consider, among other things, approval of the Sale.  The Sale Hearing will be held on February __, 2014, at _____ .m. Pacific Standard Time in Courtroom #3 of the United States Bankruptcy Court, 1001 SW 5th Avenue, 7th Floor, Portland, Oregon.

5.    The notice of the Sale Hearing (the "Sale Notice"), substantially in the form attached hereto as <u>Exhibit D</u>, is hereby approved as reasonably calculated to provide creditors and other parties in interest with proper notice of the Sale and Sale Procedures.

6.    The notice of the Assumption and Assignment Procedures, substantially in the form attached hereto as <u>Exhibit E</u> (the "Assumption and Assignment Notice"), is hereby approved as reasonably calculated to provide all counterparties to the Debtor's executory contracts and unexpired leases that may be assigned to Purchaser (or other successful bidder at an auction) with proper notice of the assumption and assignment of their respective executory contracts or unexpired leases, the amount, timing and nature of any cure relating thereto, and the conditions for provision of adequate assurance of future performance.

7.      The notices described in paragraphs 5 and 6 above shall be good and sufficient, and no other or further notices shall be required, if given as follows:

(a)      The Debtor files with the Court and serves through the Court's ECF system copies of the Sale Motion, the Sale Notice and the Assumption and Assignment Notice on all parties appearing electronically in these cases, including without limitation, the United States Trustee;

(b)      The Debtor serves, within three business days after entry of this Order (the "Mailing Deadline"), by first-class mail, postage prepaid, or other method reasonably calculated to provide notice, copies of the Sale Notice on (i) all parties known to the Debtor who previously expressed an interest in purchasing the Debtor's assets, and (ii) each person identified on the master mailing list kept in this case, including without limitation all known creditors, all shareholders and all persons requesting special notice under Bankruptcy Rule 2002(i); provided, however, that the Debtor shall not be required to separately mail copies of the Sale Notice to any party that receives electronic notice through the Court's ECF system;

(c)      The Debtor serves on or before the Mailing Deadline, by first-class mail, postage prepaid, or other method reasonably calculated to provide notice, copies of the Sale Motion, the Sale Notice and this Order on the Debtor's secured creditors whose interests will be affected by the relief requested in the Sale Motion; provided, however, that the Debtor shall not be required to separately mail copies of the foregoing to any party that receives electronic notice through the Court's ECF system.

(d)      The Debtor serves, on or before February ___, 2014, by first-class mail, postage prepaid, or other method reasonably calculated to provide notice, copies of the Sale Motion (exclusive of the exhibits thereto) and the Assumption and Assignment Notice, properly

completed, on all non-Debtor parties to the Debtor's executory contracts and unexpired leases that Purchaser may designate for assumption and assignment in connection with the Sale; provided, however, that the Debtor shall not be required to separately mail copies of the foregoing to any party that receives electronic notice through the Court's ECF system.

(e)    Except as otherwise ordered by this Court, within three days after the identification by the Debtor of a successful bidder other than Purchaser (the "Successful Bidder"), the Debtor files with the Court and serves by first-class mail, postage prepaid, or other method reasonably calculated to provide notice, an amended Assumption and Assignment Notice (identifying the Successful Bidder) on the non-Debtor parties to the Debtor's executory contracts and unexpired leases to be assumed and assigned to the Successful Bidder in connection with the Sale; provided, however, that the Debtor shall not be required to separately mail copies of the foregoing to any party that receives electronic notice through the Court's ECF system.

8.    The failure of any objecting person or entity to timely file a written objection to the Sale Motion shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Sale Motion, to the consummation and performance of the Sale, or to the assumption and assignment of any executory contract or unexpired lease upon the terms and conditions set forth in the Assumption and Assignment Notice.

9.    The Expense Reimbursement is approved.  Subject to this Court's review and approval, Purchaser shall be entitled to payment of the Expense Reimbursement in the event it is not declared the Successful Bidder under the Sale Procedures, regardless of whether the party declared the Successful Bidder closes on the Sale.  The Expense Reimbursement shall include all expenses reasonably incurred by Purchaser related to the contemplated sale transaction from December 1, 2013, and continuing through Purchaser's participation, if any, in the Sale Hearing;

provided, however, that in no event shall the total amount of the Expense Reimbursement exceed $250,000. Purchaser and its counsel shall not be required to submit a fee application of the type submitted by professionals employed by the Debtor prior to payment of the Expense Reimbursement.

10.     The Debtor is authorized to take all actions necessary to effectuate the relief granted by this Order.

11.     This Order shall be effective and enforceable immediately upon entry. Time is of the essence in obtaining the highest and best value for the Debtor's assets.

12.     The provisions of this Order are non-severable and mutually dependent.

13.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

# # #

I certify that I have complied with the requirements of LBR 9021-1(a)(2)(A).

Presented by:

_____/s/  David A. Foraker_____.
David A. Foraker, OSB #812280
Greene & Markley, P.C.
1515 SW Fifth Avenue, Suite 600
Portland, OR  97201
Telephone:  (503) 295-2668
Facsimile:   (503) 224-8434
E-mail: david.foraker@greenemarkley.com
Attorneys for Debtor

cc:     List of Interested Parties

\7576\P Sale Procedures Order (Blackline-u).doc

**EXHIBIT A**

**FORM OF PURCHASE AGREEMENT**

## EXHIBIT B

## SALE PROCEDURES

1.    <u>Alternative Bids</u>.  The Debtor will consider bids (each, an "Alternative Bid") submitted by interested parties, subject to the qualifications and procedures below. The Debtor may amend or alter these procedures if it deems such amendments or modifications to be in the best interests of the Debtor's estate, <u>provided</u> that the Debtor shall provide notice of such modifications to any parties who express continuing interest in purchasing the assets of the Debtor following receipt of the Sale Notice.

2.    <u>Alternative Bid Deadline</u>.  All Alternative Bids must be received not later than 11:00 a.m. (PDT) on February 6, 2014 (the "Alternative Bid Deadline") by counsel for the Debtor:

David A. Foraker
Greene & Markley, P.C.
1515 SW 5th Avenue, Suite 600
Portland, OR 97201

The Debtor's counsel shall immediately distribute a copy of each such Alternative Bid received to counsel for Purchaser.

3.    <u>Qualified Alternative Bid</u>. The Debtor will consider an Alternative Bid only if the Alternative Bid is a "Qualified Alternative Bid." To be a Qualified Alternative Bid, the Alternative Bid must:

(a)    identify the proponent of the Alternative Bid and an officer or employee who is authorized to appear, act on behalf of and bind the bidder;

(b)    contain a signed definitive agreement of purchase and sale (together with a copy of the signed agreement that is marked to show changes from the Purchase Agreement) with, at a minimum, the following requirements: (i) substantially identical terms and conditions

as the Purchase Agreement except with higher or better consideration; and (ii) terms and conditions no less favorable to the bankruptcy estate than the terms and conditions in the Purchase Agreement (provided that no Qualified Alternative Bid shall provide for the payment to such bidder of any breakup fee, topping fee, expense reimbursement, or other similar arrangement);

(c)     agree that the Purchase Price pursuant to Section 1.05 of the purchase price shall be at least $3,625,000 (i.e., $375,000 more than the Purchase Price contained in Section 1.05 of the Purchase Agreement executed by Purchaser), and that the purchase price shall be paid in cash;

(d)     be accompanied by a deposit in the form of cash, cashier's check or letter of credit issued by a federal or state chartered domestic bank in the amount of $500,000, refundable in the event the bidder is not the Successful Bidder at the Auction (as defined below);

(e)     be accompanied by financial information for the bidder sufficient to enable the Debtor to determine the bidder's creditworthiness and ability to close a sale of the Acquired Assets, including information sufficient to demonstrate the bidder's ability to provide adequate assurance of future performance of obligations under any executory contracts or leases to be assumed and assigned to the bidder;

(f)     not be conditional on the outcome of any unperformed due diligence by the bidder, the receipt of equity or debt financing, or the approval of the bidder's board of directors, shareholder, or other corporate approval; and

(g)     by its terms, remain open and irrevocable through the conclusion of the Sale Hearing, unless extended by agreement of the parties.

4.    <u>Auction, Bidding Increments, and Bids Remaining Open</u>.  If the Debtor receives a Qualified Alternative Bid, the Debtor shall conduct an auction (the "Auction") at the offices of Greene & Markley, P.C., on the business day immediately prior to the Sale Hearing, beginning at 9:00 am (Pacific time) or such later time and/or other place as the Debtor shall notify all bidders who have submitted Qualified Alternative Bids (such persons together with the Purchaser are referred to as "Qualified Bidders").  The following procedures will apply:

(a)    Only representatives and professional advisors of the Debtor, Qualified Bidders, secured creditors, any official committee of unsecured creditors and other persons authorized by the Court shall be entitled to attend the Auction, and only Qualified Bidders shall be entitled to participate and make any additional bids ("Subsequent Bids") at the Auction.

(b)    All Qualified Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each bidder shall be fully disclosed to all other bidders and that all material terms of each bid will be fully disclosed to all other bidders throughout the entire Auction.

(c)    At least two days prior to the Auction, the Debtor will give Qualified Bidders a copy of the highest and best Qualified Alternative Bid received and copies of all other Qualified Alternative Bids. In addition, the Debtor will inform each Qualified Bidder who has expressed its intent to participate in the Auction of the identity of all Qualified Bidders that may participate in the Auction.

(d)    Prior to the start of the Auction, the Debtor may announce at the Auction additional procedural rules for conducting the Auction that the Debtor determines to be reasonable under the circumstances (e.g., the amount of time allotted to make subsequent alternative bids), so long as such rules are not inconsistent with these Sale Procedures.

(e)    At the Auction, bidding shall begin with the highest Qualified Alternative Bid and continue in minimum increments of at least $100,000 higher than the previous highest bid.

(f)    The Auction shall continue in one or more rounds of bidding and shall conclude after each participating bidder has had the opportunity to submit an additional Subsequent Bid with full knowledge and written confirmation of the then-existing highest bid, signed by the Debtor's counsel and identifying the party making the then-highest bid.

(g)    For the purpose of evaluating the value of the consideration provided by each Subsequent Bid (including any Subsequent Bid by Purchaser), the value shall be the net consideration payable to the Debtor after giving effect to the Expense Reimbursement that may be payable to Purchaser under the Purchase Agreement.

(h)    At the conclusion of the bidding, the Debtor shall announce the winning bidder (the "Successful Bidder").

(i)    The Debtor, in consultation with its professionals, shall determine in its sole discretion whether an Alternative Bid meets the qualifications for a Qualified Alternative Bid described herein and in the order approving these procedures and whether a Qualified Alternative Bid or Subsequent Bid constitutes the highest and/or best offer for the Assets.

(j)    The highest and/or best offer as determined by the Debtor shall be submitted to the Bankruptcy Court for approval at the Sale Hearing. Purchaser shall be deemed a party-in-interest with standing to appear and be heard in connection with any motions, hearings, or other proceedings relating to the sale, including the Purchase Agreement and any Qualified Alternative Bid or Subsequent Bid.

(k)     If the Debtor does not receive any Qualified Alternative Bids, no Auction will be held,

Purchaser will be declared the Successful Bidder, and the Debtor will report to the Bankruptcy

Court and present the Sale Order for entry by the Court at the Sale Hearing, approving the sale of

the Assets to Purchaser in accordance with the terms of the Purchase Agreement. No potential

purchaser of any of the Debtor's assets will be entitled to object to entry of the Sale Order at the

Sale Hearing unless the potential purchaser timely submitted a Qualified Alternative Bid.

# EXHIBIT C

## ASSUMPTION AND ASSIGNMENT PROCEDURES

1.      Pursuant to the Purchase Agreement, Purchaser will, on or before the Alternative Bid Deadline, submit to the Debtor the list of the executory contracts and leases that Purchaser proposes that the Debtor assume and assign to it; and each bidder submitting an Alternative Bid shall submit with its Alternative Bid on or before the Alternative Bid Deadline, the list of the executory contracts and leases that it proposes that the Debtor assume and assign to it (collectively, the "Executory Contract Designation Deadline"). The Debtor shall maintain a schedule (the "Schedule") of executory contracts (the "Assumed Contracts") and unexpired leases (the "Assumed Leases") that Purchaser or a Successful Bidder (if applicable) designates for assumption and assignment.

2.      For each Assumed Contract and Assumed Lease, the date on which Purchaser (or a Successful Bidder, if applicable) seeks to have the assumption and assignment become effective shall be the closing date pursuant to the terms of the Purchase Agreement (the "Proposed Assumption Effective Date").

3.      On or before _____, 2014, the Debtor shall provide notice (the "Assumption and Assignment Notice") to each non-debtor counterparty to an Assumed Lease or Assumed Contract that Purchaser may designate for assumption and assignment, substantially in the form attached hereto as Exhibit E, that (i) identifies the proposed amount to be paid to such counterparty to cure all defaults under such agreement that are required to be cured pursuant to section 365 of the Bankruptcy Code as a prerequisite to assumption (together with the timing of such payments, if any), and (ii) describes the procedures for objecting to the proposed assumption and assignment of the agreement.

4.      Objections, if any, to the proposed assumption and assignment of any Assumed Contract or Assumed Lease to Purchaser must be made in writing and filed with the Court no later than [date], 2014 (the "Purchaser Contract Objection Deadline").

5.      Any counterparty to an executory contract or unexpired lease that does not file and serve an objection to assignment (a "Contract Objection") before the Purchaser Contract Objection Deadline will be deemed to have consented to the assumption and assignment of its Assumed Contract or Assumed Lease to Purchaser and the cure of existing defaults and shall be forever barred from objecting to the cure and from asserting any additional cure or other amounts against the Debtor or Purchaser. In that event, the Debtor and Purchaser may provide in the Sale Order for the assumption and assignment of the applicable Assumed Contract or Assumed Lease to Purchaser, and for payment of the cure amount, if any, specified in the Assumption and Assignment Notice, all without further notice to that counterparty.

6.      If Qualified Alternative Bids are received by the Debtor, and Purchaser is not the Successful Bidder at the Auction, the Debtor shall provide an amended Assumption and Assignment Notice to each non-Debtor counterparty to an Assumed Contract or Assumed Lease designated by the Successful Bidder for assumption and assignment, identifying the Successful Bidder, and providing information to the non-debtor counterparties regarding the ability of the Successful Bidder to provide adequate assurance of future performance as required by 11 U.S.C. § 365. Objections, if any, to the proposed assumption and assignment of any Assumed Contract or Assumed Lease to a Successful Bidder (other than Purchaser) must be made in writing and filed with the Court on a date to be fixed by the Court at the Sale Hearing.

7.      If a timely Contract Objection is filed solely as to the proposed cure (a "Cure Objection"), and Purchaser is the purchaser, the Cure Amount shall be determined by the Court

at the Sale Hearing, unless otherwise agreed by the Debtor and Purchaser. If a timely Cure

Objection is filed and Purchaser is not the purchaser, then the agreement may nevertheless be

assumed and assigned to the Successful Bidder on the Proposed Assumption Effective Date, and

the Successful Bidder shall pay the undisputed portion of the cure on or as soon as reasonably

practicable after the Proposed Assumption Effective Date, and the disputed portion of the cure

shall be determined as follows and paid as soon as reasonably practicable following resolution of

such disputed cure. To resolve the Cure Objection, the Debtor, the Successful Bidder, and the

objecting party may confer in good faith to attempt to resolve any such objection without Court

intervention. If the Debtor determines that the Cure Objection cannot be resolved without

judicial intervention, then the cure will be determined as follows: (i) with respect to Assumed

Contracts and Assumed Leases pursuant to which the counterparty has agreed to an alternative

dispute resolution procedure, then, according to such procedure; and (ii) with respect to all other

executory contracts and unexpired leases, by the Court at the discretion of the Debtor either at

the Sale Hearing or such other date as determined by the Court.

      8.     If a timely Contract Objection is filed that objects to the assumption and

assignment on a basis other than the proposed cure, the Debtor, the Successful Bidder, and the

objecting counterparty shall confer in good faith to attempt to resolve any such objection without

Court intervention. If the Debtor determines that the objection cannot be resolved without

judicial intervention, then, if Purchaser is the purchaser, the objection shall be resolved by the

Court at the Sale Hearing unless otherwise agreed by the Debtor and Purchaser. If the Successful

Bidder is not Purchaser, at the discretion of the Debtor and the Successful Bidder, the objection

shall be determined by the Court at the Sale Hearing or such other date as determined by the

Court. If the Court determines at such hearing that the executory contract or unexpired lease

should not be assumed and assigned, then such agreement shall no longer be considered an Assumed Contract or Assumed Lease.

9.      Each Assumed Contract and Assumed Lease will be assumed and assigned to Purchaser or the Successful Bidder (as applicable) on the date (the "Assumption Effective Date") that is the later of (i) the Proposed Assumption Effective Date, and (ii) the Assumption Resolution Date (as defined below). The "Assumption Resolution Date" shall be, (i) if no Contract Objection has been filed on or prior to the Contract Objection Deadline, the business day after the Contract Objection Deadline, or (ii) if a Contract Objection has been filed on or prior to the Contract Objection Deadline, the date of the Assumption Resolution Stipulation or the date of a Court order authorizing the assumption and assignment to Purchaser or the Successful Bidder (as applicable) of the Assumed Contract or Assumed Lease.

# EXHIBIT D

## FORM OF SALE NOTICE

UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

In re                               )

                                  )  Case No. 14-30037-rld11

Altrec, Inc., a Delaware corporation,    )

                                  )  Chapter 11

              Debtor.            )

                                  )  NOTICE OF DEBTOR'S INTENT TO

                                  )  SELL SUBSTANTIALLY ALL OF ITS

                                  )  ASSETS FREE AND CLEAR OF LIENS

                                  )  AND OTHER INTERESTS

                                  )

Altrec, Inc. (the "Debtor"), as debtor in possession, has filed a Motion for Orders (1) Authorizing and Scheduling an Auction for the Sale of Substantially All Assets of the Debtor Free and Clear of Liens and Other Interests, (2) Approving Sale Procedures, (3) Approving Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases, (4) Directing Appointment of Consumer Privacy Ombudsman, (5) Approving Purchase Agreement or Subsequent Overbid, (6) Scheduling a Hearing to Consider Approval of the Sale, and (7) Establishing the Form and Manner of Notices Relating Thereto [ECF Doc #__] (the "Sale Motion"). Under the Sale Motion, the Debtor seeks, among other relief, authority to sell substantially all of its assets, free and clear of liens and other interests, to Great Outdoors Holdco, LLC (the "Purchaser") pursuant to (i) that certain Asset Purchase Agreement dated January 13, 2014, by and between the Debtor and Purchaser (the "Purchase Agreement") or (ii) a higher and better offer received at an auction scheduled for February _, 2014, beginning at 9:00 am (Pacific time).

        1.      <u>LBR 2002-1(b)(2) Disclosures</u>. Below is a summary of the basic terms of the proposed sale and other important information:

             (a)      Purchaser is the only other party to the proposed transaction at this time. Purchaser has no relationship to the Debtor other than as the proposed buyer under the Purchase Agreement and as the Debtor's postpetition lender under a DIP loan facility for up to $1 million (the "DIP Facility").

             (b)      The assets to be sold (the "Assets") are essentially all of the Debtor's assets other than (i) all claims of the Debtor and its bankruptcy estate under Chapter 5 of the Bankruptcy Code and (ii) all amounts that may be due to the Debtor as a result of the Payment Card Interchange Fee and Merchant Discount Antitrust Litigation. Under the Purchase Agreement, the purchase price for the Assets (the "Purchase Price") is (i) $3,250,000, subject to adjustment, and (ii) the assumption of certain liabilities, which are limited largely to (A) obligations (other than cure costs) under executory contracts and unexpired leases assigned to the Purchaser that are required to be performed after the closing of the sale transaction and (B) certain limited obligations for returns and exchanges by customers that relate to the operation of the Debtor's business before the closing of the sale transaction. The Purchase Price will be reduced at the closing on a dollar for dollar basis by the amount of all advances made by Purchaser to the Debtor under the DIP Facility.

(c)     The Assets are encumbered by security interests that secure claims in amounts that exceed $7 million.  As a condition to the sale, $250,000 of the Purchase Price will be set aside for the benefit of the Debtor's estate.  All proceeds from the sale of the Assets other than the $250,000 set aside will be paid to the Debtor's prepetition secured creditors according to the priority of their security interests in the Assets.

(d)     The Debtor will consider competing bids submitted by interested parties in accordance with the Sale Procedures set forth in the Court's Order Approving (I) Form of Purchase Agreement, Including Expense Reimbursement, (II) Sale Procedures, (III) Assumption and Assignment Procedures, (IV) Notice Procedures, and (V) Other Relief entered on January __, 2014 [ECF Doc #__] (the "Sale Procedures Order").  Under the Sale Procedures Order, among other things, an alternative bid must be received not later than 11:00 am (Pacific time) on February 6, 2014, and must exceed Purchaser's proposal by at least $375,000 and otherwise contain terms and conditions no less favorable to the Debtor's bankruptcy estate.

(e)     No independent appraisal of the value of the Assets has been obtained by the Debtor.  At November 30, 2013, the Debtor's books and records reflected assets (excluding deferred tax assets) totaling approximately $5.7 million.  According to the Debtor's CRO, the liquidation value of the Assets is estimated not to exceed $1.2 million.

(f)     The proposed sale is in the best interest of the estate because (i) the sale will result in greater overall recoveries for creditors than would a piecemeal liquidation, and (ii) the sale will preserve the Debtor's business as a going concern for the benefit of employees, vendors and others.  The Debtor is proposing the sale outside of a Chapter 11 plan because it presently lacks the working capital and financing needed to sustain the operation of its business beyond March 7, 2014, when the DIP Facility will mature.  In addition, the Purchaser has indicated that it is wishes to proceed quickly with the sale or not at all.

2.     **Notice of the Sale Hearing.  A final hearing on the Sale Motion will be held on February __, 2014, at __:__ .m. Pacific Standard Time in Courtroom #3 of the United States Bankruptcy Court, 1001 SW 5th Avenue, 7th Floor, Portland, Oregon.  At the hearing, the Court will, among other things, consider approval of the proposed sale to the Purchaser or, if an auction under the Sale Procedures Order is conducted, to the successful bidder at the auction.**

3.     Objections to the Sale Motion.  Any party in interest wishing to object to any aspect of the Sale Motion must both (i) file, on or before February __, 2014, a written response stating the specific grounds for the objection and such party's relation to this case with the clerk of the United States Bankruptcy Court, 1001 SW 5th Avenue, 7th Floor, Portland, Oregon 97204, and (ii) attend the final hearing on the Sale Motion.  **Any party that does not timely file an objection shall be deemed to consent to the Sale Motion and all relief requested therein, and the failure to timely file an objection shall be a bar to the assertion, at the final hearing or thereafter, of any objection to the Sale Motion or to the transactions described therein or contemplated thereby.**

4.      Further Information.  For further information about the Sale Motion, contact David A. Foraker or Corri Larsen at Greene & Markley, P.C., 1515 SW Fifth Avenue, Suite 600, Portland, OR 97201.  Mr. Foraker's email address is david.foraker@greenemarkley.com; Ms. Larsen's email address is corri.larsen@greenemarkley.com.  Copies of the Sale Motion and the Sale Procedures Order will be made available upon request.

Dated:  January 13, 2014.

Greene & Markley, P.C.


By ____/s/ David A. Foraker_____
    David A. Foraker, OSB #812280
    Attorneys for Debtor

\7576\P Notice of Intent to Sell.doc

**EXHIBIT E**

**FORM OF ASSUMPTION AND ASSIGNMENT NOTICE**

UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

|  |  |
|---|---|
| In re | ) |
|  | ) Case No. 14-30037-rld11 |
| Altrec, Inc., a Delaware corporation, | ) |
|  | ) Chapter 11 |
| Debtor. | ) |
|  | ) NOTICE OF DEBTOR'S ASSUMPTION |
|  | ) AND ASSIGNMENT OF EXECUTORY |
|  | ) CONTRACTS AND UNEXPIRED |
|  | ) LEASES |
|  | ) |

To: [Name of Counterparty to Contract(s) or Lease(s)]

Altrec, Inc. (the "Debtor"), as debtor in possession, has filed a Motion for Orders (1) Authorizing and Scheduling an Auction for the Sale of Substantially All Assets of the Debtor Free and Clear of Liens and Other Interests, (2) Approving Sale Procedures, (3) Approving Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases, (4) Directing Appointment of Consumer Privacy Ombudsman, (5) Approving Purchase Agreement or Subsequent Overbid, (6) Scheduling a Hearing to Consider Approval of the Sale, and (7) Establishing the Form and Manner of Notices Relating Thereto [ECF Doc #__] (the "Sale Motion"). Under the Sale Motion, the Debtor seeks, among other relief, (a) authority to sell substantially all of its assets, free and clear of liens and other interests, to Great Outdoors Holdco, LLC (the "Purchaser") pursuant to (i) that certain Asset Purchase Agreement dated January 13, 2014, by and between the Debtor and Purchaser (the "Purchase Agreement") or (ii) a higher and better offer received at an auction scheduled for February __, 2014, beginning at 9:00 am (Pacific time) (the "Auction"), and (b) authority to assume and assign to Purchaser or, if an Auction is conducted and Purchaser is not the successful bidder at the Auction, to the successful bidder at the Auction (the "Successful Bidder"), the Debtor's rights and interests in and under certain executory contracts (each an "Assumed Contract") and unexpired leases (each an "Assumed Lease").

1.    Purpose of this Notice. This notice, together with a service copy of the Sale Motion (exclusive of exhibits), is being sent to you because you are a counterparty to one or more of the Assumed Contracts and/or Assumed Leases listed in the Schedule of Assumed Contracts and Assumed Leases attached hereto as Exhibit A (the "Schedule"). **Please review the attached Schedule carefully to locate your name(s) and the corresponding contract(s) and/or lease(s) to which you are a party. The non-Debtor counterparties to the Assumed Contracts and Assumed Leases are listed on the Schedule alphabetically. The Schedule also includes for each Assumed Contract and Assumed Lease the amount, if any, that the Debtor proposes to pay to the non-Debtor counterparty in connection with the closing of the contemplated sale transaction to cure all defaults, if any, under that Assumed Contract or Assumed Lease (the "Proposed Cure Amount").**

2.      <u>Assumption and Assignment Procedures</u>.  On January _, 2014, pursuant to the Sale Motion, the Court entered an Order Approving (I) Form of Purchase Agreement, Including Expense Reimbursement, (II) Sale Procedures, (III) Assumption and Assignment Procedures, (IV) Notice Procedures, and (V) Other Relief [ECF Doc #__] (the "Sale Procedures Order").  Under the Sale Procedures Order, among other things, the Court approved the Assumption and Assignment Procedures that are attached hereto as <u>Exhibit B</u>.

3.      <u>The Sale Order</u>.  In the Sale Motion, the Debtor seeks entry of a proposed form of order approving the contemplated sale transaction, including approval of the assumption and assignment of the Assumed Contracts and Assumed Leases (the "Sale Order").  An excerpt of the Sale Order which includes the provisions applicable to the assumption and assignment of the Assumed Contracts and Assumed Leases is attached hereto as <u>Exhibit C</u>.

4.      **<u>Notice of the Sale Hearing</u>.  A final hearing on the Sale Motion will be held on February _, 2014, at _:_.m. Pacific Standard Time in Courtroom #3 of the United States Bankruptcy Court, 1001 SW 5th Avenue, 7th Floor, Portland, Oregon.  At the hearing, the Court will, among other things, consider approval of (i) the proposed sale to the Purchaser or any Successful Bidder, (ii) the assumption and assignment to Purchaser or any Successful Bidder of the Assumed Contracts and Assumed Leases, (iii) the Proposed Cure Amounts, and (iv) the form of Sale Order.**

5.      <u>Objections to the Sale Motion, Assumption or Assignment, or Proposed Cure Amounts</u>.  If you wish to object to any aspect of the Sale Motion or to the assumption or assignment of any Assumed Contract or Assumed Lease or to any Proposed Cure Amount, you must both (i) file, on or before February __, 2014, a written response stating the specific grounds for the objection and your relation to this case with the clerk of the United States Bankruptcy Court, 1001 SW 5th Avenue, 7th Floor, Portland, Oregon 97204, and (ii) attend the final hearing on the Sale Motion.  **Unless you timely file an objection you will be deemed to have consented to the Sale Motion and all relief requested therein and to the assumption and assignment of each Assumed Contract and Assumed Lease and to each applicable Proposed Cure Amount and will be forever barred from objecting to the sale or to such assumption and assignment and from seeking any additional cure or other amounts against the Debtor or its estate or against Purchaser or any Successful Bidder, as the case may be.**

5.      <u>Further Information</u>.  For further information, contact David A. Foraker or Corri Larsen at Greene & Markley, P.C., 1515 SW Fifth Avenue, Suite 600, Portland, OR 97201.  Mr. Foraker's email address is <u>david.foraker@greenemarkley.com</u>; Ms. Larsen's email address is <u>corri.larsen@greenemarkley.com</u>.

Dated:  January 13, 2014.

Greene & Markley, P.C.

By ____/s/ David A. Foraker_____
    David A. Foraker, OSB #812280
    Attorneys for Debtor

\7576\P Notice – Assumption and Assignment.doc

**Page 2 of 2 -**  NOTICE OF DEBTOR'S ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Exhibit A - Schedule of Assumed Contracts and Assumed Leases

| Non-Debtor Party to Agreement | Description of Agreement | Proposed Cure Amount |
|---|---|---|
| | | |

<u>Exhibit B - Assignment and Assumption Procedures</u>

Exhibit C – Excerpt of Proposed Sale Order

24.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and

conditioned upon Closing, the assumption and assignment to Purchaser of the Assumed

Contracts and Assumed Leases identified on Exhibit B to this Order is hereby approved, and the

requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are hereby

deemed satisfied.

25.     The Debtor is hereby authorized in accordance with sections 105(a) and 365 of

the Bankruptcy Code to (a) assume and assign to Purchaser, effective at Closing, the Assumed

Contracts and Assumed Leases free and clear of all Liens, Claims, Encumbrances and Interests,

and (b) execute and deliver to Purchaser such documents or other instruments as may be

necessary to assign and transfer the Assumed Contracts and Assumed Leases to Purchaser.

26.     Each Assumed Contract and Assumed Lease is an executory contract or

unexpired lease under section 365 of the Bankruptcy Code.  The Debtor may assume each

Assumed Contract and Assumed Lease in accordance with section 365 of the Bankruptcy Code.

The Debtor may assign each Assumed Contract and Assumed Lease in accordance with sections

363 and 365 of the Bankruptcy Code, and any provisions in any Assumed Contract or Assumed

Lease that prohibits or conditions the assignment of such Assumed Contract or Assumed Lease

or that would terminate, recapture, impose any penalty, condition renewal or extension, or

modify any term or condition upon the assignment of such Assumed Contract or Assumed Lease

constitute unenforceable anti-assignment provisions, which are void and of no force and effect.

All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for

the assumption by the Debtor and assignment to Purchaser of each Assumed Contract and

Assumed Lease have been satisfied.  At such times as provided in the Purchase Agreement, in

accordance with sections 363 and 365 of the Bankruptcy Code, Purchaser shall be fully and irrevocably vested in all right, title, and interest of the Debtor in and to each Assumed Contract and Assumed Lease.

27.     All defaults or other obligations of the Debtor under the Assumed Contracts and Assumed Leases arising or accruing prior to the date of this Order (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured or deemed cured by the Debtor at Closing or as soon thereafter as practicable, and Purchaser shall have no liability for any obligation arising or accruing prior to the Closing Date, except as otherwise expressly provided in the Purchase Agreement.

28.     Each non-Debtor party to an Assumed Contract or Assumed Lease is forever barred, estopped, and permanently enjoined from (a) asserting against the Debtor or Purchaser, or the property of either of them, any default existing as of the date of Closing Date, (b) asserting against Purchaser any counterclaim, defense, setoff or any other claim asserted or assertable against the Debtor, or (c) imposing or charging against Purchaser any rent accelerations, assignment fees, increases, or any other fees as a result of the Debtor's assumption and assignment to Purchaser of the Assumed Contracts and Assumed Leases.  The validity of such assumption and assignment to Purchaser of each Assumed Contract and Assumed Lease shall not be affected by any dispute between the Debtor and any other party to an Assumed Contract or Assumed Lease.  The failure of the Debtor or Purchaser to enforce at any time one or more terms or conditions of any Assumed Contract or Assumed Lease shall not be a waiver of such terms or conditions, or of the Debtor's or Purchaser's rights to enforce every term and condition of the Assumed Contracts and Assumed Leases.

\7576\O Exhibit C Excerpt of Proposed Sale Order

Exhibit C – Proposed Form of Sale Order

UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

| | |
|---|---|
| In re: | ) Case No. 14-30037-rld11 |
| | ) |
| Altrec, Inc., a Delaware corporation, | ) Chapter 11 |
| | ) |
| | ) ORDER APPROVING (I) PURCHASE |
| Debtor. | ) AGREEMENT WITH PURCHASER, (II) |
| | ) SALE OF SUBSTANTIALLY ALL THE |
| | ) DEBTOR'S ASSETS FREE AND CLEAR OF |
| | ) ALL LIENS CLAIMS, ENCUMBRANCES |
| | ) AND INTERESTS, AND (III) ASSUMPTION |
| | ) AND ASSIGNMENT OF CERTAIN |
| | ) EXECUTORY CONTRACTS AND |
| | ) UNEXPIRED LEASES |
| | ) |
| | ) |
| | ) |
| | ) |

This matter came before the Court on _____ __, 2014, upon the motion [ECF Doc #__]

(the "Sale Motion") of Altrec, Inc., (the "Debtor"), as debtor in possession, requesting, among

other things, entry of this order (the "Sale Order" or this "Order") approving (i) the proposed

sale (the "Sale") of all or substantially all of the Debtor's assets (collectively, the "Assets") and

(ii) the assumption and assignment of certain of the Debtor's executory contracts and

unexpired leases in connection with the Sale.

On January ___, 2014, pursuant to the Sale Motion, the Court entered an Order
Approving (I) Form of Purchase Agreement, Including Expense Reimbursement, (II) Sale
Procedures, (III) Assumption and Assignment Procedures, (IV) Notice Procedures, and (V)
Other Relief [ECF Doc #___] (the "Sale Procedures Order"). [On _____, 2014, in accordance
with the terms of the Sale Procedures Order, the Debtor conducted an auction for the Assets
(the "Auction"), at which _____(the "Purchaser") was the Successful Bidder (as
defined in the Sale Procedures Order).] [No Qualified Alternative Bid (as defined in the Sale
Procedures Order) was received by the Debtor on or before the Alternative Bid Deadline as
defined in and as fixed in the Sale Procedures Order.]

The Court having considered the Sale Motion; a final hearing on the Sale Motion
having been held before the Court to consider entry of this Order, appearances being noted on
the record; all objections to this Sale Order being resolved, overruled or withdrawn; and after
due deliberation and consideration and sufficient cause appearing therefor,

IT IS HEREBY FOUND AND CONCLUDED that:

A.     On January 6, 2014, the Debtor filed herein a voluntary petition under Chapter
11 of the Bankruptcy Code.

B.     This Court has jurisdiction over this matter pursuant to 28 USC §§ 157 and 1334
and LR 2100.1. Consideration of this matter constitutes a core proceeding within the meaning
of 28 USC § 157(b)(2). Venue is proper under 28 USC § 1408.

C.     The statutory predicates for the relief sought in the Sale Motion are sections
105(a), 363 and 365 of the Bankruptcy Code. The Sale Motion is also governed by Bankruptcy
Rules 2002, 6004, 6006 and 9007 and LBR 2002-1.

D.     Findings of fact shall be construed as conclusions of law and conclusions of
law shall be construed as findings of fact when appropriate.

E.     Good and sufficient notice of the Sale Motion and the relief sought therein has
been given and no other or further notice is required. A reasonable opportunity to bid, to object
and to be heard regarding the relief requested in the Sale Motion has been afforded to all

ORDER APPROVING (I) PURCHASE AGREEMENT WITH PURCHASER, (II) SALE OF
SUBSTANTIALLY ALL THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS CLAIMS,
ENCUMBRANCES AND INTERESTS, AND (III) ASSUMPTION AND ASSIGNMENT OF
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES

creditors, equity security holders and other parties in interest, including, without limitation:  (i) the United States Trustee; (ii) those parties which have expressed an interest in bidding on the Assets; (iii) creditors asserting liens or other interests in any of the Assets; (iv) those persons who have requested special notice under Bankruptcy Rule 2002(i); (vi) parties to executory contracts and unexpired leases; (vii) the Purchaser; and (viiii) all persons on the master mailing matrix.

F.     On or about January __, 2014, the Debtor and Great Outdoors Holdco, LLC (the "Purchaser") entered into that certain Asset Purchase Agreement dated such date pursuant to which Purchaser agreed to purchase the Assets on the terms and subject to the conditions set forth therein.  The Asset Purchase Agreement, as amended to date, is attached hereto as Exhibit A and referred to herein as the "Purchase Agreement".

G.     On _____, __, 2014, the Court entered the Sale Procedures Order.

H.     As evidenced by the certificates of service filed with this Court as ECF Doc #__ (the "Certificates of Service"), and based on representations of counsel at the final hearing on the Sale Motion (the "Sale Hearing"), due, proper, timely, adequate and sufficient notice of the Sale Motion, the Sale Hearing and the Sale and the transactions contemplated thereby has been provided in accordance with the Sale Procedures Order and in compliance with sections 102(1), 363(b) and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014 and any other applicable requirements.  Such notice was good, sufficient and appropriate under the circumstances and no other or further notice of the Sale Motion and the transactions contemplated thereby (including, without limitation, the assumption and assignments of the executory contracts and unexpired leases) is or shall be required.

I.     All objections to the Sale Motion were resolved, withdrawn or overruled at the Sale Hearing.

J.     The Debtor may sell the Assets free and clear of all Liens, Claims, Encumbrances and Interests (as defined below) because (i) applicable nonbankruptcy law permits sale of the Assets free and clear thereof, (ii) each entity with a security interest in any

Assets to be transferred in connection with the Sale has consented to the Sale or is deemed to have consented to the Sale or could be compelled in a legal or equitable proceeding to accept money satisfaction of such Interest, and/or (iii) the Interest of such entity is in bona fide dispute; therefore, in each case, one or more of the standards set forth in section 363(f) of the Bankruptcy Code has been satisfied. Those holders of Liens, Claims, Encumbrances and Interests that have been properly noticed and that did not object to the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

K.      Good and sufficient reasons for approval of the Purchase Agreement and the Sale have been articulated. The relief requested in the Sale Motion is in the best interests of the Debtor, its creditors and other parties in interest.

L.      The Debtor has demonstrated both (i) good, sufficient and sound business purpose and justification and (ii) compelling circumstances for the Sale other than in the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code, in that, among other things, the immediate consummation of the Sale to Purchaser is necessary and appropriate to maximize the value of the Assets; the Debtor lacks sufficient working capital and financing availability to continue the operation of its business beyond March 7, 2014; the Sale will provide the means for the Debtor to maximize distributions to creditors; and absent consummation of the Sale, the Debtor may be forced to conduct a piecemeal liquidation of the Assets, which is likely to yield substantially less proceeds available to distribute to creditors than the Sale.

M.      Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby with respect to the transactions contemplated by the Purchase Agreement. In the absence of a stay pending appeal, if the closing under the Purchase Agreement (the "Closing") occurs at any time after entry of this Order, then, with respect to the Purchase Agreement, Purchaser, as a purchaser in good faith of the Assets, shall be entitled to the protections of section 363(m) of the Bankruptcy Code if this Order or any authorization contained herein is reversed or modified on appeal.

N.      The Debtor has the power and authority to execute the Purchase Agreement, and all other documents contemplated thereby, and to consummate the transactions contemplated by the Purchase Agreement. No consents or approvals other than the authorization and approval of this Court are required for the Debtor to consummate the Sale.

O.      The Purchase Agreement constitutes the highest and best offer for the Assets and will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative. The Debtor's determination that the Purchase Agreement constitutes the highest and best offer for the Assets constitutes a valid and sound exercise of Debtor's business judgment. Purchaser timely submitted a complete bid that was in compliance with the Sale Procedures Order and it was determined by the Debtor that the Purchaser was a Qualified Bidder (as defined by the Sale Procedures) and that the Purchaser was eligible to participate in the Auction. At the conclusion of the Auction, the Debtor determined in accordance with the Sale Procedures that the Purchaser's bid was the highest and best bid.

P.      The Purchase Agreement was negotiated, proposed and entered into by Debtor and Purchaser without collusion, in good faith and from arms'-length bargaining positions. The Debtor has followed in good faith the procedures for notice and sale of the Assets as set forth in the Sale Procedures Order.

Q.      The Purchaser is not an "insider" or "affiliate" of the Debtor (as each such term is defined in the Bankruptcy Code). Neither the Debtor nor the Purchaser have engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the application of section 363(n) of the Bankruptcy Code to the Sale and the transactions contemplated by the Purchase Agreement. Specifically, the Purchaser has not acted in a collusive manner with any person and the aggregate price paid by Purchaser for the Assets was not controlled by any agreement among the bidders. Purchaser is entitled to the protections afforded under section 363(m) of the Bankruptcy Code because the Purchaser is a good faith purchaser in that, *inter alia*: (a) Purchaser recognized that Debtor was free to deal with any other party interested in acquiring the Assets; (b) Purchaser complied with the provisions in the

Page 5 of 17   ORDER APPROVING (I) PURCHASE AGREEMENT WITH PURCHASER, (II) SALE OF SUBSTANTIALLY ALL THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS CLAIMS, ENCUMBRANCES AND INTERESTS, AND (III) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Sale Procedures Order; (c) Purchaser agreed to subject its bid to the competitive bidding procedures set forth in the Sale Procedures Order; (d) all payments to be made by Purchaser in connection with the Sale have been disclosed; (e) no common identity of directors or controlling stockholders exists between Purchaser and the Debtor; and (f) the negotiation and execution of the Purchase Agreement was at arms' length and in good faith.

     R.     Purchaser submitted the highest and best qualified bid at the Auction. Purchaser's bid included a credit for the amount of its secured administrative expense claim under the Debtor's DIP loan facility.

     S.     Purchaser has provided Debtor with a deposit having a value of $_____ and Purchaser has adequately demonstrated its unconditional financial wherewithal to pay the purchase price and to consummate the Sale. The consideration to be provided by Purchaser pursuant to the Purchase Agreement: (a) is fair and reasonable; (b) is the highest and best offer for the Assets provided in accordance with the Sale Procedures Order; and (c) constitutes reasonably equivalent value and fair consideration (as those terms are defined in each of the Uniform Fraudulent Act, Uniform Fraudulent Conveyance Act and the Bankruptcy Code) under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia. Approval of the Purchase Agreement and the Sale of the Assets in accordance with this Order and the Purchase Agreement are in the best interests of the Debtor, its creditors and other parties in interest.

     T.     The Purchase Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession or the District of Columbia. Neither Debtor nor Purchaser is entering into the transactions contemplated by the Purchase Agreement fraudulently for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims.

     U.     The transfer of the Assets to Purchaser will not subject Purchaser to any Liens, Claims, Encumbrances or Interests whatsoever with respect to the operation of the Debtor's

businesses prior to the date on which the Closing occurs (the "Closing Date").

  V. Purchaser would not have entered into the Purchase Agreement and would not consummate the transactions contemplated thereby if the Sale of the Assets to the Purchaser were not free and clear of all Liens, Claims, Encumbrances and Interests and including, without limitation, any and all successor liability.

  W. Subject to the qualifications set forth in the Purchase Agreement, the Debtor has good, valid and marketable title to all of the Assets. All of the Assets are, or will on the Closing Date, be owned by the Debtor and will be transferred under the Purchase Agreement.

  X. The transfer of the Assets to Purchaser pursuant to the Purchase Agreement will be a legal, valid and effective transfer of the Assets, and vests or will vest Purchaser with all right, title and interest of Debtor to the Assets free and clear of Liens, Claims, Encumbrances and Interests.

  Y. The Debtor has demonstrated that it is an exercise of its sound business judgment to assume and assign the executory contracts and unexpired leases identified on the attached <u>Exhibit B</u> ("Assumed Contracts" and "Assumed Leases," respectively) to Purchaser in connection with the consummation of the Sale, and the assumption and assignment of the Assumed Contracts and Assumed Leases is in the best interests of the Debtor, its creditors, and other parties in interest. The Assumed Contracts and Assumed Leases being assigned to, and the liabilities being assumed by, Purchaser are an integral part of the assets being purchased by Purchaser and, accordingly, the assumption and assignment of each Assumed Contract and Assumed Lease is reasonable and enhances the value provided to the creditors of the Debtor's estate. The Debtor has (i) cured, or has provided adequate assurance of cure of, any default existing prior to the date hereof under any of the Assumed Contracts and the Assumed Leases, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code, and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assumed Contracts and Assumed Leases, within the meaning of section 365(b)(1)(B) of the Bankruptcy

 ORDER APPROVING (I) PURCHASE AGREEMENT WITH PURCHASER, (II) SALE OF SUBSTANTIALLY ALL THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS CLAIMS, ENCUMBRANCES AND INTERESTS, AND (III) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Code. Purchaser has provided adequate assurance of the future performance of and under the Assumed Contracts and Assumed Leases, within the meaning of section 365(b)(1)(C) of the Bankruptcy Code.

Z.     [Among the Assets are customer lists, which may include personally identifiable information (the "Possible PII") under section 101(41A) of the Bankruptcy Code. Under the Court's order entered on _____, 2014 [ECF Doc #__], [name] was appointed as the consumer privacy ombudsman (the "CPO") pursuant to section 332 of the Bankruptcy Code. On _____, 2014, the CPO filed a report [ECF Doc #__] (the "CPO Report"). The CPO Report concludes, and the Court finds, that (i) the Sale is in compliance with section 363(b)(1)(A), and (ii) giving due consideration to the facts, circumstances, and conditions of such Sale, no showing was made that such Sale would violate applicable nonbankruptcy law in compliance with section 363(b)(1)(B) of the Bankruptcy Code.]

Based upon the foregoing findings and conclusions, and upon the record made at the Final Hearing, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.     Any objections to the entry of the Sale Order or the relief granted herein and requested in the Sale Motion that have not been withdrawn, waived, resolved or settled, and all reservations of rights included therein, are denied and overruled on the merits with prejudice.

2.     The terms and conditions of the Purchase Agreement are hereby approved in all respects. Pursuant to the provisions of sections 105, 363 and 365 of the Bankruptcy Code, the Debtor is hereby authorized to sell the Assets and to assume and assign the Assumed Contracts and the Assumed Leases to Purchaser.

3.     Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Assets shall be transferred to Purchaser, and the Assumed Contracts and the Assumed Leases shall be assigned to Purchaser, in accordance with the Purchase Agreement, and such transfer and assignment shall constitute a legal, valid, binding, and effective transfer of such Assets and

shall vest Purchaser with title to the Assets and rights in and to the Assumed Contracts and

the Assumed Leases, in each case, free and clear of all liens (as defined in section 101(37)

of the Bankruptcy Code), claims (as defined in section 101(5) of the Bankruptcy Code), and

interests, including claims of equity security holders (as defined in Section 101(17) of the

Bankruptcy Code), security interests, demands, guaranties, options, rights, contractual

commitments, pledges, restrictions (including, without limitation, any restriction on the use,

transfer, receipt of income or other exercise of any attributes of ownership of the Assets and

all debts arising in any way in connection with any acts of the Debtor), encumbrances,

personal injury and other tort claims, defects, hypothecations, charges, loan agreements,

instruments, leases, licenses, conditional sale or other title retention agreements, options,

contracts, offsets, recoupment, rights of recovery, judgments, orders, and decrees of any

court or governmental entity, successor, transferee, products liability, environmental, tax and

other liabilities, obligations and claims of any kind or nature, including claims arising under

the Employee Retirement Income Security Act of 1974, the Fair Labor Standard Act, Title

VII of the Civil Rights Act of 1964, the Age Discrimination and Employment Act of 1967,

the Federal Rehabilitation Act of 1973, the National Labor Relations Act, the Consolidated

Omnibus Budget Reconciliation Act of 1985 or the Worker Adjustment and Retraining

Notification Act, section 2101 of the Bankruptcy Code, *et seq.*, or other applicable law,

whether arising prior to or subsequent to the commencement of this Chapter 11 case,

whether arising in connection with the transactions authorized by this Sale Order, and

whether imposed by agreement, understanding, law, equity or otherwise, whether secured or

unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or

unnoticed, recorded or unrecorded, contingent or non-contingent, liquidated or unliquidated,

matured or unmatured, disputed or undisputed, or known or unknown (the foregoing

collectively referred to herein as "Liens, Claims, Encumbrances and Interests" herein).

    4.     As set forth in the Purchase Agreement, the transfer of the Assets shall not

subject the Purchaser to any liability with respect to any obligations incurred in connection

with or in any way related to the Assets prior to the Closing Date or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable subordination or successor or transferee liability. Except as set forth herein, the sole and exclusive right and remedy available to any person who asserts any Lien, Claim, Encumbrance and Interest in any way related to the Assets, and incurred or otherwise arising prior to the Closing Date or by reason of the Sale shall be a right to assert such Lien, Claim, Encumbrance and Interest against the Debtor's estate.

5. The Debtor is authorized to execute and deliver, and is empowered to fully perform under, consummate and implement, the Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement, and to take all further action as may be reasonably requested by Purchaser for the purpose of assigning, transferring, granting, conveying and conferring to Purchaser, or reducing to Purchaser's possession, any or all of the Assets, or as otherwise may be necessary or appropriate to the performance of the obligations as contemplated by the Purchase Agreement.

6. Except as expressly permitted or otherwise specifically provided for in the Purchase Agreement or in this Order, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Assets shall be transferred to Purchaser and, as of the Closing Date, shall be free and clear of all Liens, Claims, Encumbrances and Interests. Subject only to the Carve-Out (as defined below), all such Liens, Claims, Encumbrances and Interests shall attach to the proceeds of the Sale under the Purchase Agreement (the "Sale Proceeds") to the same extent, priority and validity as they attached to the Assets, in each case subject to any rights, claims and defenses the Debtor may possess with respect thereto. Anything herein to the contrary notwithstanding, at the Closing, $250,000 of the Sale Proceeds (the "Carve-Out") shall be set aside and reserved exclusively for the benefit of the estate free and clear

of all Liens, Claims, Encumbrances and Interests. For the avoidance of doubt, no Lien, Claim, Encumbrance or Interest shall attach to the Carve-Out.

7. Purchaser shall not be deemed, as a result of any action taken in connection with the Purchase Agreement, to: (a) be the successor of Debtor; (b) have, de facto or otherwise, merged with or into Debtor; (c) be a mere continuation or substantial continuation of Debtor or the enterprise of Debtor; or (d) be responsible for any liability of Debtor or for payment of any benefit accruing to Debtor.

8. On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Assets or a bill of sale transferring good and marketable title in the Assets to Purchaser. Each and every federal, state and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement.

9. This Order is and shall be effective as a determination that all liens shall be, and are, without further action by any person or entity, released with respect to the Assets as of the Closing Date.

10. The consideration provided by Purchaser for the Assets under the Purchase Agreement is fair and reasonable and may not be avoided under section 363(n) of the Bankruptcy Code.

11. The transactions contemplated by the Purchase Agreement are undertaken by Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale to Purchaser. Purchaser is a good faith purchaser of the Assets, and is entitled to all of the benefits and protections afforded by section 363(m) of the Bankruptcy Code.

12. This Court retains jurisdiction to enforce and implement the terms and provisions of the Purchase Agreement, all amendments thereto, any waivers and consents

thereunder and of each of the agreements executed in connection therewith in all respects, including, without limitation, retaining jurisdiction to (a) compel delivery of the Assets to Purchaser, (b) resolve any disputes arising under or related to the Agreement, and (c) interpret, implement and enforce the provisions of this Order. As of the Closing Date, all agreements and orders of this Court entered prior to the date hereof shall be deemed amended or modified solely to the extent required to permit the consummation of the transactions contemplated by this Order and the Purchase Agreement. To the extent that this Order is inconsistent with any prior order or pleading with respect to the Sale Motion, the terms of this Order shall govern.

13.     On or before the Closing Date, each of Debtor's creditors is authorized and directed to execute such documents and take all other actions as may be necessary, or reasonably requested by Debtor, to release its Liens, Claims, Encumbrances and Interests in the Assets, if any, as such Lien, Claim, Encumbrance and Interest may have been recorded or otherwise exist.

14.     If any person or entity that has filed financing statements or other documents evidencing Interests with respect to the Assets shall not have delivered to Debtor and Purchaser prior to the Closing Date in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Liens, Claims, Encumbrances and Interests that the person or entity has with respect to Debtor and/or Assets or otherwise, then (a) Debtor is hereby authorized as part of the closing of the Sale to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to such assets and contracts, and (b) Purchaser is hereby authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Liens, Claims, Encumbrances and Interests in the Assets as of the Closing Date of any kind or nature whatsoever.

15.    The terms and provisions of the Purchase Agreement and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtor, its estate, its successors and assigns, Purchaser and its respective affiliates, successors and assigns, and any affected third parties, notwithstanding any subsequent appointment of any trustee under any chapter of the Bankruptcy Code, as to which trustee such terms and provisions likewise shall be binding.  Nothing contained (i) in any plan of reorganization (or liquidation) confirmed in the Debtor's Chapter 11 case, (ii) the order of confirmation confirming any plan of reorganization (or liquidation), (iii) any order dismissing the Chapter 11 case or converting it to a Chapter 7 case, or (iv) any order appointing an examiner or trustee in the Chapter 11 case shall conflict with or derogate from the provisions of the Purchase Agreement or the terms of this Order and no such plan or order shall discharge the obligations of the Debtor under this Order or the Purchase Agreement or any documents or agreements delivered in connection therewith.

16.    After the Closing Date, no person or entity, including, without limitation, any federal, state or local taxing authority, may attach or perfect a lien or security interest against any of the Assets on account of, or collect or attempt to collect from Purchaser or any of its affiliates, any tax (or other amount alleged to be owing by Debtor) (i) for any period commencing before and concluding prior to or after the Closing Date or (ii) assessed prior to and payable after the Closing Date, except as otherwise specifically provided in the Purchase Agreement.

17.    All entities that are presently, or on the Closing Date may be, in possession of some or all of the Purchased Assets are hereby directed to surrender possession of the Assets to Purchaser at the Closing, and Purchaser hereby is authorized to retrieve and take possession of all Assets in the possession of any third parties, including but not limited to any lessor or licensor.

18.    Following the Closing of the Sale, no holder of any Lien, Claim, Encumbrance, or Interest shall interfere with Purchaser's title to, or use and enjoyment of,

the Assets based on, or related to, any Interest, or based on any actions the Debtor may take in bankruptcy.

19.     All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtor to transfer the Assets to Purchaser in accordance with the Purchase Agreement and this Sale Order.

20.     As and to the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Assets sold, transferred, or conveyed to Purchaser on account of the filing or pendency of this Chapter 11 case or the consummation of the Sale contemplated by the Purchase Agreement.

21.     No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the transfer of the Assets to Purchaser.

22.     The Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties hereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtor's estate.

23.     The Purchaser shall have no obligation to proceed with the Closing until all conditions precedent in the Purchase Agreement to its obligation to do so have been met, satisfied, or waived in accordance with the terms of the Purchase Agreement.  The failure specifically to include any particular provisions of the Purchase Agreement in the Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Purchase Agreement be authorized and approved in its entirety.  Likewise, all of the provisions of the Sale Order are nonseverable and mutually dependent.  In the event of any direct conflict between the terms of the Purchase Agreement and this Order, this Order shall be controlling.

24.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon Closing, the assumption and assignment to Purchaser of the Assumed Contracts and Assumed Leases identified on Exhibit B to this Order is hereby approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

25.     The Debtor is hereby authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code to (a) assume and assign to Purchaser, effective at Closing, the Assumed Contracts and Assumed Leases free and clear of all Liens, Claims, Encumbrances and Interests, and (b) execute and deliver to Purchaser such documents or other instruments as may be necessary to assign and transfer the Assumed Contracts and Assumed Leases to Purchaser.

26.     Each Assumed Contract and Assumed Lease is an executory contract or unexpired lease under section 365 of the Bankruptcy Code. The Debtor may assume each Assumed Contract and Assumed Lease in accordance with section 365 of the Bankruptcy Code. The Debtor may assign each Assumed Contract and Assumed Lease in accordance with sections 363 and 365 of the Bankruptcy Code, and any provisions in any Assumed Contract or Assumed Lease that prohibits or conditions the assignment of such Assumed Contract or Assumed Lease or that would terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such Assumed Contract or Assumed Lease constitute unenforceable anti-assignment provisions, which are void and of no force and effect. All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtor and assignment to Purchaser of each Assumed Contract and Assumed Lease have been satisfied. At such times as provided in the Purchase Agreement, in accordance with sections 363 and 365 of the Bankruptcy Code, Purchaser shall be fully and irrevocably vested in all right, title, and interest of the Debtor in and to each Assumed Contract and Assumed Lease.

27.    All defaults or other obligations of the Debtor under the Assumed Contracts and Assumed Leases arising or accruing prior to the date of this Order (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured or deemed cured by the Debtor at Closing or as soon thereafter as practicable, and Purchaser shall have no liability for any obligation arising or accruing prior to the Closing Date, except as otherwise expressly provided in the Purchase Agreement.

28.    Each non-Debtor party to an Assumed Contract or Assumed Lease is forever barred, estopped, and permanently enjoined from (a) asserting against the Debtor or Purchaser, or the property of either of them, any default existing as of the date of Closing Date, (b) asserting against Purchaser any counterclaim, defense, setoff or any other claim asserted or assertable against the Debtor, or (c) imposing or charging against Purchaser any rent accelerations, assignment fees, increases, or any other fees as a result of the Debtor's assumption and assignment to Purchaser of the Assumed Contracts and Assumed Leases. The validity of such assumption and assignment to Purchaser of each Assumed Contract and Assumed Lease shall not be affected by any dispute between the Debtor and any other party to an Assumed Contract or Assumed Lease. The failure of the Debtor or Purchaser to enforce at any time one or more terms or conditions of any Assumed Contract or Assumed Lease shall not be a waiver of such terms or conditions, or of the Debtor's or Purchaser's rights to enforce every term and condition of the Assumed Contracts and Assumed Leases.

29.    The CPO Report is approved.

30.    Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), this Order shall be effective and enforceable immediately upon its entry. Time is of the essence in closing the transactions referenced herein and Debtor and Purchaser intend to close the Sale as soon as practicable.

31.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

# # #

I certify that I have complied with the requirements of LBR 9021-1(a)(2)(A).


Presented by:


_____/s/  David A. Foraker_____
David A. Foraker, OSB #812280
Greene & Markley, P.C.
1515 SW Fifth Avenue, Suite 600
Portland, OR  97201
Telephone:  (503) 295-2668
Facsimile:    (503) 224-8434
E-mail: david.foraker@greenemarkley.com
Attorneys for Debtor

cc:     List of Interested Parties


\7576\P Sale Order (Clean-u)

**EXHIBIT A—PURCHASE AGREEMENT**

**EXHIBIT B—ASSUMED CONTRACTS AND ASSUMED LEASES**

<u>Certificate of Service</u>

I hereby certify that, on the date set forth below, a true and correct copy of the foregoing DEBTOR'S MOTION FOR ORDERS (1) AUTHORIZING AND SCHEDULING AN AUCTION FOR THE SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS AND OTHER INTERESTS, (2) APPROVING SALE PROCEDURES, (3) APPROVING PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (4) DIRECTING APPOINTMENT OF CONSUMER PRIVACY OMBUDSMAN, (5) APPROVING PURCHASE AGREEMENT OR SUBSEQUENT OVERBID, (6) SCHEDULING A HEARING TO CONSIDER APPROVAL OF THE SALE, AND (7) ESTABLISHING THE FORM AND MANNER OF NOTICES RELATED THERETO, was served on all parties requesting notice through the bankruptcy court's ECF system by electronic notice, and on the parties listed on the attached List of Interested Parties by the methods indicated.  Unless another method of service is indicated, service was made by placing a copy thereof in a sealed, first-class, postage prepaid envelope, addressed to each party's last known address and depositing the same into the United States mail at Portland, Oregon on the date set forth below.

Dated: January 13, 2014.


/s/ David A. Foraker_____
David A. Foraker, OSB #812280
Attorney for Debtor

\7576\P COS Motion for Order Authorizing Auction & Sale etc (1).wpd

<u>List of Interested Parties</u>

(Altrec, Inc.)

<u>List of 20 Largest Unsecured Creditors (First Class Mail):</u>

Huntington Capital Fund II, L.P.
Attn: Morgan L. Miller, Jr.
Registered Agent
4660 La Jolla Village Dr., Ste. 550
San Diego, CA 92122

Dale Stockamp
17210 Wall Street
Lake Oswego, OR 97034

The Burton Corporation
Attn: Jim Bruce
80 Industrial Parkway
Burlington, VT  05401

The North Face
c/o VF Outdoor Inc
Attn: Lisa Long
2701 Harbor Bay Pkwy
Alameda, CA 94502

Arc'teryx Equipment Inc.
Attn: Rob Scott
2155 Dollarton Hwy #100
N. Vancouver, BC V7H 3B2
CANADA

Patagonia
Attn: Yvonne Besvold
259 W Santa Clara St
Ventura, CA 93001

Keen, Inc.
Attn: Greg Hoyle
515 NW 13th Ave
Portland, OR 97209

**Page 1 of 7**     List of Interested Parties (Master Service List)

Invest Northwest LP
Attn: Mike Reynoldson
3204 NW 130th St
Vancouver, WA 98686

L & C Private Equities II, LP
Attn: Mike Reynoldson
3204 NW 130th St
Vancouver, WA 98685

Timberland Company
Attn: Diane Borowski
c/o VF Corporation
105 Corporate Center Blvd
Greensboro, NC 27408

Canada Goose
Attn: Colin Renfrey
250 Bowie Ave
Toronto, Ontario M6E 4Y6
CANADA

Sorel
Attn: Jean Boudreau
c/o Columbia Sportswear
1260 NW Waterhouse Ave #3
Beaverton, OR 97006

Mountain Hardwear
Attn: Jean Boudreau
1260 NW Waterhouse Ave #3
Beaverton, OR 97006

Icebreaker Nature Clothing Corp
Attn: Kimberlee Viera
1330 NW 14th Ave
Portland, OR 97209

Columbia Sportswear
Attn: Jean Boudreau
1260 NW Waterhouse Ave #3
Beaverton, OR 97006

Smartwool
Attn: Diane Borowski
c/o VF Corporation
105 Corporate Center Blvd
Greensboro, NC 27408

Mercent Corporation
Attn: Lovisa Hill
1633 Westlake Ave N Ste 200
Seattle, WA 98109

Nisum Technologies
Attn: Imtiaz Mohammady
500 S Kraemer Blvd Ste 301
Brea, CA 92821

Google Inc
Attn: Carmencita Bonayon
Dept #33654
POB 39000
San Francisco, CA 94139

Amer Sports Winter & Outdoor Co
Salomon
Attn: Scott Chase
2030 Lincoln Ave
Ogden, UT 84401

Secured Creditors:

Fluffco Investments, LLC
Attn: Irving J. Levin
8405 SW Nimbus Ave., Ste. D
Beaverton, OR 97008

Fluffco Investments, LLC
Diana Hoff
Registered Agent
8405 SW Nimbus Ave., Ste. D
Beaverton, OR 97008

Fluffco Investments LLC
c/o Leon Simson Esq

**Page 3 of 7**    List of Interested Parties (Master Service List)

888 SW Fifth Avenue Ste 1600
Portland, OR  97204
    Attorneys for Fluffco Invesments, LLC

Huntington Capital Fund II LP
Attn: Morgan L. Miller, Jr.
Registered Agent
4660 La Jolla Village Dr., Ste 560
San Diego, CA 92122

Kenton Jernigan
25 Grove End Rd
London NW8 9BP
UNITED KINGDOM

Raymond Johnson
10820 Kulshan Rd
Woodway, WA 98020

Christopher R. Kelly
800 5th Avenue, Suite 4100
Seattle, WA 98104

Charles R. Ekberg, Esq.
Lane Powell
1420 Fifth Avenue, Suite 4200
PO Box 91302
Seattle, WA 98111-9402
    Attorneys for Christopher R. Kelly

Dale Stockamp
17210 Wall Street
Lake Oswego, OR 97034

Douglas R Pahl, Esq.
Perkins Coie
1120 NW Couch St., 10th Fl
Portland, OR 97209-4128
    Attorneys for Dale Stockamp

The Burton Corporation
POB 4449
Burlington, VT 05406

**Page 4 of 7**    List of Interested Parties (Master Service List)

The Burton Corporation
c/o Jaimesen Heins
Registered Agent
80 Industrial Parkway
Burlington, VT 05401

C. Thomas Davis, Esq.
12220 SW First Street
Beaverton, OR 97005
        Attorney for The Burton Corporation

Additional Parties (UCC-1 Filings) (First Class Mail):

De Lage Landen Financial Services, Inc.
1111 Old Eagle School Rd
Wayne, PA 19087

De Lage Landen Financial Services, Inc.
c/o The Prentice-Hall Corporation System, Inc.
Registered Agent
2711 Centerville Road, Suite 400
Wilmington, DE 19808

De Lage Landen Financial Services, Inc.
c/o The Prentice-Hall Corporation System, Inc.
Registered Agent
285 Liberty St NE
Salem, OR 97301

TCF Equipment Finance, Inc.
11100 Wayzata Blvd. Ste. 801
Minnetonka, MN 55305

TCF Equipment Finance, Inc.
c/o The Corporation Trust Company
Registered Agent
1209 Orange St
Wilmington, DE 19801

Dell Financial Services L.L.C.
Mail Stop-PS2DF-23
One Dell Way

**Page 5 of 7**    List of Interested Parties (Master Service List)

Round Rock, TX 78682

Dell Financial Services L.L.C.
c/o Corporation Service Company
Registered Agent
2711 Centerville Rd., Suite 400
Wilmington, DE 19808

Leaf Capital Funding, LLC and/or Its Assigns
2005 Market Street, 15th Floor
Philadelphia, PA 19103

Leaf Capital Funding, LLC and/or Its Assigns
c/o Registered Agent Solutions, Inc.
Registered Agent
1679 S Dupont Hwy, Suite 100
Dover, DE 19901

Royal Bank America Leasing
550 Township Line Rd. Ste 425
Blue Bell, PA 19422

Western Equipment Finance, Inc.
PO Box 640
Devils Lake, ND 58301

Western Equipment Finance, Inc.
c/o Corporation Service Company
Registered Agent
316 N 5th St
PO Box 1695
Bismarck, ND 58502-1695

Hewlett-Packard Financial Services Co.
200 Connell Dr
Berkeley Heights, NJ 07922

Hewlett-Packard Financial Services Co.
c/o The Corporation Trust Company
Registered Agent
1209 Orange St
Wilmington, DE 19801

**Page 6 of 7**     List of Interested Parties (Master Service List)

CIT Technology Financing Services, Inc.
10201 Centurion Parkway N., Ste 100
Jacksonville, FL 32256

CIT Technology Financing Services, Inc.
c/o CT Corporation System
Registered Agent
388 State St., Ste 420
Salem, OR 97301

\7576\O List of Interested Parties - Master Service List re Motion Authorizing Auction for Sale of Assets etc.wpd

**Page 7 of 7**     List of Interested Parties (Master Service List)